# BRACEWELL

June 5, 2018

**VIA ECF**

Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re: United States v. Ciminelli, S2 16 Cr. 776 (VEC)

Dear Judge Caproni:

We write in response to the government's June 1, 2018 letter, which seeks to provide "clarity regarding [its] theory of wire fraud." G. Letter at 1. As discussed below, the more the government explains its theory, the less we understand it, and the less it accords with Second Circuit precedents.

1. The government writes that "a corporate victim [here Fort Schuyler] is defrauded of its right to control its assets when an insider [here presumably Dr. Kaloyeros] with an interest in a vendor [here presumably LPCiminelli] misrepresents that relationship to induce the company into engaging in a transaction with the vendor, because the information regarding the insider's relationship is economically valuable." Id.[1] According to the government, that is because

---

[1] Here, Dr. Kaloyeros did not have an undisclosed financial interest in LPCiminelli; his interest was supposedly "personal." See G. Letter at 2 (Dr. Kaloyeros had a "personal interest in awarding contracts to particular companies").

**Paul Shechtman**
Partner

T: +1.212.508.6107   F: +1.800.404.3970
1251 Avenue of the Americas, 49th Floor, New York, New York 10020-1100
paul.shechtman@bracewell.com        bracewell.com

AUSTIN   CONNECTICUT   DALLAS   DUBAI   HOUSTON   LONDON   NEW YORK   SAN ANTONIO   SEATTLE   WASHINGTON, DC

# BRACEWELL

June 5, 2018
Page 2

"the misrepresentation deprive[s] the victim of information necessary to determine for itself whether to make an economic decision." Id. at 3.  Almost 25 years ago, the government advanced a similar argument in the Second Circuit, only to have it rejected:

> The government, on the other hand, argues that the test for materiality under the mail fraud statute is the same as the test for materiality under the securities laws: whether "the concealed information had the reasonable potential to affect an economic decision" . . . .  According to the government, it does not matter whether the towns would have suffered some economic loss if the scheme had been successful, because the loss of the "right to control" the expenditure of public funds, through the loss of the ability to make a fully informed decision, is sufficient to constitute mail fraud under §1341.  We disagree.

United States v. Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir. 1994)(emphasis added).  The Court went on to hold that, in order to convict, "the government had to establish that the [non-disclosure] caused (or was intended to cause) actual harm to the village of a pecuniary nature or that the village could have negotiated a better deal for itself if it had not been deceived."  Id.

      2.     Nowhere in its letter does the government suggest that its evidence will demonstrate that Fort Schuyler "could have negotiated a better deal for itself if it had not been deceived." (There is no inkling of such proof in the government's exhibits or the 3500 material.) That lack of evidence should doom this case.  The Second Circuit has "repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain."  United States v. Binday, 804 F.3d 558, 570 (2d Cir. 2015).  Thus, absent a showing that Fort Schuyler did not receive the full benefit of the bargain -- a quality building at a fair price -- the government cannot prevail.  See United States v. Takhalov, 827 F.3d

June 5, 2018
Page 3

1307, 1313-14 (11th Cir. 2016)(a wire fraud scheme requires the defendant to "lie about the price . . . or about the characteristics of the good").[2]

3.     In Skilling, the Court rejected the government's entreaty to "locat[e] within §1346," not just bribery or kickback cases, but "undisclosed self-dealing by a public or private employee -- i.e., the taking of official action by the employee that furthers his own undisclosed financial interest while purporting to act in the interests of those whom he owes a fiduciary duty." 561 U.S. 358, 409 (2010).  That means that a defendant, call him X, who rigs an RFP to steer business to a company in which he has an undisclosed interest cannot be prosecuted under §1346.  Having lost in Skilling, the government should not be able to "win" by arguing that X deprived the issuer of the RFP of "valuable economic information . . . that was relevant to [its] economic decision making."  G. Letter at 1.  If the scheme is consummated and the issuer suffers no economic harm, that should preclude prosecution.[3]

---

[2]     The best the government does in its letter is this:  had Fort Schuyler not been deceived, "it may well have considered whether other developers would provide higher quality services or have negotiated better deals for itself."  G. Letter at 2 (emphasis added).  "May well" is not proof; it is prosecution by speculation.  See also Tr. 5/29/18 at 15 (Mr. Podolsky: "the scheme . . . kept out competitors who might have had a better value")(emphasis added); id. at 23 (the scheme "prevented Fort Schuyler from . . . selecting a developer that might have been better suited to [its] actual needs").

