UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 16-cr-00776 (VEC) |
| v. | |
| ALAIN KALOYEROS, et al, | |
| Defendant. | |

**<u>SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT JOSEPH GERARDI</u>**

WALDEN MACHT & HARAN LLP
Milton L. Williams
Avni P. Patel
Jacob Gardener
One Battery Park Plaza, 34th Floor
New York, NY 10004
(212) 335-2030

*Counsel for Defendant Joseph Gerardi*

## Table of Contents

INTRODUCTION .................................................................................................................... 6

BACKGROUND ..................................................................................................................... 7

I.   PERSONAL BACKGROUND ................................................................. 7

II.   SERVICE TO HIS COMMUNITIES ...................................................... 12

III.   COR DEVELOPMENT AND COMMUNITY DEVELOPMENT ............. 14

IV.   IMPACT OF CONVICTION .................................................................. 17

SENTENCING ANALYSIS ................................................................................................... 19

I.   GUIDELINES CALCULATION ............................................................ 19

II.   THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) CALL FOR A BELOW-
GUIDELINES SENTENCE ................................................................. 25

1.   A Loss-Enhanced Guidelines Sentence Substantially Overstates the Seriousness of the
Offense ................................................................................................................. 26

2.   The Nature, Circumstances, and Seriousness of the Offense Warrant Leniency ............. 33

3.   Joe's History and Characteristics Counsel for Mercy ......................................... 37

4.   Incarceration is Unnecessary to Achieve Deterrence ........................................ 40

5.   The Public Does Not Need Protection from Joe .................................................. 42

6.   A Lenient Sentence is Necessary to Avoid Unwarranted Sentencing Disparities ............. 43

7.   A Non-Custodial Sentence is Available and Warranted ...................................... 47

# Table of Authorities

## Cases

*Gall v. United States,*
   552 U.S. 38 (2007) ................................................................................................ 25

*Kimbrough v. United States,*
   552 U.S. 85 (2007) ................................................................................................ 29

*Pepper v. United States,*
   562 U.S. 476 (2011) .............................................................................................. 37

*Spears v. United States,*
   555 U.S. 261(2009) ............................................................................................... 29

*United States v. Adelson,*
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) .......................................................... passim

*United States v. Algahaim,*
   842 F.3d 796 (2d Cir. 2016) ................................................................................. 28

*United States v. Andersen,*
   45 F.3d 217 (7th Cir. 1995) .................................................................................. 19

*United States v. Bannister,*
   786 F. Supp. 2d 617 (E.D.N.Y. 2011) ................................................................. 41

*United States v. Barrington,*
   648 F.3d 1178 (11th Cir. 2011) ............................................................................ 19

*United States v. Block,*
   No. 16-CR-595 (S.D.N.Y. Nov. 8, 2017) ................................................. 23, 36, 45

*United States v. Cavera,*
   550 F.3d 180 (2d Cir. 2008) ................................................................................. 25

*United States v. Cole,*
   765 F.3d 884 (8th Cir. 2014) ................................................................................ 46

*United States v. Collins,*
   No. 07-CR-1170 (S.D.N.Y. Oct. 17, 2013) .............................................. 32, 41, 45

*United States v. Colton,*
   231 F.3d 890 (4th Cir. 2000) ............................................................................... 24

*United States v. Cooper,*
   394 F.3d 172 (3d Cir. 2005) ................................................................................. 39

*United States v. Corsey,*
   723 F.3d 366 (2d Cir. 2013) ............................................................. 27, 28, 30, 34

*United States v. Coughlin,*
   2008 WL 313099 (W.D. Ark. Feb. 1, 2008) ........................................................ 48

*United States v. Crouse,*
   145 F.3d 786 (6th Cir. 1998) ............................................................................... 39

*United States v. Crummy,*
   249 F. Supp. 3d 475 (D.D.C. 2017) ..................................................................... 21

*United States v. Cuti*,
  2011 WL 3585988 (S.D.N.Y. July 29, 2011) ................................................................ 19

*United States v. Deutsch*,
  987 F.2d 878 (2d Cir. 1993) .......................................................................................... 19

*United States v. Diaz*,
  2013 WL 322243 (E.D.N.Y. Jan. 28, 2013) .................................................................. 29

*United States v. Dorvee*,
  616 F.3d 174 (2d Cir. 2010) .......................................................................................... 29

*United States v. Emmenegger*,
  329 F. Supp. 2d 416 (S.D.N.Y. 2004) ........................................................................... 27

*United States v. Faibish*,
  No. 12-CR-265 (E.D.N.Y.) ............................................................................................ 29

*United States v. Ferguson*,
  No. 3:06-CR-137 (D. Conn. Dec. 31, 2008) ................................................................. 32

*United States v. Ghavami*,
  No. 10-CR-1217 (S.D.N.Y.) ..................................................................................... 20, 44

*United States v. Graham*,
  No. 06-CR-137 (D. Conn. April 30, 2009) .............................................................. 32, 45

*United States v. Gupta*,
  904 F. Supp. 2d 349 (S.D.N.Y. 2012) ...................................................................... 26, 41

*United States v. Haddock*,
  12 F.3d 950 (10th Cir. 1993) ......................................................................................... 24

*United States v. Johnson*,
  2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ............................................................... 27

*United States v. Kuhn*,
  351 F. Supp. 2d 696 (E.D. Mich. 2005) ........................................................................ 39

*United States v. Lumiere*,
  No. 16-CR-483 (S.D.N.Y. Jun. 14, 2017) ............................................................... 33, 46

*United States v. Milton*,
  No. 3:06-CR-137 (D. Conn. Jan. 30, 2009) .................................................................. 32

*United States v. Nesbeth*,
  188 F. Supp. 3d 179 (E.D.N.Y. 2016) ........................................................................... 41

*United States v. Ovid*,
  2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010) ................................................................. 27

*United States v. Parris*,
  573 F. Supp. 2d 744 (E.D.N.Y. 2008) ..................................................................... 32, 33

*United States v. Ranum*,
  353 F. Supp. 2d 984 (E.D. Wis. 2005) .......................................................................... 27

*United States v. Robie*,
  166 F.3d 444 (2d Cir. 1999) .......................................................................................... 19

*United States v. Schneider*,
    930 F.2d 555 (7th Cir. 1991) ............................................................................ 23

*United States v. Smith*,
    2009 WL 249714 (N.D. Ohio Feb. 2, 2009) ..................................................... 47

*United States v. Smith*,
    951 F.2d 1164 (10th Cir. 1991).......................................................................... 22

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009).................................................................................. 41

*United States v. Treacy*,
    No. 08-CR-366 (S.D.N.Y. Sept. 2, 2009) .......................................................... 32

*United States v. Turkcan*,
    No. 08-CR-428 (E.D. Mo. June 11, 2009) .......................................................... 32

*United States v. Warner*,
    792 F.3d 847 (7th Cir. 2015) .............................................................................. 48

*United States v. Washington*,
    715 F.3d 975 (6th Cir. 2013) .............................................................................. 39

*United States v. Woods*,
    159 F.3d 1132 (8th Cir. 1998)............................................................................ 39

## Statutes and Sentencing Guideline Provisions

18 U.S.C. § 3553(a) ......................................................................................... passim

U.S.S.G. § 2A1.3 ................................................................................................. 31

U.S.S.G. § 2A2.2 ................................................................................................. 31

U.S.S.G. § 2B1.1.............................................................................................. passim

U.S.S.G. § 2K1.4 ................................................................................................. 31

## Other Authorities

A. Mitchell Polinsky and Steven Shavell, *On the Disutility and Discounting of Imprisonment and the Theory of Deterrence*, 28 J. Legal Studies 1 (1999) ............................................ 40

David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) .................................................................................... 42

Frank O. Bowman III, Sentencing High-Loss Corporate Insider Frauds After Booker, 20 Fed. Sent. R. 167 (Feb. 2008)............................................................................................ 28, 30, 32

Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1 (1988). ................................................................ 29

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1 (2006) .................. 40

## INTRODUCTION

Joseph Gerardi ("Joe") is a 59-year-old man with a wife, three children, and an extended family and community who rely on him. For the entirety of his six decades in New York, Joe has lived a life dedicated to radical generosity. There is generosity and then there is Joe. Joe learned at an early age when his alcoholic father abandoned his family, leaving Joe as the oldest child to raise five siblings and support his mother, that leading a value-driven life begins with being present.

Joe has lived a life serving his family, his community, and the County of Onondaga. To say that the people in Joe's life rely on him is an understatement. The breadth of his kindness knows no bounds. As the 63 letters of support filed in this matter suggest, Joe's generosity begins with a selflessness learned early and goes beyond the financial realm. His conviction does not reflect his character, nor does it do justice to the positive impact Joe has had on each individual he meets and the communities he serves. It is an aberration to that value-driven life.

We respectfully submit this sentencing memorandum as a truer and more complete narrative of Joe's personal history and character and the facts surrounding the offense conduct than that advanced by the government at trial, which, among other things, attempted to portray Joe as an opportunistic businessman. It is indisputable that Joe, and his partners who founded COR Development, are committed to leading a company that has the interests of community members, small business owners, and tenants as its first priority, often at the expense of any profit. For the reasons stated in this submission, we request that the Court impose a below-Guidelines sentence, one that is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.

**BACKGROUND**

I.      **PERSONAL BACKGROUND**

Joe was born on August 5, 1959 in New Hartford, New York as the oldest of six children to Joseph Gerardi and Clorinda "Joan" Gerardi.  Joe grew up very quickly in East Utica, New York, because at the age of 12, he assumed the additional, and daunting, role of "head of the household."  As Paul Stewart, Joe's friend of over 50 years, explains: "Throughout the years, Joe never complained about his added role, it was a given."  *Paul Stewart.*[1]  The circumstances that led to Joe's premature entry into adulthood were stark.  Joe very quickly faced the reality that his father was an alcoholic who would abandon his wife and six children.

