
November 19, 2018

**VIA ECF**
Honorable Valerie E. Caproni
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:    **Sentencing Memorandum**
                   *United States v. Kaloyeros, et al.,* **S2 16 Cr. 776 (VEC)**

Dear Judge Caproni:

      You do not know Steven F. Aiello. That is why we wish you could have a cup of coffee with him. If you could, you would hear him speak about his immigrant grandparents and the carpet and flooring business his father ran on the North Side of the City of Syracuse. He would tell you about how prior to the January trial he found his mother's long lost necklace in a couch cushion and how he kept that necklace in his right pocket through both trials for strength, courage and humility – the virtues his mother instilled in him. Before your coffee could be refilled, Steve would talk with simple joy about his wife Lori and their children Stevie, Elizabeth and Tommy and you would see the pride swell in him when he talks about their potential and how proud he is – not about what they have achieved (which is impressive) - but that they have good hearts and are good neighbors.

      We wish you could walk with Steve through the City of Syracuse. If you could, you may never reach your destination because you would be stopped – constantly – by neighbors and friends who cross the street to say hello and to thank Steve for some advice or some silent act by Steve or his company, COR Development. In between these welcome interruptions, Steve would educate you on the history of the City of Syracuse – the North Side, where he grew up, what it was like living there when Syracuse had manufacturing jobs and how the community has fallen but *can* and *is* rising again. He would point out the buildings he installed carpet in with his father; homes that he sold as a real estate agent; a business or restaurant that he would encourage you to visit and try; and plans that he had for a neglected parcel or entire neighborhood. As 20-year friend Richard Barry described after recently running into Steve, "he was very excited about a new project. He drove me around a field, over hill and dale, sharing his vision of the future development and how beautifully it would transform the area." (*See* Richard Barry, at <u>B4</u>)[1]. You would see and feel the energy and conviction that drives Steve and how that energy leads to

---

[1] 220 letters of support are annexed to this submission. They are arranged alphabetically by the author's last name. A hardcopy will be sent to the Court, Probation and Government.

{O0307685.1}

ideas to improve the community, whether through a program, a building or the development of entire city blocks. When he finished describing his plan, you would believe he could do it.

We wish you could walk through COR's office's in Fayetteville, New York. When you entered, you would know why Bill De Marle wrote that COR is a "very welcoming place and it was obvious it came from the top down." (*See* William De Marle, at <u>D7</u>). Because you would be greeted by Barbara (*See* Barbara Sessler, at <u>S4</u>) and then Margaret (*See* Margaret Williams, at <u>W4</u>), whose office is the first door on the right, would come out and say hello. You would meet Kate Johnson (*See* Catherine Johnson, at <u>J3</u>) and have no idea you were speaking to the CEO of a multi-million dollar business. Steve's co-workers would welcome you with a warmth that reflects the pride they have for their company. As Thomas Balestra, a 15 year employee of COR said, "No matter what your position in the company, Steve treats everyone like they matter." (*See* Thomas Balestra, at <u>B1</u>).   Based on the way you were welcomed, you would immediately know that you were not in a typical office, but in a place where every employee knows they are respected, treated fairly and feel lucky and proud to be part what employees like Bobby Baxter refer to as their "COR Family". (*See* Bobby Baxter, at <u>B6</u>).

Finally, we wish you could walk into Steve and Lori's home. You would instantly feel at ease and welcomed to the table to enjoy and share in the discussions of the day over a meal that Steve prepared himself, probably from one of his mother's recipes.

As you left the Aiello home, finished your walk with Steve, or ended you visit at COR, you would understand why 220 people – 193 of which are not family but are the people of Central New York – took time out of their day to write on Steve's behalf. By any measure, that is an extraordinary number particularly since Steve is not a public official, all-star athlete or celebrity. It is also impressive since each of these people knows that Steve has been convicted of multiple crimes and many noted that they could not avoid following the case because of the saturating news coverage of the trials in their community. This out-pouring of support *following the convictions*, is the product of how Steve reaches people, how he improves those around him and how people have come to trust and rely on Steve.