[3]     Much of the confusion in this area comes from the use of the word "could" in the cases.  Mail fraud is an inchoate crime so, if the scheme is not consummated, a defendant can still be convicted.  But to support a mail fraud conviction, the proof must show that the defendant contemplated economic harm.  See United States v. Rossomando, 144 F.3d 197, 202 (2d Cir. 1998)(an unclear "'no ultimate harm' instruction [can create] a substantial risk that the jury [is] confused into believing that the government [is] not required to prove that [the defendant] intended to harm the [alleged victim]")(emphasis added).  Here, of course, the government contends that the scheme was complete.

# BRACEWELL

June 5, 2018
Page 4

The First Circuit has put it well:

> We understand that the intangible rights doctrine has become firmly entrenched in the federal courts and that old habits die hard.  But we do not think courts are free simply to recharacterize every breach of fiduciary duty as a financial harm, and thereby to let in through the back door the very prosecution theory that the Supreme Court tossed out the front.

United States v. Ochs, 842 F.2d 515, 527 (1st Cir. 1988).

    4.    The cases that the government cites are not to the contrary.  In Finazzo, for example, the defendant's deceit caused Aeropostale, his employer, to purchase products that were "inferior in quality to the other vendor's products" and more expensive.  850 F.3d 94, 114 (2d Cir. 2017).  In Binday, the defendants purchased STOLI policies from insurers deceiving them into believing that the policies were non-STOLI and thereby obtaining the policies at a lower price.  804 F.3d 558, 573 (2d Cir. 2015); see also Brief for United States in Opposition to Petition for Certiorari, 2016 WL 2766151 at *20-21 ("the insurers lost economic value as a result of petitioner's misrepresentations because the insurers were induced to sell policies . . . at a lower price than the insurers would have charged if they had chosen to sell STOLI policies").[4]  And in Viloski, defendant Viloski acted as a real estate consultant for Dick's Sporting Goods and, in some

---

[4]     Binday is akin to cases in which a borrower submits false information to a bank to obtain a loan for which he would not qualify if the bank knew the true facts.  See, e.g., United States v. Dinome, 86 F.3d 277 (2d Cir. 1996).  If the false information is material, the borrower has obtained the loan at an interest rate that is lower than the bank requires to assume the risk of non-payment.  See United States v. Rossomando, 144 F.3d 197, 201 (2d Cir. 1998)("where a defendant deliberately supplies false information to obtain a loan . . . he intend[s] to inflict a genuine harm . . . to deprive the bank of the ability to determine the actual level of credit risk and . . . whether, and at what price, to extend credit to the defendant").

# BRACEWELL

June 5, 2018
Page 5

transactions, "did no consulting work, but accepted a consulting fee" that he passed on to co-defendant Queri, an employee of Dick's. 557 F. App'x. 28, *31 (2d Cir. 2014). Fairly read, none of these cases comes close to this one. See Tr. 5/29/18 at 29 (the Court: "Finazzo is a lot easier to see it than this case . . . exactly where the economic harm was").[5]

      5.    One final point: As articulated by the government, the right-to-control theory is unconstitutionally vague. It fails to define the conduct that it prohibits. There is no claim that Fort Schuyler was disadvantaged in terms of the work that LPCiminelli performed or the monies that it paid for that work. Nor is there any claim that Mr. Ciminelli intended some economic harm to Fort Schuyler. See United States v. Novack, 443 F.3d 150, 156 (2d Cir. 2006)(the government "must, at a minimum, prove the defendant contemplated some actual harm or injury"). And so one is left with this question: could Mr. Ciminelli be convicted of wire fraud because his alleged deceit "could have caused economic harm" to Fort Schuyler when (i) it didn't and (ii) he never intended that his actions would cause Fort Schuyler to lose money?

---

[5] We are prepared to discuss the other cases that the government cites in court tomorrow.

AUSTIN   CONNECTICUT   DALLAS   DUBAI   HOUSTON   LONDON   NEW YORK   SAN ANTONIO   SEATTLE   WASHINGTON, DC

# BRACEWELL

June 5, 2018
Page 6

In sum, a theory that says Fort Schuyler was deprived of <u>potentially</u> valuable information that <u>may well have</u> impacted its spending of funds leaves a jury at sea.

> Respectfully submitted,
>
> /s/ Paul Shechtman
>
> Paul Shechtman
> Partner
>
>
> Spencer Durland
> Hodgson Russ LLP

PS/SD:wr

AUSTIN   CONNECTICUT   DALLAS   DUBAI   HOUSTON   LONDON   NEW YORK   SAN ANTONIO   SEATTLE   WASHINGTON, DC

#5720493.1