As the oldest of those six children, he became the provider and began working full-time first at an ice cream store at night and thereafter, at a meat packing plant/slaughterhouse while his mother was forced to sign up for public assistance, attend community college and take a job first as an administrative assistant with the City of Utica and then delivering mail for United States Postal Service, where she worked until she retired at age 72.  As Michael Cerminaro, Joe's friend of over 50 years, explains:

> As the eldest of 6 siblings he was thrust into the role of having to help provide for his family and of serving as a positive role model for his two sisters and three brothers.  As a result, he took a full-time job at a local meat packing company, while he was still attending high school.  He worked early morning shifts (before school started) and late evening shifts (after school ended) in order to stay in school.  He took this new role of 'head of household' very seriously and it showed in the manner in which he conducted himself.

---

[1] This is one of 63 letters submitted on behalf of Joseph Gerardi.  The letters have been separately provided to the Court in an Appendix and will be referred to herein by the name of the author.

*Michael Cerminaro.*  For Joe, the responsibility of this role went well beyond providing financial support.  It meant working each day to instill the values of family, education, and morality in his five brothers and sisters.  One of Joe's brothers, Jay Gerardi, explains:

> Our dad left when I was young and even when he was around, he wasn't much of a dad.  Joe was almost more of a dad when I was young than a brother, always helping and making sure you were to stay on the straight and narrow.  He has done so many selfless things in his life for family and friends without a second thought, most of the time not even taking credit for what he had helped with.

*Jay Gerardi.*  Jay recalls that Joe always tried to ensure that his family did not feel abandoned by his father, despite his father's personal demons and shortcomings.  In 1984, Joe's father was in the hospital during the weeks leading up to the Christmas holiday.  Yet, on Christmas Day, his siblings received presents from his father.  Jay recalls: "I received a present from our dad [and] I broke down in tears and ran to my room. . . .  Our dad had been in the hospital for a few weeks and I couldn't understand how I received anything from him.  Joe told me he had been buying dad's presents for years and asked me to keep that to myself."  *Jay Gerardi.*  Joe wanted his siblings to feel remembered.

The value of selflessness and generosity of kindness extended even to the father who abandoned him.  Michael Cerminaro also recalls:

> I also remember many nights that I shared with him when he tried to nurse his father back to health following excessive rounds of alcohol abuse.  He never turned his back on anyone in his family or any of his friends and he always maintained a higher level of responsibility than me and our other friends.

*Michael Cerminaro.*  In 1984, Joe was in the hospital with his father on the day he died from liver disease.

Throughout his teenage years, Joe continued to work full-time to support his family, but also pursued his dream of higher education.  He knew that education could open doors to create a more stable life for his family and to make an impact in the community.  Joe worked his way

through Mohawk Valley Community College, which he attended at night so that he could continue to work full-time.  He then went on to receive his undergraduate degree in Business Administration from the State University of New York at Buffalo and his law degree from Syracuse University. Joe never let his additional burdens or responsibilities affect his dedication and drive.  As Patricia Galinn, Joe's cousin, reflects: "Joe knew at a young age that the key to success for himself and his family was education.  He put himself through a four year college as well as law school." *Patricia Galinn.*

Joe met his wife, Laurie, in May 1985 in a restaurant near his law school and near the VA Medical Center where she worked as a medical technologist.  Joe and Laurie struck up a conversation and left the restaurant with their first date promised, but unplanned.  At the time, Laurie's father was seriously ill and in the hospital, only to die a few days later.  When Joe called Laurie to schedule their first date, Laurie shared the devastating news that she had lost her father. A few days later, as she stood by her father's casket, Laurie looked up and saw Joe walk into the wake, making a point to be there to show his support before they had even gone out on a first date. As Laurie describes:

> It is difficult for me to explain how indicative this gesture of kindness and empathy was of Joe's capacity to always, so selflessly, put others before himself.  Joe is an amazing human being and for the last 33 years, since that day, I have not only witnessed, but have lived with, his generosity and support that knows no bounds.

*Laurie Gerardi.*  As Joe and Laurie dated, Joe went on to finish law school and began his career at a small firm in Watertown, NY.  Before long, it was clear to Laurie that she was to be a part of the stable future that Joe strived to establish for his family, and on August 20, 1988, Joe and Laurie were married.

In 1998, Joe and Laurie learned that they were to be parents.  However, that news was not all joyful.  As Laurie remembers:

9

> Joe and I received the awful news that no parent ever wants to hear, that our son
> would be born with a severe heart defect.  As I was halfway through the pregnancy,
> my utter happiness turned starkly to sadness and worry, but Joe's optimism, love
> and belief in the goodness of our lives got us, and me, through my pregnancy and
> through three horrible surgeries in the first eight months of our new baby's life.

*Laurie Gerardi.*  In an uncertain time, Joe chose to exemplify faith and hope and ensure that their

son, Joey, lived a full, thriving life.  John and Amy Doldo, friends of the Gerardis since 1986,

remember:

> The most important part of Joe's character is his devotion to his wife and children.
> When their first son was diagnosed in utero with a life threatening heart condition,
> Joe faced perhaps the greatest challenge of his life.  Knowing that his son would
> need open heart surgery shortly after birth, Joe dealt with the situation with
> tremendous strength and determination, seeing to it that little Joey received the care
> he needed to not only survive, but to thrive.

*John and Amy Doldo; see also Daniel Rodahan.*[2]  Having experienced how frightening, painful,

and uncertain such news can be for any parent, Joe wanted to ensure that no parent felt alone when

facing similar challenges.  Ellen and Patrick O'Connor, friends of Joe's for 17 years, remember:

"When Patrick and I were expecting our first child, our son was diagnosed with a potential cardiac

condition.  Having experienced that same with their first child, Joe was open and empathetic with

what we were going through.  His support helped us get through this early challenge as new

parents."  *Ellen and Patrick O'Connor.*

Joe and Laurie continued to navigate their life as new parents in Syracuse, New York.  Joey

was quickly joined by twin siblings: Jake and Julia.  Because he had already witnessed the

importance of having a father who was present, Joe took his paternal role very seriously and

---

[2] "Young Joseph, Jr., made it into this world with surgery.  Upon birth, Joe and his wife took the
newborn to Michigan for heart surgery.  He later achieved the distinguished honor as Eagle Scout
with the help of his father, who has been a scout leader for 14 years.  He is now starting his first
year at Western Michigan with an Aerospace career in mind.  At this point in his life, he will need
his father around for guidance and support."

understood the gravity that came with it.   Joe understood very clearly that it was the human relationships and the kindness he showed others that mattered.

Joe knew that the strength of "family" support goes well beyond the traditional concept of family.  The instances where Joe has embodied the values of being a good neighbor are countless, but it is the quiet grace and humility with which Joe offers his strength, generosity, and reliability to those around him that people remember.  Joe never needs, or wants, thanks, but instead finds comfort in knowing that he might have made another's life easier in a meaningful way.  Paul Stewart, a childhood friend of Joe's for over 50 years, explains:

> While my mom was in intensive care in Utica just before her passing in October of 2013, I was flying in from Wisconsin almost every weekend.  Joe was there if I needed a ride and always offered me his home if I needed a place to stay, which many people would probably do for a friend.  But Joe was not like any friend.  What I found out from my mom was that Joe would drive to Utica from his office in Syracuse to stop by her hospital room to make her laugh, as only Joe can do.  He never mentioned to me he was visiting my mom because with Joe it was a given, no need for acknowledgement.

*Paul Stewart.*

When Joe's uncle was diagnosed with pancreatic cancer, he died within three weeks.  But as his cousin reflects: "It did not matter that Joe lived an hour away.  He did not miss a day to be with my dad, console us as a family or offer to help in any way he could.  He is a loyal, compassionate and loving man." *Sandy D'Onofrio.*  A close family friend, Maria Koster, describes that Joe's reliability extends past his immediate family in a way that allows any individual who encounters Joe to feel like they have the support of a family member.  In 2013, Maria recalls that Joe was there for her when she lost her father and when her husband left her:

> The last example of Joe's character. . . . is a very personal one. . . . [Joe] mentioned that he was aware that I was going through a very difficult time in my life.  My former husband was an alcoholic and had been arrested for a DUI after crashing his vehicle.  The drinking had been going on for a while and was taking a heavy toll on me and my three children. . . .  Joe shared some very personal information with

me about his own family and growing up with an alcoholic parent. Joe looked me in the eye and told me that if I ever needed anything, to ask his family for help. I will never forget the empathy and concern Joe demonstrated that day, while I was at one of the lowest points in my life. Joe gave me courage and is a shining example of the friendship and support that helped me cope with my situation.

*Maria Koster.*

Generosity comes in all forms and Joe has never hesitated to share his good fortune with others to ensure quality of life. As Cynthia Adydan, Joe's sister-in-law, describes:

Joe is a very generous person. He has helped out many people in their time of need. Over the last two years, he has paid for his mother-in-law, my mother, to live in a quality Senior Living Facility. This has taken a great burden off of all us and allows her to live out the rest of her life in comfort. I can remember a few times when I was in between jobs and needed help, Joe would stick a few hundred dollars in my purse when I wasn't looking. He is also a prankster and would also stick broccoli or carrot sticks in my purse when I wasn't looking.

*Cynthia Adydan.* He has continued that commitment to ensure that the people around him have the stability to thrive. During a time of need, Joe purchased a home for his sister, Jill Cote, and her family. Jill reflects on the impact of Joe's act of kindness:

Because of this, it has made it possible for me to raise my children in a good neighborhood, it made it possible for them and myself to go to good schools and to become productive members of society. . . . Knowing that my boys are good decent people who were given a chance at much better life, I thank him in my prayers every day for this act of generosity that has contributed to the strength and character that me and my boys possess today, and every day, because of his selfless act.