Moreover, these letters represent a cross section of the Central New York community: small business owners like Nader Hatem, owner of King David's Restaurant, Melvin Charney, owner of Charney Men's Clothing Stores and Pamela Dwyer, the owner of the Ladybug Lunchbox food truck; public officials like the Onondaga County Executive Joanne Mahoney, and New York State Senator John DeFrancisco; religious and community leaders like the Bishop of Syracuse, Robert Cunningham (*See* Robert Cunningham, at <u>C17</u>) and Jim and Julie Boeheim (*See* James and Julie Boehiem, at <u>B10</u>); COR employees like Tim Winters (*See* Tim Winters, at <u>W8</u>) and Vince Claps (*See* Vince Claps, at <u>C10</u>) and friends and neighbors from all walks of life. Steve's presence and reputation in the community is so strong that the Federal Express courier who delivers to COR, Thomas Phelps,  Steve's and Lori's veterinarian, Ann Harris, and Scott Drummond, the gentleman who seals and repairs Steve and Lori's driveway, all volunteered to support Steve by writing to the Court. Simply put, Steve is universally respected, loved and trusted in his community. To a person, they resoundingly request, and at times plead, that you impose a non-custodial sentence and return to Steve to them and their community. We join their overwhelming chorus.

As his counsel who have stood with Steve during what has been some of the most difficult moments of his 60 years on this earth, and having pried into the most intimate parts of his life over the last two-plus years, we have been welcomed into his family, his company and his home. There is no finer man who we have had the privilege to represent. There is no client that we would rather have. Words do not do Steve Aiello justice and we are frustrated that we cannot fully capture who Steve is in this format – since Steve is someone you need to be with and experience to appreciate his skills, his drive and his "strong moral compass." (*See* Dr. Anthony Visco, at V2).

The founders of our judicial system purposefully designed the Court to be distanced and removed so that it can render impartial judgments. But sentencing requires the Court to learn about the whole man; to consider everything that he is and everything that he can be. Acknowledging that our words will not do Steve justice, we nonetheless attempt to provide the Court with the context it needs to render a "sufficient" sentence that is "not greater than necessary", by bringing Steve and the Syracuse community that he calls home to you. 18 U.S.C. § 3553(a).

**Steve as a Young Man:**

The universal love and respect that Steve has come to enjoy from his community is the product of the values he learned from his parents. Many of Steve's immediate family, cousins and neighbors from his childhood neighborhood wrote to you to describing the values Steve's family successfully imprinted on him. Steve learned about hard, honest work by doing it with his father – the owner of a local carpet and flooring business. He and his older brother Lou were expected to work and learn the trade, and work and learn they did. *See* PSR at ¶ 135 and Mary Aiello Wisniewski, at W12.

He learned to take care of his family when his grandparents moved into their home as they required additional care and support. (*See* PSR at ¶ 135 and Mary Wisniewski, at W12). Steve continued that tradition of caring for his family and, as just one example, his sister Mary and his wife Lori recalled that after Lori's mother suffered a stroke, Steve physically carried her into their home so that she could enjoy Sunday dinners and family events. (*See* Mary Wisniewski, at W12 and Lori Aiello, at A7). Steve did this for years. In addition, he and Lori built her a new home so that she could have better access to care and support. The new home became the site of the "geriatric family dinners" that many letter writers fondly wrote about, because all were welcomed and made to feel part of the family – whether you were a relavtive or not.

After high school Steve attended Onondaga Community College and later Niagara University. Even as a young college student, Steve had a maturity and leadership quality that caused people to look to him for guidance. Christopher McCarthy, Steve's college roommate at Niagara University, recalled that Steve was often the "voice of reason" and he "commanded respect for his maturity and sense of humor." (*See* Christopher McCarthy, at M13). With that respect came the opportunity to serve his college community and Steve was ultimately elected Student Body Vice President. *Id*.

At Niagara, Steve met and fell in love with, a young nursing student from Syracuse named Lori Harris. They have been by each other's side ever since. They are each other's source of strength and their love for one another can be seen in the quality family they have raised, a family that letter writers praise for its civility, kindness and neighborliness. As pharmacist Mary Boats wrote, "Steve is a dedicated family man, he and his wife Lori have raised three wonderful, kind, caring hardworking children. The Aiello Family is loved and respected in our community." (*See* Mary Boats, at B8).

Following graduation from Niagara, Steve returned to Syracuse and took a job with Catholic Charities working with Vietnamese Refugees that had fled Vietnam after the end of the war. His job was to help them acclimate to living in the United States and this was a challenging job dealing with young, frustrated men with language and cultural barriers.

Soon thereafter, Steve and Lori married and they moved to New York City where Steve enrolled in St. John's Law School. There, in the basement apartment, affectionately remembered as the "Aiello Submarine" due to its subterranean location, Steve and Lori worked hard to make ends meet. Lori worked nights as a nurse. Steve struggled with law school. When money ran out, Steve and Lori moved home to Syracuse.