*Jill Cote.*

## II.     SERVICE TO HIS COMMUNITIES

Joe has dedicated his life to service. Beyond his generosity to family and friends, Joe finds meaning in service to his communities and the individual growth of young men and women and they strive to become decent human beings. As Joe's Pastor at the Immaculate Conception Church states, "Community service is natural to Joe." *Pastor Thomas Ryan.*

12

For the last 14 years, Joe has volunteered his time, financial resources, and skills to the Boy Scouts of America.  Both of Joe's sons joined Cub Scouts at ages 5 and 6 and went on to join Boy Scouts and achieve their Eagle Scout honor.  Since he began his service, Joe has assisted in Cub Scout Pack 152, and for the past 8 years he has additionally served Boy Scout Troop 152 as the Charter Organization Representative and Adult Leader.  Brett Fero, who has worked alongside Joe in service since 2016, reflects: "Joe's character and integrity have served as a role model for both adult leaders and more than 30 Boy Scouts that rely on his leadership . . .  Joe lives and teaches the values of the Boy Scout Law: . . . trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brace, clean, and reverent." *Brett Fero.*  Every year, Joe spent hundreds of hours organizing camping expeditions such as high-peak adventures in the Adirondack Mountains, fundraising efforts through the Easter flower sales and holiday poinsettia wreath sales, and countless other service activities.  Matthew FitzGibbons, who has known Joe and his work with the Boy Scouts for the last 10 years, observed: "Joe was always a stellar leader—my experience is that he cared for every scout and always was careful to be sure that [they all] followed all safety rules.  In scouting activities, Joe was a leader that was very collaborative, helpful, decisive, and always centered on providing fun learning experiences for the scouts. . . .  In my time leading with Joe, he never sought the limelight." *Matthew FitzGibbons.*

Joe prided himself on serving as a leader in an organization that empowers young men to develop the skills and values that will help them live a life full of integrity and succeed—just as he had worked so hard to guide his siblings from an early age.  After Joe's conviction, he was forced to resign from his leadership positions within the organization.

Amidst the collateral consequences of the conviction, which impacted not only Joe and his family, but the hundreds of members of these organizations, Joe has exhibited unwavering reliability.  Laurie remembers:

> I will never forget the day that Joe was arrested for many reasons.  But there is one memory that reaffirms to me that the man I married values being reliable and is a person of integrity.  That evening, Joe was in charge of a Boy Scout recruiting event—a hot dog roast.  After an emotional day full of horrible events, Joe came home, brushed himself off, and still went to that recruiting event as planned and cooked hot dogs for 80-100 participants.  I feel that speaks volumes of his dedication to the cause he loves and his strength of character.  People were depending on him and instead of folding up under adversity, he did the hard thing and showed up.

*Laurie Gerardi.*

In addition to his service to the Boy Scouts of America, Joe has similarly dedicated his time and resources to organizations in his community.  These efforts include the Front Row Players, Francis House Hospice Care, CNY Food Bank, local churches, and the Salvation Army.

## III.   COR DEVELOPMENT AND COMMUNITY DEVELOPMENT

When Joe and Laurie were facing the gravity of birthing a child with a life-threatening heart condition, Joe was also shouldering the stress of founding a new company.  It was around that time that COR Development was born as well.  The name "COR," meaning heart in Latin, was partially inspired by Joe and Laurie's son who survived his heart defect against all odds.

COR Development, and its partners, are committed to building an organization that gives back to the community and benefits the Syracuse and Central New York region through job creation, commerce expansion, and creating a robust city where families can thrive.  Christopher Polimino, a business colleague for 8 years, states: "Joe is an honest hard-working businessman and through his actions and investment in the future of our town, he has created numerous opportunities and jobs for many people.  His willingness to take calculated business risks and invest in the future of our community is unparalleled by any other member of our community."

14

*Christopher Polimino.*  David Kellish, who has known Joe personally and professionally for over 15 years, adds: "He and his partners have provided some nicely developed properties which are assets to Central New York, and provide thousands of jobs."  *David Kellish*.

Among these developments is the Fayetteville Town Center, which revitalized a dilapidated town suffering from lack of commerce and jobs.  COR rebuilt the infrastructure that is now employing hundreds of people.

COR's commitment to community development and job creation is often at the expense of its profit.  Edward Kochian, who served as Onondaga County Deputy County Executive and judges the best construction project, explains:

> One of the nominated projects was Elmcrest Children's Center, a school for children who have suffered abuse and with developmental disabilities.  What I learned about the COR Development team and their principal partners was compelling and encouraging about their humanity.  One of the partners, Lou Aiello (deceased), the lead partner, raised over $1 million to build a 10,000 square foot family center/wing.  The COR partners contributed $60,000 toward the cost of construction and the building was completed at cost i.e. no profit was taken.

*Edward Kochian.*  Joe and his COR partners were more concerned about creating a safe place for children with special needs than any profit.

As COR continued to grow and expand, Joe and his partners achieved great developmental and financial success.  Yet, despite COR's community influence, Joe never stopped extending his generosity and empathy for tenants, small business owners, and doing everything in his control to help the "underdog" achieve stability.  Nader Hatem, a business owner who leases and contracts with COR Development, will never forget Joe's kindness.  He explains:

> In 2002, our landlord decided to evict the 8 restaurants in the food court with a 28-day notice.  Being married recently with 2 children, new house, and 5 great employees, our business debt was crippling.  After exhausting all options of trying to find another location that would help a struggling small business, I was introduced to Joe.  A few miles away from where I grew up, there was this dilapidated mall that Joe turned into a premier destination for our community.  I

15

would never had dreamed of being part of a location like that, because these destinations are meant for big franchises and big box stores not the little guy. I was very hesitant and nervous at the time, but even though my options were limited, Joe helped make it happen and was very supportive during the entire time. He helped expedite the process so me and my employees weren't out of work long. These types of situations rarely occur, and Joe was very important part of making us a success. Me and my employees will forever be grateful. Out business went from having 5 employees to 30 employees with expansion plans soon. Joe was a very big part of our company's success, Joe may not know the extent of his help or what he has meant to me, my family, or employees, but Joe will always have a special place in our hearts because of what he did for us.

*Nader Hatem.*

Joe has ensured that all of his colleagues and associates embody these values. Tim Winters, a Project Manager for COR Development, notes that Joe "always stressed to be honest with tenants and to give them the benefit of the doubt. As with the customers of COR Development, Joe and the partners, you really were part of the family. Joe also understood that your family always came first." *Tim Winters.* Joe took great care to get to know his employees and associates as individuals. Beyond thinking about employees' health concerns and sending employee family members special gifts, Joe understands that the job has real impact on families. Alan Costello, a colleague of Joe's, describes:

In August of 2008, less than a year after meeting and becoming friends with Joe, my wife and I lost our son, Conor, at the age of 24. I was overcome with grief, as were my wife and two daughters, ages 15 and 18. I had no option but to take care of my wife and daughters, to handle our home and financial obligations, and to operate my firm and handle my heavy caseload. At a time when I could have failed, Joe made sure that I didn't. There was no talk of COR moving its work. Rather, Joe hunkered down with me, shared my pain, provided advice and support, and helped me through the darkest time in my life. At that early stage in our friendship, there was no reason for Joe to dedicate himself the way he did. What I came to learn over time is that is who Joe is. He is a caretaker of his immediate and extended families, his co-workers and his friends. Joe is a really good man. He supported me in my efforts to save my family and that support aided my family's recovery. Joe supported me at my very lowest time without hesitation.

16

Joe's work ethic to create an organization and culture that focuses on providing security not only for his family, but also the families of employees and clients, has not changed with COR's success. Jim D'Onofrio, who has worked with Joe for 25 years, believes that Joe is fully aware of the responsibility that comes with managing a community-facing business. D'Onofrio reflects on Joe's character: "I've witnessed first-hand the respect with which Joe treats everyone, their respective positions meaningless to him as he treats everyone with the utmost kindness." *Jim D'Onofrio.*

## IV.    IMPACT OF CONVICTION

The events of the last two years have impacted not only a family, but a community. Ellen O'Connor describes, "Not only does his family rely on him, but the community that Joe and his company, COR, reach also rely on him." *Ellen O'Connor.* As described throughout this submission, Joe's dedication and hard work has empowered small business owners, and the initiatives he spearheads has helped create thousands of jobs. Due to his conviction, COR is no longer in the same position to provide a sanctuary for tenants, clients, and businesses.

Beyond COR, Joe provides not only for a family, but an "extended family." He financially supports many family members who rely on his continued employment at COR and presence in their life. This includes his mother-in-law. Joe has assumed much of the financial burden related to her care. Laurie's mother suffers from end-stage COPD and Joe has shouldered her daily expenses, subsidized her medical care, and relocated her to a retirement community so she has family nearby.

Joe still has his own mother in his life as well. The woman who raised him when he was helping to raise her five other children has been devastated by the conviction. As Laurie relays: "She is increasingly worried about her son, who alleviated her burden at an early age." *Laurie*

17

*Gerardi.*  It was Joe's mother who stayed with Joey, Jake, and Julia during the lengthy trial so that Laurie could be in the courtroom with Joe.

Central to understanding the impact that the conviction has had on Joe is understanding the impact it has had on his family and his children.  During the last two years, Joe spent an extended amount of time away from his three children at a critical point in their lives.  The highly publicized trial placed his adolescent children at the center of negative reactions from peers and individuals in the community.  All three children suffered from relentless bullying and taunting from classmates so extreme that Julia had to drop out of certain classes.  Julia developed emotional issues early in seventh grade, and Joe and Laurie have always focused on helping her stay strong and positive.  In the last year, Julia's well-being has become an increasing concern of Joe and Laurie's.[3]  Laurie notes: "Julia is very close with her father and is therefore very worried about his conviction and sentencing and is constantly praying that her father will not spend time away from us in prison.  I have doubts that she could handle that and cannot imagine having to ensure that she is stable and healthy, while raising all three kids, without Joe by my side."  *Laurie Gerardi.*

Despite his own fears, Joe's primary concern is, and always will be, the impact the conviction has had on his family.  Kristin Forte, Joe's niece, observes: "I also see first-hand the toll it has taken on his children, my aunt, and the rest of the family.  I know it has taken a huge toll on him as well, but amazingly, most of the time you would never know it because he is so focused on the needs of his family.  I know that may sound strange but that is just another example of the man my uncle is, selfless."  *Kristin Forte.*

---

[3] *See Sandy D'Onofrio* ("This has taken a toll on Joe and his family.  Teenage years are difficult enough to navigate through in ordinary times.  This situation has added an additional layer of stress and uncertain emotions for Joe's three children.").