Soon after returning home, Steve took a job as a residential real estate broker with Eagan real estate and he instantly began to show promise. Steve's long-time colleague and friend, David Hanlon who went through training with Steve, recalled that Steve "was ahead of the rest in his capacity and desire to learn. Soon he moved into the Commercial part of the business, as he began his journey to become one the best developers in our city's history." (*See* David Hanlon, at H1).

During the early years of Steve's real estate career, Steve and Lori struggled to make ends meet. Margery Morgan, a 30 year family friend, recalls cementing her friendship with Steve and Lori during this time since "[f]inancially we were in similar circumstances…We didn't have much so we spent time at each other's homes. I have distinctive memories of making cookies for Lori and Steve's weekend open houses as he was a residential sales agent." (*See* Margery Morgan, at M19).

Success for Steve took patience and hard work. In this vein, longtime friend, Sarah Patrick's favorite story exemplifies how Steve became successful:

> My favorite story about Steve shows a man who has patience and willingness to work hard. When Steve started in real estate, one of his first assignments was selling lots for homes. Picture Steve, a big guy, sitting in a folding chair in the heat on a Sunday afternoon in the middle of an empty field. He had vision!

(*See* Sarah Patrick, at P4).

After Eagan, Steve started working in commercial real estate development with Widewaters Group, a widely respected development company. But with three children at home and after lots of travel to other parts of the country to seek out development opportunities, Steve wanted to bring development to Central New York. So in 1998, Steve, his older cousin Lou and

{O0307685.1}                                              4

good friend Joe Gerardi, started COR Development Corporation. Their other partners, Paul Joynt and Jeff Aiello would soon join the team.

**COR is Latin for "heart":**

COR was formed deliberately to do business with "higher values, ethics, standards and integrity" than Steve and his partners had previously experienced in the development business. They demonstrated a real commitment to that model with their first act by naming the company COR, because in Latin it means "heart". 15 years later, Lisa McKenney, a financial advisor who administers COR's 401k plan, was so moved by the story of COR's origins that she still recalls where she was the moment she learned about COR's foundational principles. (*See* Lisa McKenney, at M15).

Steve and COR meant what they set out to do and there is no question that their consistent, ethical and disciplined approach is the reason of their success. Melvyn Charney, who has managed his family's 65 year old business for the last 26 years, said that Steve Aiello and COR have kept their word – something that he "has never once" seen before from a property management company. And he felt compelled to write to the Court because "Steve is one of the first people I have met…that not only has vision for our community, he has backed it up with action." (*See* Melvyn Charney, at C5).

That is why Steve and COR stand out in the best ways possible. Indeed, the letters speaking to Steve's and COR's virtues as consummate professionals are too numerous to reference. Nearly every letter submitted to the Court references the positive and meaningful impact Steve and COR have had on the local community. As Thomas Hennessey Jr., the owner of Cooney Air Conditioning & Heating said, Steve and COR have a

> wonderful vision, invested and completed many wonderful projects in the central and northern New York area. His company has completely transformed an area close to my residence, the old vacant Fayettevllle Mall giving it new life. The new Fayetteville Town Center is a very busy, fully leased, job, and revenue creating success story. Just one of the many he and his company have completed. From what I have observed, every project they complete is of quality and built to "You can tell they truly care."

(*See* Thomas Hennessey, at H8).

One reason Steve and COR truly care is because he and his partners are personally invested. They personally own, invest and bear the risk in each project. They do not flip properties. They do not pump and dump. They do not build and move on. Their model is one of personal investment, risk and reward and, as a result, Steve's and COR's success is intertwined with the community's. As but one example related to this case, Steve and his partners personally guaranteed a $12 million loan from M&T Bank to pay their subcontractors on the SORAA project because COR had not been paid tens of millions of dollars it was owed by Fort Schuyler. Steve and his partners bore this risk because of the commitment they made to their subcontractors and they were not going to let forces outside their control absolve them of their commitments.