## SENTENCING ANALYSIS

### I.    GUIDELINES CALCULATION

The PSR miscalculates the applicable Guidelines range.  Specifically, it incorrectly applies an 18-point enhancement under U.S.S.G. § 2B1.1(b)(1)(J) for the $8.4 million COR purportedly gained as a result of Joe's offense.  PSR ¶¶ 69, 79.

Gain may only be used to support an enhancement "if there is a loss but it reasonably cannot be determined."  U.S.S.G. § 2B1.1 cmt. n. 3(B).  Because the Government did not demonstrate that Fort Schuyler suffered a loss as a result of Joe's conduct, his sentence cannot be enhanced due to financial gain.  *See, e.g., United States v. Robie*, 166 F.3d 444, 455 (2d Cir. 1999) (holding that sentence may not be enhanced due to gain where there is no evidence of financial loss); *United States v. Andersen*, 45 F.3d 217, 221-22 (7th Cir. 1995) ("Here we have no clear evidence that customers or consumers suffered any loss. . . .  Thus, while in many situations it would be reasonable to use profits as a proxy for loss, where, as here, there is no persuasive evidence of monetary loss, the defendants' gain ought not to be used to measure loss.").

"[F]or a loss enhancement to apply, the Government bears the burden to prove both the existence and amount of the loss attributable to the offenses of conviction."  *United States v. Cuti*, No. 08-CR-972 DAB, 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011) (citing *United States v. Williams*, 247 F.3d 353, 358 n. 7 (2d Cir. 2001)).  The Government must prove the alleged loss by a preponderance of the evidence using "reliable and specific evidence," and the Court "may not speculate about the existence" of the loss.  *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011); *see also United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993) (finding error where sentencing court engaged in speculation regarding loss).

Here, the conclusion that Fort Schuyler suffered a loss is speculative and incorrect.  First, loss was not an issue at trial.  The Government did not—and never attempted to—prove loss.  It

did not have to.  The Court explained repeatedly that wire fraud does not require loss.  *See, e.g.*, Trial Transcript ("Tr.") 2885 ("In order to find that there was a scheme to defraud, it is not necessary that . . . Fort Schuyler actually suffered any pecuniary loss[.]").

Second, the evidence the Government did adduce does not prove that Fort Schuyler suffered a loss.  Even assuming arguendo that COR's involvement in the Syracuse RFP had the potential to make the bidding process less competitive than it otherwise might have been, this fact alone provides an insufficient basis for finding that Fort Schuyler suffered a loss.  Judge Kimba Wood recently arrived at this exact conclusion in a case with substantially similar facts.  When sentencing three defendants for "a wide-ranging scheme" that "systematically deprive[d]" the public of the benefit of competition, she noted that "[m]ost of the victims' losses are very difficult to quantify because there is no way to know the but-for bids; that is, what bids would have been submitted if the bids were not rigged."  *United States v. Ghavami*, No. 10-CR-1217 (S.D.N.Y.) Sentencing Tr., ECF No. 424 (July 23, 2013) at 6, ECF No. 426 (July 24, 2013) at 123.  Critically, though, she held:

> The fact that there may have been losses, however, is insufficient to meet the government's burden to show that the victims did sustain a loss.  It is possible that this bidding process, although anticompetitive, had the same result as it would have absent the defendants' fraud.

Sentencing Tr. (July 23) at 10.  So too here.  Indeed, not only is it possible that COR would have won the Syracuse RFP absent the charged bid rigging, the government offered no evidence that another developer would, or should, have won.

The Government contends that "there was a loss" because "other contractors had lower management fees."  PSR ¶ 69.  That is woefully inadequate to prove loss.  As an initial matter, the Government presented no evidence at trial that other developers would have charged lower fees on the specific Syracuse projects at issue in this case.  The two developers who testified at trial

(Mark Balling and Stephen Bills) made no mention of the Syracuse projects, spoke generally about typical fees, and conceded that fees are project-specific.[4]  Tr. 1575-76.  In fact, when the Court admitted Balling and Bills' testimony, it explained: "[The] point [of their testimony] is not what the development fee should be in this case.  I have no idea how [they have] any idea what development fees ought to have been in this case."  Tr. 1485.

Further, the fact that two developers typically offered lower management fees on other projects does not prove that Fort Schuyler suffered a loss.  Proving that requires the Government to show, at a minimum, that these supposedly lower-cost developers *were excluded from bidding on or winning the Syracuse RFP as a result of the wire fraud offense, and would have won but for the offense*.  The government did not identify a single developer that both would have charged less for the work COR did and was prevented from competing for the RFP due to Joe's offense.  Nor did it prove that any other developer would have prevailed in a more competitive RFP process.  Thus, it did not demonstrate loss.

Moreover, even if we imagine that the Government *had* identified a developer that would have charged less for the work COR did, was prevented from competing for the RFP based on the charged scheme to defraud, and would have won the RFP but for that scheme (despite the lack of evidence regarding each of these elements), that would *still* be insufficient to prove loss because the Government did not demonstrate that any such developer would have provided the same high-quality work that COR performed.  It is basic common sense that loss takes into account not only

---

[4] Their testimony, therefore, does not establish that there was a loss.  *See United States v. Crummy*, 249 F. Supp. 3d 475, 482, 485 (D.D.C. 2017) (holding that because "there is no evidence before the Court that would allow it to compare the fair market value of the services that MCC provided on the contracts to the contract price," "the loss amount in this matter for the purpose of section 2B1.1(b)(1) is zero, and thus, with respect to the loss table, there is no basis for increasing Crummy's base offense level above six").

the money paid, but also the value of the services received.  *See* U.S.S.G. § 2B1.1 cmt. n. 3(E)(i) ("loss shall be reduced by . . . the fair market value of the . . . services rendered"); Tr. 825 (Fort Schuyler Board member Robert Geer testifying that quality of services was often more important than price).  Thus, it is not enough for the Government to point to a developer who may have charged a lower fee; in order to prove loss, the government must also prove that the contractor would have provided the same or better work product for that fee.  The government neither proved, nor attempted to prove, any such thing.

Nor is there any contention that Fort Schuyler received anything less than what it negotiated and paid for.  It is undisputed that Fort Schuyler received the full benefit of its bargain, and thus cannot be said to have suffered a loss.  *See United States v. Smith*, 951 F.2d 1164, 1167 (10th Cir. 1991) (reversing loss enhancement because the government failed to carry its burden of proving that the alleged victims received less than what they paid for).  There is similarly no contention that Fort Schuyler was misled or hampered in its contract negotiations with COR.  Indeed, Fort Schuyler was free at all times to demand whatever terms it wanted,[5] walk away from the negotiating table, and/or contract with whomever it pleased.

The Government's concession that "there is no identifiable victim" and no "victims entitled to or seeking restitution" (PSR ¶ 70) conclusively establishes that Fort Schuyler suffered no loss.  Had Fort Schuyler suffered a loss, it would be an "identifiable victim" and would be "entitled to or seeking restitution."  Stated differently, Fort Schuyler is not a victim and is not entitled to restitution precisely because it suffered no loss.

---

[5] The protracted, hard-fought negotiations between Fort Schuyler and COR reveal that Fort Schuyler exercised its ability to demand and obtain the terms it wanted.  *See* Tr. 2213-17 (testimony of Catherine Johnson describing the negotiations).

Fort Schuyler's own actions confirm that it suffered no loss.  Indeed, after Joe and co-defendant Steve Aiello were indicted and convicted, Fort Schuyler—knowing the details of the allegedly rigged RFP process—continued to work with COR under the terms of their existing contractual arrangement and also hired COR to manage the CNY Film Hub.  Fort Schuyler did not even demand a renegotiation of its contracts with COR.  Despite its awareness of the allegedly rigged RFP, its executive officers and Board of Directors—who have a fiduciary duty to ensure that Fort Schuyler's money is spent wisely—did not feel it necessary to contract with any potentially lower-cost competitor.  Had Fort Schuyler been incurring losses by conducting business with COR, it surely would have, at some point, terminated its arrangement with COR and hired a different firm.  Its failure to do so is telling.

Lastly, in 2017, after Joe was indicted for the present offenses, the New York State Urban Development Corporation (d/b/a Empire State Development) retained construction management firm Gilbane Building Company to audit COR's work for Fort Schuyler.  Gilbane concluded, after extensive analysis, that COR was providing services at a fair and competitive price.

In conclusion, the Guidelines do not allow for an enhancement in this case because the Government's assertion that Fort Schuyler suffered a loss is speculative and incorrect.  *United States v. Block*, No. 16-CR-595 (S.D.N.Y.) (Oetken, J.), is instructive on this point.  In *Block*, Judge Oetken refused to add a loss enhancement—even though he "believe[ed] that the government's [$300 million] estimate of actual loss to shareholders attributable to the defendant's fraud" was "probably about right"—because "to determine that would ultimately require a degree of speculation and assumption" due to a lack of "sufficient reliable evidence to quantify that calculation by a preponderance of the evidence."  Sentencing Tr., November 8, 2017, ECF No. 169 at 39; *see also United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991) (holding that

23

although the defendants "may have placed the [victim] at risk," the "government did not earn a [sentencing] bonus in this case" because it did not prove that this risk caused measurable loss). Here, too, there is a lack of "sufficient reliable evidence" establishing any loss to Fort Schuyler.[6] Accordingly, we respectfully request that the Court decline to apply a loss enhancement.  When that improper 18-point enhancement is eliminated, Joe's Guidelines offense level becomes 9 and his sentencing range becomes 4-10 months.

Even if a loss enhancement were applicable (which it is not), an enhancement of 18 points based on a $8.4 million gain would be incorrect.  First, contrary to the PSR (¶ 69), COR earned $3.4 million in construction management fees, not $8.4 million.  Second, any reasonable gain attributed to COR should be divided by five to account for the fact that Joe, a one-fifth partner on the Fort Schuyler projects, was only entitled to one-fifth of the profits.  *See United States v. Colton*, 231 F.3d 890, 911-12 (4th Cir. 2000) (where defendant is a non-majority owner in a business venture, the sentencing enhancement must be based on his personal (and not the venture's collective) gain).