It is no mistake why so many people described the beneficial impact Steve's and COR's projects have had for their communities. John Johnson, described how the City of Watertown turned to Steve and COR to help with a housing shortage for its troops serving in the 10th Mountain Division at Fort Drum that resulted in rent gouging for the troops, their families and the local population. "Mr. Aiello listened" to Watertown's concerns and "once committed to an investment he built the Beaver Meadows apartment project as promised" helping provide much needed quality housing and stabilizing rental rates for our troops and their families. (*See* John Johnson, at J4). Similar praise is given for the re-development of the Towne Center in Fayetteville which Steve and COR turned from a dilapidated, deteriorating eye sore into a thriving market place that encouraged further investment and "infused money into our economy and created innumerable jobs." (*See* Dr. Patrick Lynch, M.D., at L4 and Theresa Pelletier, at P7). The Towne Center is designed to live up to its name, "an all-inclusive complex, that welcomes everyone." (*See* Robert Pomfrey, at P15) with facilities like a public gazebo and town building where the community can gather. (*See* Anthony Ciero, at C6).

The same is true for the redevelopment of the condemned, vacant, drug and crime invested Cherry Hill housing project into safe, quality housing development for low-income families and veterans called Maple Heights. (*See* Dr. Patrick Lynch, M.D., at L4). And the excitement is building for what Steve and COR are doing with the contaminated waste land of the Syracuse's Inner Harbor. (*See* Tim Norton, at N4; Robert Sekowski, at S3; and Mayor Thomas G. Young, at Y2).

Steve's vision for COR to act with higher values and ethics extends to the way he treats his employees, many of whom have written to the Court. These employees speak of unheard of generosity. Bobby Baxter first described how Steve gave him a job offer despite an old felony conviction and when he fell behind on his mortgage following a surgery and his wife losing her job, Steve and COR stepped in and gave Mr. Baxter a check to help him get current on his mortgage with no questions asked. (*See* Bobby Baxter, at B6). Tim Winters, COR's project manager, described that after his son tragically died, Steve and COR gave him all the paid time off he needed to care for his family, then when Mr. Winters forgot to plan a gathering for the family following the funeral, Steve and COR stepped in and planned and paid for the entire affair. When Mr. Winters called Steve to thank him, Steve simply replied, "I had to do something more for you and your family." (*See* Tim Winters, at W8).

COR's employees also speak of the good example that Steve sets that allows his people, and by extension, COR to thrive. As Vince Claps, a 15 year COR veteran wrote, "I will be forever grateful that [Steve] created a business environment that allows me to keep the morals and ethics that I hold sacred." (*See* Vince Claps, at C10). And that good example attracts talented, loyal people such as David Eade, a successful commercial real estate broker, who could have worked anywhere he wanted but he chose to work with Steve and COR because of Steve's "reputation for honesty, integrity and hard work." (*See* David Eade, at E1). As a final example, Peter Heacox, a self-described "blue-collar" worker who is not a COR employee but interacted with members of COR's ground crew wrote, "I can say that I have never met a group of people that spoke so highly of their boss." These acts of kindness are part of why Steve and COR are successful and what has created the fidelity his employees feel to the "COR family". (*See* Bobby Baxter, at B6).

It is also why despite the challenges and strains the trials have put on COR that it has not had one meaningful resignation or departure. (*See* Allen Naple, at N2) In fact, as its CEO, Kate Johnson writes, Steve still resists making staffing reductions despite the tremendous negative impact this trial has had on COR. (*See* Catherine Johnson, at J3). Due to this loyalty and respect, the people that work with Steve believe that he is an "irreplaceable asset to the community." (*See* David Eade, at E1).

**Charitable Work and Public Service:**

It is hard to know where the line between business and service is with Steve Aiello. That line get beneficially blurred because at the center of what drives Steve is to develop a community that his grandchildren would not want to move away from. (*See* Christina Wiesniewski, at W10). That desire has motivated Steve to give, serve, develop and live with a sense of public and community purpose. Steve has served in innumerable roles sometimes formally, sometimes anonymously, in an effort to improve his community. Formally, Steve was on the Board of Directors of Onondaga Community College; he served on the board of the Franciscan Companies which provides healthcare assistance to the local community; he served on the board for Everson Museum; served on the board for the Greater Syracuse Chamber of Commerce; and served on the Executive Committee for the renovation of the Cathedral of the Immaculate Conception.

Steve, Lori and COR have also generously provided financial support to countless local groups such as the Make A Wish Foundation, the Jim and Julie Boehiem Foundation, the Boys and Girls Club, Elmcrest Children's Center; the Fayetteville Manlius Community Outreach, Inc. Food Pantry; the Francis House; My Father's Kitchen and many more.