Finally, the gain to COR is an improper metric because it is not a reasonable approximation of loss.  *United States v. Haddock*, 12 F.3d 950, 961 (10th Cir. 1993) ("If gain to the defendant does not correspond to any actual, intended, or probable loss, the defendant's gain is not a reasonable estimate of loss.").  Any possible loss to Fort Schuyler would be the *difference* between what COR gained and what another developer (who would have won the RFP had it not been for the alleged bid rigging) would have gained.  That would be easy to calculate if the government had supplied proof regarding the second part of the equation.  The government's failure to do so

---

[6] Nor is there any evidence, or allegation, that Joe intended any loss.

does not mean that loss "reasonably cannot be determined."  U.S.S.G. § 2B1.1 cmt. n. 3(B).  It means the government failed to prove loss.

## II.     THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) CALL FOR A BELOW-GUIDELINES SENTENCE

Although the Guidelines must be consulted, they are merely advisory and are not presumptively reasonable.  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).  Sentencing courts are free to sentence well below the Guidelines, and generally do.  Indeed, last year, judges in the Southern District of New York imposed within-Guidelines sentences in a mere 24.7% of cases and below-Guidelines sentences in nearly 75% of cases.[7]

In rendering "an individualized assessment based on the facts presented," a sentencing court must consider the factors set forth in 18 U.S.C. § 3553(a).  *Gall v. United States,* 552 U.S. 38, 50 (2007).  These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need to reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, protect the public, and avoid unwarranted sentencing disparities; and the kinds of sentences available.  18 U.S.C. § 3553(a)(1)-(6).  Such factors warrant a lenient below-Guidelines sentence in this case.

Before delving into the § 3553(a) factors, we first address a preliminary issue, which is that, if the Court calculates a Guidelines range with a loss enhancement, a significant downward departure or variance is warranted to reflect the fact that a loss-enhanced sentence drastically overstates the seriousness of the offense.

---

[7] *See* United States Sentencing Commission, Statistical Information Packet (2017), Table 8 (p.11), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/nys17.pdf.    Approximately 53% of sentences were non-Government-sponsored below-Guidelines sentences. *Id.*  Approximately 21% were Government-sponsored below-Guidelines sentences. *Id.*    Approximately 1% of sentences were above-Guidelines. *Id.*

1.  **A Loss-Enhanced Guidelines Sentence Substantially Overstates the Seriousness of the Offense**

For the reasons listed in the previous section, the correct Guidelines calculation should not be enhanced by any loss amount because the Government did not prove that Fort Schuyler suffered a loss. Nevertheless, should the Court disagree and apply a loss enhancement under U.S.S.G. § 2B1.1(b)(1), we respectfully urge the Court to depart[8] or vary downward significantly based on the fact that a loss-enhanced Guidelines range drastically overstates the seriousness of Joe's offense by: (1) over-relying on dollar amounts; and (2) utilizing a draconian loss table that is untethered to reality.

First, as many courts and commentators have noted, the fraud guideline that governs this case unreasonably relies on dollar amounts and "fetish[izes] abstract arithmetic." *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006), *aff'd mem.*, 301 Fed. Appx. 93 (2d Cir.2008). U.S. District Judge Jed Rakoff, for example, has denounced the "inordinate emphasis" that the Guidelines place "on the amount of actual or intended financial loss" in fraud cases without explaining "why it is appropriate to accord such huge weight to [this factor]." *Id.* at 509. Judge Rakoff has similarly observed that "[b]y making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).[9] Numerous other judges have echoed this criticism. *See, e.g., United States*

---

[8] U.S.S.G. § 2B1.1 at cmt. n. 20 authorizes a downward departure where, as here, "the offense level determined under this guideline substantially overstates the seriousness of the offense."

[9] *See also* Judge Rakoff, Keynote Address at American Bar Association's 27th Annual National Institute on White Collar Crime Conference, at 3 (March 8, 2013) ("Perhaps the most fundamental flaw in the sentencing guidelines is that they are based on the assumption that you can, in the name of reducing disparities, isolate from the complexity that every sentence presents a few arbitrary factors to which you then assign equally arbitrary weights -- and somehow call the result rational.").

*v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) ("[T]he Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime. . . .  Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less solely responsible for a white-collar offender's Guidelines sentence."); *United States v. Ovid*, No. 09-CR-216 (JG), 2010 WL 3940724, at *8 (E.D.N.Y. Oct. 1, 2010) (Gleeson, J.) (criticizing "the illusion of precise calculation created by the ever-expanding fraud guideline"); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (Adelman, J.) ("One of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level."); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) (Lynch, J.) (stating that the specific amount of loss (or gain) is often "a kind of accident" providing a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

There are many obvious problems with the Guidelines' mechanical loss enhancement scheme, including "the weakness of the correlation between loss and moral seriousness; the rigidity of the loss amount overriding the diverse reality of complex financial crimes; [and] the lack of any consideration of danger to society." *Johnson*, 2018 WL 1997975, at *4.  The scheme also fails to distinguish between types of loss, such as loss that causes identifiable pain suffered by real people as compared to loss absorbed by large entities.  This point was articulated in *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013):

> [N]ot all actual loss is equally serious.  A fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large corporation able to absorb the financial consequences . . . .  Simply put, contrary to the assumption underlying the loss guideline, not all dollars of loss are fungible.

27

723 F.3d at 381 (Underhill, J., concurring).

In light of the fraud guideline's "unusual" reliance on loss amount, the Second Circuit has urged courts to consider below-Guidelines sentences. *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). The need for a below-Guidelines sentence is especially acute where, as here, the Guidelines call for a severe sentence based on a large loss (or gain) amount which the defendant neither controlled nor foresaw. Indeed, Joe had no say in or advance knowledge of the projects that would arise from the Syracuse RFP or the amount of money that would be spent on them. Yet his loss-enhanced Guidelines sentence is largely being driven by that amount. *See* Frank O. Bowman III, Sentencing High-Loss Corporate Insider Frauds After Booker, 20 Fed. Sent. R. 167, 171 (Feb. 2008) (criticizing fraud loss guideline for "fail[ing] to distinguish between defendants who intend to steal or cause economic harm to others and defendants who, though guilty of criminal conduct, cause losses they neither desired nor perhaps even foresaw").

Compounding the fraud guideline's overreliance on dollar amounts is the fact that the offense levels attached to these amounts do not reflect reality. Indeed, unlike the guidelines governing most crimes, the fraud guideline is driven by a loss table that "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *Corsey*, 723 F.3d at 379 (Underhill, J., concurring). Before the Guidelines were promulgated, 18% of first-time offenders convicted of sophisticated fraud involving the highest category of loss received probation while the rest served an average of 18-24 months in prison. *See* U.S. Sentencing Comm'n, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 33 (1987). Ignoring these sentencing practices when formulating the fraud and theft guidelines in 1987, the Sentencing Commission "decided to abandon the touchstone of prior past practice." Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key*

*Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 23 (1988). The Commission has never revised the fraud guideline to reflect actual practice.

Because the Guidelines' usefulness is premised on their incorporation of "data about past sentencing practices," where, as with fraud, such data has been disregarded in favor of severe, arbitrarily selected sentencing ranges driven by political spasms, sentencing courts may, and regularly do, conclude that the applicable guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough v. United States* 552 U.S. 85, 96, 109-10 (2007); s*ee also Spears v. United States*, 555 U.S. 261, 264 (2009) (explaining that when the Guidelines fail to account for past sentencing practices, a district court can vary downward "based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"); *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (no deference to Guidelines if they do not reflect "an empirical approach based on data about past sentencing practices"); *United States v. Diaz*, No. 11–Cr.–00821–2(JG), 2013 WL 322243 at *3–7 (E.D.N.Y. Jan. 28, 2013) (expressing disagreement with Guidelines ranges for drug trafficking offenses because they are not based on empirical data and national experience).

Not only does the fraud guideline fail to account for historical practice, it has become increasingly removed from such practice thanks to the "mindless acceleration" of the loss calculation table, which "a whole host of judges [] have [complained about] publicly and scores of others [have] grumbled about [] privately." *United States v. Faibish*, No. 12-CR-265 (E.D.N.Y.), Sentencing Tr., Mar. 10, 2016, ECF No. 271 at 23 (rejecting loss calculation enhancement as not proportional to the offense and finding that "common sense" favored

rejecting the loss calculation enhancement).  Judge Underhill summarized this so-called "bracket

inflation" in his concurrence in *Corsey*:

> The fraud guideline was initially set forth in Guideline section 2F1.1.  The Sentencing Commission set the original 1987 Guidelines for economic offenses higher than historical sentences in order to further the deterrence and just punishment goals of sentencing.  In 1989, in response to the savings and loan crisis, Congress passed legislation increasing the maximum penalties for financial fraud offenses and directing the Sentencing Commission to include specific offense characteristic enhancements in the fraud guideline.  In 2001, the Sentencing Commission amended the Guidelines to combine the fraud, theft and embezzlement, and property destruction guidelines into a single guideline, section 2B1.1.  That change was accompanied by the publication of a new loss table that had the effect of increasing offense level calculations, especially for high-dollar-value crimes.  Most recently, the fraud guideline was amended in 2003 in response to Congressional directives in the Sarbanes–Oxley Act.  Those amendments included further changes to the loss table that added offense level points in the highest loss cases.  The three sets of amendments to the loss table of the fraud guideline alone have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences.  Each of the three increases in the recommended Guideline ranges for fraud crimes was directed by Congress, without the benefit of empirical study of actual fraud sentences by the Sentencing Commission.