Perhaps more indicative of Steve's true character are his anonymous acts of service and generosity. (*See e.g.* Margery Morgan, at M19; Sheldon Kruth, at K6; and Miles Bottrill, at B11). As just one example, when Steve became aware that the Blessed Sacrament School's classrooms did not have phones to communicate within the school or even call 911 in an emergency, Steve anonymously paid for an entire new phone system. (*See* Andrea Polcaro, at P14).

Similarly important to note are Steve's small acts of service. When word got to Steve that the local food pantry staff was concerned about not having a lit entrance to their space, "[w]ithin days, the light was installed and ready for the next shift." (*See* Linda Napier, at N1). When Steve knew that a friend from out of town was visiting for the day only, he arranged for someone to drive her to see her mother in a local nursing home. (*See* Mary Kate Herron, at H10). Similarly, many neighbors and colleagues wrote that when tragedy struck, Steve and Lori provided limitless support. Sometimes it was providing rides and meals to a family recovering from an illness or traumatic injury like the Avenillo Family (*See* Grendao Avenillo, at A17). Other times it was paying for medical expenses when a neighbor could not afford the care (*See* Julie Aiello, at A6). John Giamartino, Jr said it best: Steve "doesn't wake up every day trying to cheat the system, he wakes up every day trying to make the communities he has lived in his whole life better. In my opinion, that is where Steven belongs." (*See* John Giamartino, at G4).

### Steve Changes People's Lives For the Better

It is rare to have multiple people say that someone has positively changed your life. For Steve, it seems to happen with regularity. Thomas Balestra writes that he approached Steve out of the blue asking for a job opportunity in one of COR's future developments. A year later, when the project was completed, Steve remembered the request, called him and offered him a job. Mr. Balestra writes, "the job opportunity Steve gave me 10 years ago change my life and I believe that everything I have today is a direct result of Steve keeping his word." (*See* Thomas Balestra, at B1). Aaron Nipper recalled how when he faced criminal charges, lost driving privileges and could not hire a lawyer, that Steve did not fire him. Instead, Steve got someone to drive for him, then loaned him money to pay for a lawyer and ultimately the charges were dismissed. Because Steve believed in him and worked with him, it "changed" his life. (*See* Aaron Nipper, at N3). Or as Theresa Pelletier shared, "When I was trying to figure out life as a widow with no job and no health insurance, Steve offered me both… You will not find a person like that that truly cares about people that way in today's society." (*See* Theresa Pelletier, at P7).

### Steve is Consistently the Same Man:

One of the stronger themes to emerge from the avalanche of support for Steve is that he is consistently the same good-natured man. This was best captured by Debra Douthit

> I'm struck by the consistency of his persona and how others experience him. Across a breadth of contexts, from the powerful movers and shakers down to and including the salt of the earth, Steve is perceived the same way.

(*See* Debra Douthit, at D14). Ann Elliott and Steve Greenstein also said it well

> Over the years, our first impressions of Steve held steady because of the consistency of qualities that he demonstrated. We found him to be a person of the utmost trustworthiness, a loyal friend, a person we respect as a husband, a parent, a family member, and a contributor of his energies and expertise to the community at large.

(*See* Steve Greenstein and Ann Elliot, at G10). Consistent with these observations, it is no surprise that Steve's one-time spinning instructor had no idea that Steve owned her gym. Even after realizing it she states that Steve and Lori's "unassuming approach was and remains refreshing." (*See* Madge Flynn, at F5). Or, to put it another way "Steve Aiello's true character is revealed in his ordinary life." (*See* Margery Morgan, at M19). These observations do not come lightly; they come because Steve is simply the "most down to earth, honest and humble person" in his community. (*See* Brian Ackerman, at B1).

**"Please return him to us, his friends and community" – Dr. Randall Green, MD**

A community could not more universally request that Steve be returned to them and to serve his sentence within and for the community. We cannot say it better so we will provide a few of the 200-plus requests for a non-incarnation sentence:

"Prison would be a loss to the people of our community." (*See* Michael Allen at A13)

"A prison sentence for Steven Aiello would prove to be an overall loss for Syracuse. We highly encourage a verdict that keeps Steve in the community." (*See* Jim and Julie Boehiem, at B10).

"Steve is a successful small-town family business owner who has earned the respect, admiration and trust of our community…He and his family are our neighbors, our friends. I want them to stay here in our community. **Our community needs them**." (*See* Carolyn Cifra, at C9) (emphasis supplied).

"Sending Steve to prison would tangibly hurt the community." (*See* Theodore Voulgaris, at V3).