*Corsey*, 723 F.3d at 379-80 (Underhill, J., concurring) (citations omitted).  Judge Underhill

concluded: "The history of bracket inflation directed by Congress renders the loss guideline

fundamentally flawed, especially as loss amounts climb."  *Id.* at 380.[10]

As a result of the fraud guideline's overreliance on dollar amounts, disengagement from

historical practice, and rampant bracket inflation, Guidelines sentences "have so run amok that

they are patently absurd on their face."  *Adelson*, 441 F. Supp. 2d at 515.  Indeed, the impact of

high-loss-amount enhancements under § 2B1.1 dwarfs that of any other Guidelines sentencing

---

[10] *See also* Frank O. Bowman, III, Sentencing High-Loss Corporate Insider Frauds After Booker, 20 Fed. Sent'g Rep. 167, 168 (2008) ("For the small class of defendants . . . convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense.  Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges.").

provision.  In Joe's case, for example, the proposed loss amount results in an astronomical 18-point enhancement (representing 66-77 months' imprisonment), significantly larger than any other enhancement in the Guidelines.  Indeed, only a handful of double-digit enhancements even exist in the entire Guidelines manual.

The draconian loss-enhanced Guidelines have put fraud crimes on par with offenses that are self-evidently more serious, resulting in offense levels comparable to, and often exceeding, those applicable to violent offenses.  The PSR calculates a Guidelines offense level for Joe of 27.[11] By way of comparison, the Guidelines' base offense level for bombing an airport or mass transit center is 24 (U.S.S.G. § 2K1.4(a)(l)); for arson creating substantial risk of death or serious bodily injury, also 24 (U.S.S.G. §2K1.4(a)(1)); for a pre-planned aggravated assault where a firearm was discharged causing life-threatening bodily injury, 26 (U.S.S.G. § 2A2.2); and for voluntary manslaughter, 29 (U.S.S.G. § 2A1.3).

In order to avoid unjust outcomes, courts within and outside the Second Circuit consistently impose sentences for fraud offenses far below the advisory Guidelines range.  Indeed, "since *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high.  This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines for cases like these and the fundamental requirement of § 3553(a) that judges impose sentences 'sufficient, but not greater than necessary' to comply with its objectives."  Frank O.

---

[11] With no criminal history, this offense level translates to a Guidelines range of 78-97 months. That is *more than four times greater* than the 22-month median term of incarceration imposed for fraud crimes last year in the Southern District of New York.  United States Sentencing Commission, Statistical Information Packet (2017), Table 7 (p.10), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/nys17.pdf.

Bowman III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent. R. 167, 169 (Feb. 2008).  *See, e.g., United States v. Collins*, No. 07-CR-1170, ECF No. 244 (S.D.N.Y. Oct. 17, 2013) (Preska, J.) (Sentencing Tr. at 36) (imposing sentence of one year and one day despite Guidelines sentence of life imprisonment); *United States v. Treacy*, No. 08-CR-366, ECF No. 130 (S.D.N.Y. Sept. 2, 2009) (Sentencing Tr. at 86) (despite Guidelines range of 121 to 151 months based on profits a corporate executive had gained from backdated stock options, court imposed a sentence of 24 months based on § 3553 factors); *United States v. Graham*, No. 06-CR-137, ECF No. 1266 (D. Conn. April 30, 2009) (Droney, J.) (imposing sentence of one year and one day despite Guidelines sentence of life imprisonment due to $500 million loss); *United States v. Milton*, No. 3:06-CR-137, ECF No. 1216 (D. Conn. Jan. 30, 2009) (Judgment) & ECF No. 1164 (D. Conn. Oct. 31, 2008) (Ruling on Loss Calculation, Victim Enhancement, and Restitution) (imposing 48-month sentence on defendant convicted of various fraud counts involving over $400 million in losses despite Guidelines recommendation of life imprisonment); *United States v. Turkcan*, No. 08-CR-428, ECF No. 52 (E.D. Mo. June 11, 2009) (Judgment) (imposing a one-year-and-one-day sentence of imprisonment on defendant who caused approximately $25 million in loss, resulting in a Guidelines range of 63-78 months); *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (Block, J.) (imposing 60-month sentence in the face of a Guidelines range of 360 months to life); *United States v. Ferguson*, No. 3:06-CR-137, ECF No. 1199 (D. Conn. Dec. 31, 2008) (Judgment) & ECF No. 1164 (D. Conn. Oct. 31, 2008) (Ruling on Loss Calculation, Victim Enhancement, and Restitution) (imposing sentences ranging from one year and one day to four years on five defendants convicted of fraud leading to over $544 million in loss whose Guidelines ranges included the possibility of life imprisonment); *Adelson*, 441 F. Supp.

2d at 514 (imposing 42 months on defendant convicted of causing more than $50 million in loss notwithstanding Guidelines calling for life imprisonment).

In conclusion, as sentencing courts have widely recognized, the fraud guideline governing this case is marred by numerous flaws, including an overreliance on dollar amounts, a rejection of empirical data regarding actual practice, and a mindless acceleration of the loss calculation table. These flaws have produced a loss-enhanced Guidelines range in this case that is, like the Guidelines ranges in many other fraud cases, "[r]idiculous, absurd, barbaric,"[12] "much more typical of a brutal regime than of a proud American legal system,"[13] and "a black stain on common sense."[14]   Therefore, we respectfully request the Court to focus on the § 3553(a) factors in fashioning a sentence "sufficient but not greater than necessary" to fulfill the purposes of sentencing.

The § 3553(a) factors call for a sentence below the Guidelines (even if the Guidelines are correctly calculated without a loss enhancement).   Indeed, for the reasons discussed below, a sentence below the non-loss-enhanced Guidelines range of 4-10 months, and consideration of alternatives to incarceration, are appropriate here.

### 2.   The Nature, Circumstances, and Seriousness of the Offense Warrant Leniency

Section 3553(a) requires the Court to consider the nature, circumstances, and seriousness of the offense.   Joe fully appreciates the seriousness of the crimes for which he stands convicted. Nevertheless, we respectfully submit that the nature and circumstances of this case provide a weak basis for retribution and a compelling basis for leniency.

---

[12] *United States v. Lumiere*, No. 16-CR-483, (S.D.N.Y. Jun. 14, 2017) (Rakoff, J.), Sentencing Transcript (ECF No. 117) at 28.
[13] *Id.*
[14] *Parris*, 573 F. Supp. 2d at 7.

First, there is no contention that Joe ever sought to deprive Fort Schuyler of the benefit of its bargain. Indeed, neither Joe nor anyone else at COR ever misrepresented COR's qualifications, fees, or scope of work. Nor did Joe prevent Fort Schuyler from contracting with whomever it pleased. And Joe worked tirelessly to ensure that COR provided exceptional services at a competitive rate, so much so that Fort Schuyler has continued to contract with COR to this day. As the Government concedes, there was no victim in this case, and Joe never sought to harm anyone. No investor's savings were decimated, no corporate treasuries looted, and no individuals hurt.[15] Nor were consequences like that ever contemplated or at risk of occurring. And there is no evidence that even a dime of taxpayer money was lost.

Second, Joe never deprived Fort Schuyler of competition. The Government's witnesses consistently testified that the RFP provisions were fair, appropriate, and consistent with a competitive process.[16] The RFP may have favored developers with qualifications that COR possessed, but those qualifications benefited Fort Schuyler as much as they benefited COR. And the Government did not identify any developers that were excluded from bidding on or winning the RFP for any reason, much less one created by Joe. In fact, when given the opportunity to

---

[15] Even assuming, for the sake of argument, that the Syracuse RFP created a risk of harm, such harm, if materialized, would have been diffuse and not experienced by any particular individuals. *See Corsey*, 723 F.3d at 380 (Underhill, J., concurring) ("A fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large corporation able to absorb the financial consequences."); U.S.S.G. §2B1.1 at cmt. n. 20(c) (stating that fraud is less serious when loss is diffuse and that a below-Guidelines sentence is warranted when the "aggregate loss amount . . . is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims").

[16] *See, e.g.*, Tr. 332-33, 35-36, 340, 344, 348 (Dean Fuleihan); 443, 458-61 (Walter Barber); 908-11, 920-22, 1007-08 (Joseph Schell); 1419, 1446 (Kevin Schuler); 227 (Andrew Kennedy stating that the local developer requirement was appropriate); 1619-20 (Stephen Bills conceding that local developer requirement was reasonable). Importantly, the RFP schedule and notice were created by Fort Schuyler staff (not Joe or his codefendants), and the Government's witnesses testified that the schedule and notice were fair. *See, e.g.*, Tr. 329-31, 885, 889, 925-28, 931, 964, 967, 2262.

propose changes to the Syracuse RFP that would have excluded competitors, Joe instead made comments that either broadened the RFP or were unrelated to its competitiveness. *See* GX 606 (Syracuse RFP with Joe's comments).

Third, the circumstances surrounding the Syracuse RFP diminish Joe's culpability. Most notably:

- Every single act Joe took with respect to the Syracuse RFP was directed by COR's consultant Todd Howe, who worked at Whiteman, Osterman & Hanna, a large, well-respected Albany law firm. Joe did not propose or initiate RFP-related actions. He followed the instructions of Mr. Howe, an experienced and well-credentialed government relations expert who came highly recommended. At the time, Mr. Howe had not yet revealed himself to be the criminal we know today.

- COR's (and Joe's) involvement in the Syracuse RFP process was disclosed to and authorized by Dr. Alain Kaloyeros, the revered President of SUNY Poly and member of Fort Schuyler's Board of Directors. Because Dr. Kaloyeros was not receiving anything of value in return, Joe had no reason to suspect that Fort Schuyler would be deceived or harmed by COR's preferential treatment.

- Before it was issued, the Syracuse RFP was vetted and approved by Fort Schuyler staff (including procurement expert Joe Schell and Chairman Dean Fuleihan), and the bidding and selection process was managed by impartial Fort Schuyler employees with no input from COR or Dr. Kaloyeros.[17]

---

[17] Tr. 911, 915-16, 945, 974, 2260.

- It is common, and even encouraged, in the construction development industry for bidders like COR to review and comment on RFPs before they are issued.[18]  Moreover, state procurement rules (like the requirement of a competitive bidding process) do not apply to Fort Schuyler.[19]  Therefore, the opportunity to influence the Syracuse RFP drafting process—especially with the encouragement of one of Fort Schuyler's Board members—was not obviously illegal.  *See United States v. Block*, No. 16-CR-595 (S.D.N.Y. Nov. 8, 2017) (Oetken, J.), Sentencing Tr. (ECF No. 179) at 70 (an "ambiguous regulatory environment . . . may have led to an assumption on the defendant's part of more leeway . . . and may to some degree diminish the degree of culpability").