"When I first learned of the opportunity to help illustrate for you the man you're about to sentence, I enthusiastically volunteered as I am deeply troubled by the prospect of his being separated from his family and taken from our community….I ask that you carefully consider the cost to Syracuse as you prepare to sentence Steve Aiello." (*See* Debra Douthit, at D14)

"[it would be a] devastating loss to the Syracuse community if Steve Aiello were sentenced to prison." (*See* Steve Greenstein and Ann Elliot, at G10).

"[Steve is] an irreplaceable asset…to the community." (*See* David Eade, at E1).

**Sentencing Guidelines:**

Thankfully, the Court does not need to sentence Steve to prison. The appropriate offense level is a 7 with a guideline range of 0-6 months which permits the Court to impose a non-custodial sentence.

The sole issue in dispute regarding Steve's guideline range calculation is whether he should receive an 18 level enhancement under §2B1.1 for the amount of loss associated with these convictions. No enhancement applies because there is no loss and the Government has not proven otherwise. *United States v. Niebuhr*, 456 Fed. Appx. 36, 39 (2d Cir. 2012) ("The Government has the burden of proving, by the preponderance of the evidence, both the amount of restitution and the loss amount."). In fact, both the PSR and the Government affirm that there is no loss.

The PSR states, "[i]n this case, **there is not an actual loss**, in that the contracts would have been awarded to some developer at some time." PSR Addendum at 37 (emphasis supplied). Consistent with that finding, the PSR acknowledges there is "no identifiable victim" and the Government is "not aware of any victims **entitled to** or seeking restitution. PSR at ¶111 (emphasis

{O0307685.1}                                              9

supplied).² Similarly, the Government is not seeking to forfeit any assets. PSR at ¶173. Restitution and forfeiture occur when a victim has lost something. Since the Government is not pursuing either, it follows that there is no loss, and therefore no §2B1.1 enhancement. Nonetheless, the Government and Probation are improperly using a distorted "gain" figure as a substitute for a non-existent loss because "gain appears to more accurately reflect the offense." PSR Addendum at 37. This is not permitted under any interpretation of the Second Circuit precedent or the Guidelines.

If there is no loss, the Guidelines say that is the end of the analysis and you do not go to gain as a substitute. *See* U.S.S.G § 2B1.1. cmt. n. 3(B) ("Gain" from a fraud offense is used as an "alternative measure of loss *only* if there is a loss but [loss] reasonably cannot be determined") (emphasis added). Gain, therefore, is not a substitute for loss when there is no loss. *United States v. Robie*, 166 F.3d 444, 455 (2d Cir. 1999)( "'[g]ain is only an alternative measure of some actual, probable, or intended loss; it is not a proxy for loss when there is none.'" quoting *United States v. Chatterji,* 46 F.3d 1336, 1340 (4th Cir. 1995)); see also *United States v. Romano*, 794 F.3d 317, 339 (2d Cir. 2015) (quoting U.S.S.G. § 2B1.1 cmt. n. 3(B)). Under these circumstances, where there is admittedly no loss, gain certainly cannot be used as its substitute. *Robie*, 166 F.3d at 455. Mr. Aiello therefore cannot receive any enhancement under §2B1.1.

With no enhancement, Steve's guidelines range is a 7. This provides the Court with the latitude to impose a non-custodial sentence without departing or varying. We request the Court do so because Steve's individual characteristics, the community support, his age, the cast collateral consequences that come with federal felony convictions and his lack of criminal history all call for a punishment other than incarceration. As Syracuse native Christopher Falso (*See* Christopher Falso, at F2) said, "I can think of no one who deserves compassion and leniency more than Steve Aiello." We hope the Court agrees.

Very truly yours,

O'CONNELL AND ARONOWITZ

By: *[signature]*

Stephen R. Coffey
Pamela N. Nichols
Scott W. Iseman

Encl.

---

² According to 18 U.S.C 3663A, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense. This is not a case where there is a missing victim or the victim cannot be identified. According to the Government's theory, the victim is Fort Schuyler Management Corporation and the Government's position is that it is not entitled to restitution, which, in a wire fraud case, would be "the value of the property on the date of the damage, **loss**, or destruction." 18 U.S.C. § 3363A(b)(1)(B)(i)(I) (emphasis supplied). It follows, therefore, that the Government is not pursuing restitution because Fort Schuyler did not lose anything of pecuniary value. It should also be noted that the PSR's position regarding restitution and forfeiture remains unchanged from the Draft PSR, with no objection from the Government.

{O0307685.1}                                10

cc: All parties via ECF