In short, even if all inferences are made in support of the verdict, the evidence shows a local and much-respected businessman caught up in a seedy, foreign world of state contracts presided over by Todd Howe, a master manipulator who directed that ethical corners be cut.  Joe was operating way out of his league and is paying the price for picking a crooked guide.

Lastly, Joe was convicted of making a false statement because, according to Special Agent Kathleen Garver, he told federal agents "that he did not ask for the RFP to be tailored to COR, nor did he feel as though it was tailored to COR."  Tr. 1700.  However, the evidence presented at trial (including extensive testimony that the RFP provisions were appropriate and did not appear to be tailored, no proof that Joe personally requested the RFP to be tailored, and Joe's handwritten comments which broadened the RFP) support that statement.

---

[18] Tr. 219, 307-09, 466-67, 851, 1257-58, 1436.
[19] Tr. 1845.

Respectfully, these circumstances do not warrant significant punishment.  At most, they entail the sort of aberrant conduct that in no way represents who Joe is as a businessman and community member.

### 3.  Joe's History and Characteristics Counsel for Mercy

Under § 3553(a)(1), the Court must consider Joe's specific history and personal characteristics, which are even more exceptional than the nature and circumstances of his offense. To begin with, before this conviction, Joe had never faced scrutiny through any criminal, civil, or regulatory action whatsoever.  But much more than that, he has, in many ways, led an exemplary life.  This matters at sentencing, where the "punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).  As one court has explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*Adelson*, 441 F. Supp. 2d at 513-14.

First, Joe pulled himself up by his bootstraps—as the oldest of six children, he stepped into the role of head of the household at 12 when his alcoholic father walked out on his mother and family.  At 16, Joe began working full-time at a local slaughterhouse to support his family and himself through school because he knew a higher education could help establish a stable life for his family.

Second, Joe is a committed family man.  As discussed previously, Joe has been the reliable and stable foundation for his immediate and extended family.  He has never hesitated in taking on

the responsibility of being a role model or financial supporting family members who need shelter, medical assistance, and education.

Third, Joe has an exceptional record of charity, community service, and other good works, which can be a significant mitigating factor at sentencing and should be a mitigating factor here. Joe has displayed extraordinary generosity, which extends well beyond his financial contributions to numerous national and local organizations dedicated to helping those in need and focused on the development of young men and women. For the last 14 years, Joe has dedicated hundreds of hours to the Boy Scouts of America and served as a leader helping execute the organization's mission, plan and execute trips and high peak expeditions in the Adirondacks, and volunteer his efforts to programs and events helping raise money for those less fortunate. Joe took on many responsibilities for both the Pack and Troop he helped lead. His Troop hosts a fall campout that serves approximately 100 local scouts and leaders on a Saturday evening. A team of volunteers prepares a spaghetti dinner in a primitive setting at Highland Forest County Park and Joe oversees the entire effort. Joe is also committed to the personal growth of individual Boy Scouts and mentors young men as they embark on the journey to earn their Eagle Scout.

Beginning in 2004, Joe served in leadership roles and on the advisory board of the Salvation Army. He served as the chair of the Salvation Army's Annual Civic Celebration Luncheon and devoted his personal time to executing the event hosting almost 700 supporters. Joe coordinated efforts between the Salvation Army and the Boy Scouts of America and committed volunteers to ring the red donation bell at Christmas, pack over 2,500 food baskets for families at the annual Christmas Bureau distribution, and brought his children touring the program to learn more about the cause.

In addition, he has provided generous financial support to organizations that could not operate, but for the generosity of individuals like him.  Of note, Joe has committed funds to the Front Row Players, made anonymous donations to a young boy who battled a rare brain cancer and needed financial support for his treatments, the Immaculate Conception Church, and over a dozen additional initiatives annually.  When the Salvation Army was in particular need, Joe made a capital campaign donation to help build a needed shelter for homeless teens.

Consideration of such good works is completely appropriate in granting both downward variances and departures.  *See, e.g., United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013) (affirming sentence where district court had granted a downward variance for defendant's charitable work); *United States v. Crouse*, 145 F.3d 786, 791 (6th Cir. 1998) (exceptional community service record permissible ground for downward departure); *United States v. Kuhn*, 351 F. Supp. 2d 696, 705 (E.D. Mich. 2005) (defendant was entitled to downward departure based on community service record that extended beyond financial contributions).  Indeed, courts have departed from the Guidelines for exceptional acts of charity similar to Joe's.  *See United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (upholding a downward departure in a pre-*Booker* case where the offender "mentored [an] underprivileged young man, who later attributed his success to [the offender]" and "paid for not one, but four young men to attend a high school together where they would have a better opportunity to succeed"); *United States v. Woods*, 159 F.3d 1132, 1136–37 (8th Cir. 1998) (affirming downward departure because of defendant's exceptional acts of charity, including bringing "two troubled young women" into her home).

Joe is philanthropic and hugely generous, to be sure, but he is so much more than that.  He gives the things that are more precious to him: time, effort, empathy, consideration, compassion, mentoring, and support for everyone who comes into his orbit.  Joe is an atypical white-collar

defendant, who rose to his position without the privileges and educational opportunities so often seen by the Court in other white-collar cases.  And, yet, Joe's deep and prolonged commitment to helping others sets him apart.  He has not just given money to good causes; he has given generously and genuinely with his time, he has opened his home and his heart to the needy, and he consistently ministers and comforts those in grief.  Joe never undertook any of his extraordinary good works to enhance his image or get something in return; it would be appropriate to credit him for those good works now.  *Adelson*, 441 F. Supp. 2d at 513–14.

We respectfully request that the Court approve a downward variance on this basis.

**4.   Incarceration is Unnecessary to Achieve Deterrence**

Section 3553(a)(2)(B) requires consideration of the need for deterrence.  There are two types of deterrence: general deterrence and specific deterrence.  Neither justifies a substantial sentence in this case.

First, with respect to general deterrence, empirical research shows that harsher penalties have little effect on deterrence in white collar cases.  *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) (noting that three panels of the National Academy of Science, as well as "every major survey of the evidence," have concluded that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects"); A. Mitchell Polinsky and Steven Shavell, *On the Disutility and Discounting of Imprisonment and the Theory of Deterrence*, 28 J. Legal Studies 1, 12 (1999) (noting that "less-than-maximal sanctions, combined with relatively high probabilities of apprehension, may be optimal" for promoting general deterrence in white collar cases); *see also Adelson*, 441 F. Supp. 2d at 514 (describing the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders").  "It appears to be primarily in the certainty of punishment,

40

not its severity, that deterrent power lies." *United States v. Bannister*, 786 F. Supp. 2d 617, 660 (E.D.N.Y. 2011). Thus, if a term of imprisonment is imposed in this case, it need not be long to serve its deterrent function. *See United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ("[C]ommon sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not. Thus, a relatively modest prison term should be 'sufficient, but not more than necessary,' for this purpose.").

However, incarceration is unnecessary here. A felony conviction in and of itself sends a powerful message to potential white-collar offenders, and Joe's very public conviction has already served as a strong deterrent to others. Regardless of whether Joe is given a custodial or non-custodial sentence, a rational person would conclude that engaging in similar conduct is folly. Joe has suffered the humiliation and immense stress of a high-profile trial and now faces the lifelong stigma and legal disabilities of a felony conviction. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (approving district court's finding that "the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant" (quotations omitted)); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (Block, J.) (imposing non-custodial sentence and urging courts to consider the collateral consequences facing a convicted felon); *United States v. Collins*, No. 07-CR-1170 (S.D.N.Y. Oct. 17, 2013) (Preska, J.) Sentencing Transcript (ECF No. 244) at 32-33 (concluding that "a lengthy prison sentence is not necessary for general deterrence of similarly situated individuals tempted to commit similar crimes particularly in light of the collateral consequences suffered" by the defendant).

Imprisonment is also unnecessary to achieve the goal of specific deterrence. Joe's life has been turned upside down by the consequences of his conduct. His conviction, and the publicity

surrounding it, has been devastating to him and his family and has destroyed his career.  He has caused his wife, children, and elderly mother and mother-in-law to suffer emotionally and financially, a fact for which he will never forgive himself.  He has been disgraced in the eyes of his community and his family.  His reputation, which he has built through a lifetime of good deeds and honesty, is tarnished forever.  In the relatively insular community of Syracuse, that is ruinous.

This has been a scarring, life-altering experience for Joe—who has never been in trouble with the law in his 59 years—and there is no chance he will put himself in a position to repeat it. He needs no incarceration to ensure that he avoids even the slightest association with criminal activity.  In fact, empirical data shows that imprisonment is highly unlikely to have any specific deterrent effect.  *See* David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) (comparing prison and non-prison groups and finding that prison does not have a specific deterrent impact upon the likelihood of re-arrest over a 126-month follow-up period).

**5.  The Public Does Not Need Protection from Joe**

Under § 3553(a)(2)(C), the Court must assess the need for the sentence "to protect the public from further crimes of the defendant."  It is an understatement to say that Joe is not a threat to society.  As his letters of support make abundantly clear, he is a caring, gentle person with no criminal history, nor anything in his past suggesting a tendency toward criminality.  The public would not be any safer by sending him to prison.  Quite the opposite.  By incarcerating Joe, society would be deprived of a good, selfless human being who has, throughout his life, dedicated himself to helping those in need, regardless of whether they are family members, friends, or strangers.

Joe has never hurt a soul and is not about to start doing so now at the age of 59.  With the exception of the present criminal proceeding, he has never been arrested or convicted of any crime.

Moreover, as a result of his criminal conviction, he will be stripped of his license to practice law and will be severely hampered in his ability to conduct business in the future, thus virtually negating any opportunity to even engage in white-collar crime.[20]  In addition, he is never going to have any further business dealings with Todd Howe, who was the driving force behind Joe's involvement in the instant offense.

In sum, this factor weighs heavily in favor of a non-custodial sentence.

6.  **A Lenient Sentence is Necessary to Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) mandates that a sentencing court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Last year, judges in the Southern District of New York granted below-Guidelines sentences to defendants convicted of fraud in over 70% of cases.[21]  The result is that the median term of incarceration imposed on defendants principally convicted of fraud was 22 months.[22]  However, unlike Joe, the vast majority of those defendants caused actual loss to actual victims.[23]  Also unlike Joe, many of those defendants had some criminal history and/or engaged in much more reprehensible conduct under much less redeeming circumstances.  In short, Joe is far from the median defendant in terms of his record and conduct.  Thus, in order "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," a sentence below 22 months is required.

---

[20] If Joe were to engage in business dealings, they would be heavily scrutinized given his very public conviction.

[21] United States Sentencing Commission, Statistical Information Packet (2017), Table 10 (p.19), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/nys17.pdf.

[22] *Id.* at Table 7 (p.10).

[23] In order for the median sentence to be 22 months—when the non-loss-enhanced Guidelines range is well below 22 months, and below-Guidelines sentences are the overwhelming norm—loss enhancements must have been applied in the vast majority of cases.

A few representative examples stand out as particularly relevant to the Court's consideration of its obligation to avoid disparity.

First is *United States v. Ghavami*, No. 10-CR-1217 (S.D.N.Y.) (Wood, J.), a case with highly similar facts. The defendants in that case corrupted a competitive bidding process for municipal bond underwriting in order to enrich themselves. Specifically, the "defendants participated in a wide-ranging scheme, for years, to systematically deprive the public of the benefit of competition," which "caused municipal issuers to lose money because they did not get the highest price possible for the escrows." Sentencing Tr., July 23, 2013, ECF No. 424 at 6, 10. The parallel is apparent, as Joe was charged with participating in a similar scheme to deprive Fort Schuyler of the full benefit of competition.

The conduct of the *Ghavami* defendants was, in many respects, more serious than Joe's. As Judge Wood described it:

> The offenses for which these three defendants are being sentenced are very serious. The defendants, along with employees of other financial institutions, rigged bids for municipal bond reinvestment products. They were part of a corrupt corporate culture that spanned years. The crimes victimized many municipalities as well as other bond issuers across the United States and the IRS and the U.S. Treasury.

Sentencing Tr., July 24, 2013, ECF No. 426 at 123. Due to the seriousness of these defendants' conduct, the Government sought a within-Guidelines prison term of at least 210 months for defendant Ghavami and at least 135 months for defendant Welty. Gov't Sentencing Mem., ECF No. 374 at 29, 31. Judge Wood rejected the Government's request and instead imposed sentences of 18 months for Ghavami and 16 months for Welty.[24] Sentencing Tr. (July 24) at 109, 110, 158, 197.

---

[24] The 27-month sentence imposed on the third defendant, Heinz, is less relevant because it was enhanced due to his conviction for witness tampering. ECF No. 426 at 182.

Joe does not deserve a sentence more severe than these defendants.  To the contrary, his sentence should be more lenient to reflect the fact that, unlike the *Ghavami* defendants, he did not victimize anyone (much less numerous entities), did not render the bidding process anticompetitive, followed the instructions of a government relations expert from a reputable law firm, and took actions with the knowledge and consent of a well-respected member of the purported victim's Board of Directors (who did not receive any bribe or kickback).

*United States v. Collins*, No. 07-CR-1170 (S.D.N.Y.) (Preska, J.), is similarly instructive. In *Collins*, the defendant, a partner at Mayer Brown, played an "indispensable role" in a vast fraud at financial services company Refco (his primary client), specifically "that of preparing legal documents over years for the transactions planned by company insiders to effect the fraud." Sentencing Tr., July 15, 2013, ECF No. 244 at 21.  Collins, who was convicted of wire fraud, securities fraud, and conspiracy, participated in "serious offenses in which major businesses and banks and untold thousands of investors lost millions and millions of dollars."  *Id.*  Judge Preska imposed a custodial sentence of one year and one day despite the fact that the Guidelines called for life imprisonment.  *Id*. at 35.

In *United States v. Graham*, No. 06-CR-137 (D. Conn.) (Droney, J.), the defendant, an in-house lawyer (like Joe), was convicted of participating in a fraudulent scheme that caused over $500 million in shareholder losses.  Although Judge Droney found that the defendant had a substantial role in creating the documents that supported and concealed the fraud, he varied downward from the Guidelines sentence of life imprisonment to a sentence of one year and one day.  Order of Oct. 31, 2008, ECF No. 1164 at 15; Judgment, May 6, 2009, ECF No. 1269 at 1.

In *United States v. Block*, No. 16-CR-595 (S.D.N.Y.) (Oetken, J.), Judge Oetken found that the CFO of a publicly traded real estate investment trust was the "mastermind" of a scheme to

fraudulently manipulate the trust's reported financial results, and that he committed the fraud "brazenly by simply making up numbers to plug a gap."  Sentencing Tr., November 8, 2017, ECF No. 169 at 40, 68.  Although Judge Oetken "believe[d] that the government's estimate of actual loss to shareholders attributable to the defendant's fraud, $300 some million[,] . . . is probably about right," he refused to impose a loss enhancement because the calculation was not sufficiently reliable.  *Id.* at 39.  Emphasizing that Block, like Joe, had otherwise led a law-abiding life, *id.* at 69, operated in a somewhat ambiguous regulatory environment, *id.* at 70, and would suffer collateral professional consequences as a result of his conviction, *id.*, Judge Oetken rejected the Government's request for a sentence of at least 84 months, *id.* at 61, and instead imposed a sentence of 18 months, *id.* at 72.

In *United States v. Lumiere*, No. 16-CR-483 (S.D.N.Y.) (Rakoff, J.), the defendant, a hedge fund portfolio manager, engaged in a scheme to defraud investors that resulted in millions of dollars in unlawful profits and, according to the Government, between $9.5 and $25 million in investor losses.  Sentencing Tr., June 14, 2017, ECF No. 117 at 2; Gov't Sentencing Mem., May 16, 2017, ECF No. 98 at 5.  Judge Rakoff found that the defendant played a "highly significant" role in the scheme, that he did so "not aberrationally one day or one week, but for years, for months," and "even when he was on the verge of being caught, sought ways to turn the scheme to his further advantage through [an] attempt at blackmail."  Sentencing Tr. at 29.  Despite this finding, and a Guidelines sentencing range of 87 to 108 months' imprisonment, Judge Rakoff sentenced the defendant to 18 months in prison.  *Id.* at 2, 30.

Finally, in *United States v. Cole*, 765 F.3d 884 (8th Cir. 2014), the defendant was convicted of conspiracy to commit mail and wire fraud, tax evasion, and conspiracy to commit tax fraud. Specifically, she participated in "one of the largest corporate frauds in Minnesota history," which

"was also a significant tax fraud." 765 F.3d at 886. The district judge sentenced the defendant to three years' probation, a downward variance from the advisory Guidelines range of 135 to 168 months' imprisonment. The reasons cited by the judge for the non-custodial sentence include: (1) the defendant had no criminal history; (2) she did not have a leading role in the fraud; (3) and a probationary sentence would allow her to work and earn money to make restitution to the victims. The sentence was upheld as reasonable by the Eighth Circuit.

The above examples show how judges regularly grant leniency in fraud cases involving significantly worse facts than those at issue in the present case. Indeed, defendants involved (often much more extensively) in far worse offenses receive sentences of between probation and 18 months' imprisonment, even when the Guidelines call for extreme punishment, including life imprisonment. Similar leniency is necessary here to prevent unwarranted sentence disparities.

### 7. A Non-Custodial Sentence is Available and Warranted

Section 3553(a)(3) instructs courts to consider "the kinds of sentences available." It is within the Court's discretion in this case to impose a non-custodial sentence—such as probation, home detention, or community confinement in a halfway house—with various conditions attached.

A non-custodial sentence is appropriate here. A sentence of home detention with various other probationary conditions, including community service, would benefit society far more than if Joe were sent to prison. Courts recognize that society can benefit from sentencing individuals to non-custodial sentences that allow and require them to use their skills to better serve the community. For example, in *United States v. Smith*, No. 1:06-CR-00394, 2009 WL 249714 (N.D. Ohio Feb. 2, 2009), the court opined that community service would put defendant's abilities as an accountant and lawyer to "good use," and commented that those "abilities would otherwise be wasted during a more lengthy prison term." *Id.* at *4; *see also United States v. Warner*, 792 F.3d

47

847, 854 (7th Cir. 2015) (despite a Guidelines range of 46 to 57 months, the court affirmed a sentence of a defendant to two years' probation; district court found that due to defendant's extensive philanthropy, "'society will be best served by allowing [defendant] to continue his good works' outside of prison"); *United States v. Coughlin*, No. 06-CR-20005, 2008 WL 313099, at *7 (W.D. Ark. Feb. 1, 2008) (sentencing a Walmart executive who pled guilty to aiding and abetting wire fraud and filing false tax returns, yielding a guideline range of 27 to 33 months' imprisonment, to five years' probation, including 27 months of home detention and 1,500 hours of community service in part because defendant's "expertise is better put to use than wasted in the physical deterioration of unnecessary imprisonment").   Joe has a demonstrated record of personally committing himself to helping others, and probation would allow him to "continue his good works."   *Warner*, 792 F.3d at 854   If the Court orders a substantial period of community service, Joe could apply his business and legal knowledge in the nonprofit, charitable context by advising organizations with respect to their business and legal needs.

Accordingly, this Court should find that a term of probation with home confinement is a "sufficiently serious sentence" for Joe, *Warner*, 792 F.3d at 860, and would best serve society as well as the goals of sentencing.[25]

---

[25] Where alternatives to prison, such as home confinement, are available and appropriate, policy against incarceration can be considered pursuant to § 3553(a)(5), which asks a court to examine "any pertinent policy statements." *Coughlin*, 2008 WL 313099, at *8-9.  The Sentencing Reform Act of 1984, which created the U.S. Sentencing Commission, was enacted in part to deal with prison overcrowding.  *Id. at *8.*  A non-custodial sentence should therefore be favored where prison is not necessary to accomplish the goals of punishment.  *Id.*