**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
:
UNITED STATES OF AMERICA                          :
:
v.                                   :
:      Case No. 16-cr-00776 (VEC)
ALAIN KALOYEROS, et al.,                           :
:
Defendants.                     :
:
------------------------------------------------------x

**<u>DEFENDANT ALAIN KALOYEROS'S SENTENCING MEMORANDUM</u>**

Reid H. Weingarten
Michael C. Miller
Michael G. Scavelli
David B. Hirsch
Meghan L. Newcomer
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

*Counsel for Alain Kaloyeros*

Dated: November 19, 2018

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................**8**

II.     ALAIN KALOYEROS'S PERSONAL HISTORY AND CHARACTER..........................**10**

   A.   Early Life .................................................................................................................10

   B.   Doctoral Studies ......................................................................................................12

   C.   Academic Career ......................................................................................................12

   D.   Service to New York State .......................................................................................16

   E.   Family ......................................................................................................................19

   F.   Workplace ................................................................................................................22

   G.   Kindness to Friends and Care for the Community ..................................................23

III.    THE CORRECT GUIDELINES RANGE IS 4-10 MONTHS. .....................................**24**

   A.   The 22-Level Gain Enhancement Is Inappropriate ..................................................25

      1.   The Gain Enhancement is Prohibited Because the Government Failed to Prove Loss.........................25

      2.   Any Loss Could Have Been Reasonably Calculated. ........................................29

      3.   Any Loss Was Minimal. .....................................................................................30

      4.   The Gain Is Not a Reasonable Approximation of Any Loss................................33

      5.   Neither Gain Nor Loss Was Reasonably Foreseeable. ......................................34

   B.   The Court Should Not Apply an Enhancement for Obstruction of Justice. ...............35

IV.     IF THE COURT ACCEPTS THE PSR'S GUIDELINES CALCULATION, A SIGNIFICANT DOWNWARD DEPARTURE IS WARRANTED. ..................................................**35**

   A.   The Offense Level Overstates the Seriousness of the Offense..................................36

   B.   The Circumstances Are Not Adequately Captured by the Guidelines. ......................38

V.      A LOW-END OR BELOW-GUIDELINES SENTENCE IS WARRANTED EVEN UNDER THE CORRECT, LOWER GUIDELINES CALCULATION..................................................**39**

   A.   The PSR's Recommendation ....................................................................................40

   B.   History and Characteristics of the Defendant..........................................................40

   C.   The Nature and Circumstances of the Offense ........................................................41

      1.   Alain Did Not Seek to Personally Profit from the Relevant Conduct...................41

      2.   The Victim Suffered No Economic Harm. .........................................................43

   D.   Protection of the Public ...........................................................................................43

   E.   Seriousness of the Offense and Deterrence..............................................................44

   F.   The Need to Avoid Unwarranted Sentencing Disparities ........................................45

VI.     THE GOVERNMENT HAS NOT SOUGHT FORFEITURE OR RESTITUTION. ...................48

VII.    CONCLUSION ..........................................................................................................**48**

1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Faller Grp., Inc. v. Jaffe,*
    564 F. Supp. 1177 (S.D.N.Y. 1983)......................................................................31

*Furman v. Georgia,*
    408 U.S. 238 (1972)......................................................................................39

*Kimbrough v. United States,*
    552 U.S. 85 (2007)......................................................................................37

*Nelson v. United States,*
    555 U.S. 350 (2009)....................................................................................40

*Pepper v. United States,*
    562 U.S. 476 (2011)....................................................................................40

*Smirlock v. United States,*
    No. 04 Civ. 9670, 2005 WL 975875 (S.D.N.Y. Apr. 25, 2005)............................38

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006).............................................................. *passim*

*United States v. Andersen,*
    45 F.3d 217 (7th Cir. 1995) ..........................................................................34

*United States v. Bazazpour,*
    690 F.3d 796 (6th Cir. 2012) ........................................................................35

*United States v. Block,*
    No. 16 Cr. 595 (S.D.N.Y. Nov. 8, 2017) ...........................................26, 33, 47

*United States v. Butler,*
    No. 08-cr-370 (E.D.N.Y. Jan. 22, 2010)..........................................................31

*United States v. Canova,*
    412 F.3d 331 (2d Cir. 2005)..........................................................................33

*United States v. Carmona-Rodriguez,*
    No. 04 CR. 667 (RWS), 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005)....................44

*United States v. Carrington,*
    96 F.3d 1 (1st Cir. 1996)...............................................................................31

*United States v. Cavera*,
　　550 F.3d 180 (2d Cir. 2008) ................................................................................. 39

*United States v. Collins*,
　　No. 07 Cr. 1170 (S.D.N.Y.) ................................................................. 42, 45, 47

*United States v. Coppola*,
　　671 F.3d 220 (2d Cir. 2012) ................................................................................. 26

*United States v. Corsey*,
　　723 F.3d 366 (2d Cir. 2013) ................................................................................. 37

*United States v. Cuti*,
　　No. 08-CR-972 (DAB), 2011 WL 3585988 (S.D.N.Y. July 29, 2011) ................. 26

*United States v. Deutsch*,
　　987 F.2d 878 (2d Cir. 1993) ................................................................................. 26

*United States v. Dickler*,
　　64 F.3d 818 (3d Cir. 1995) ............................................................................. 26, 34

*United States v. Emmenegger*,
　　329 F. Supp. 2d 416 (S.D.N.Y. 2004) ................................................................. 38

*United States v. Faibish*,
　　No. 12 Cr. 265, 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) ............................. 37

*United States v. Ferguson*,
　　676 F.3d 260 (2d Cir. 2011) ................................................................................. 28

*United States v. Foster*,
　　728 F. App'x 112 (3d Cir. 2018) .......................................................................... 30

*United States v. Galante*,
　　111 F.3d 1029 (2d Cir. 1997) ............................................................................... 41

*United States v. Gennuso*,
　　967 F.2d 1460 (10th Cir. 1992) ............................................................................ 31

*United States v. Getto*,
　　729 F.3d 221 (2d Cir. 2013) ................................................................................. 34

*United States v. Ghavami*,
　　No. 10 Cr. 1217 (KMW) (S.D.N.Y.) ............................................................. *passim*

*United States v. Graham*,
　　No. 06 Cr. 137 (D. Conn. Apr. 30, 2009) ....................................................... 42, 47

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd,* 747 F.3d 111 (2d Cir. 2014) ............................42

*United States v. Haddock*,
   12 F.3d 950 (10th Cir. 1993) ................................................................................34

*United States v. Harris*,
   821 F.3d 589 (5th Cir. 2016) ................................................................................27

*United States v. Hernandez*,
   No. 03 CR. 1257, 2005 WL 1242344 (S.D.N.Y. May 24, 2005) ..........................44

*United States v. Jamieson*,
   427 F.3d 394 (6th Cir. 2005) ................................................................................35

*United States v. Kang*,
   16 Cr. 837 (S.D.N.Y.) ..........................................................................................46

*United States v. Khandrius*,
   613 F. App'x 4 (2d Cir. 2015) ..............................................................................34

*United States v. Khedr*,
   343 F.3d 96 (2d Cir. 2003) ...................................................................................35

*United States v. Kilbride*,
   No. CR 05-870-PHX-DGC, 2007 WL 2774487 (D. Ariz. Sept. 21, 2007) ..........34

*United States v. Kipnis*,
   No. 05 Cr. 727 (N.D. Ill. Dec. 10, 2007) .............................................................42

*United States v. Korfhage*,
   683 F. App'x 888 (11th Cir.), *cert. denied*, 138 S. Ct. 205 (2017) .........................36

*United States v. Lumiere*,
   No. 16 Cr. 483 (S.D.N.Y. Jun. 14, 2017) .......................................................37, 47

*United States v. Martin*,
   796 F.3d 1101 (9th Cir. 2015) .........................................................................27, 30

*United States v. Maurello*,
   76 F.3d 1304 (3d Cir. 1996) .................................................................................33

*United States v. Mitrow*,
   No. S3 13 CR. 633 PAE, 2015 WL 5245281 (S.D.N.Y. Sept. 8, 2015) ...............26

*United States v. Morales*,
   664 F. App'x 228 (3d Cir. 2016) ......................................................................27, 30

4

*United States v. Near,*
   14-cr-0271 (N.D. Ga. Dec. 21, 2015) ......................................................................32

*United States v. Nesbeth,*
   188 F. Supp. 3d 179 (E.D.N.Y. 2016) ......................................................................45

*United States v. Parris,*
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) ......................................................................37

*United States v. Preacely,*
   628 F.3d 72 (2d Cir. 2010)........................................................................................39

*United States v. Prosperi,*
   686 F.3d 32 (1st Cir. 2012)........................................................................................42

*United States v. Ranum,*
   353 F. Supp. 2d 984 (E.D. Wis. 2005)......................................................................42

*United States v. Rigo,*
   649 F. App'x 107 (2d Cir. 2016) ...............................................................................25

*United States v. Romano,*
   794 F.3d 317 (2d Cir. 2015)......................................................................................25

*United States v. Ruiz,*
   No. 04 Cr. 1146, 2006 WL 1311982 (S.D.N.Y. May 10, 2006)................................44

*United States v. Rutkoske,*
   506 F.3d 170 (2d Cir. 2007)......................................................................................26

*United States v. Rutkoske,*
   No. 3 Cr. 1452 (LMM) (S.D.N.Y.) ...........................................................................26

*United States v. Schneider,*
   930 F.2d 555 (7th Cir. 1991) ...............................................................................32, 43

*United States v. Slatten,*
   865 F.3d 767 (D.C. Cir. 2017)...................................................................................39

*United States v. Stewart,*
   590 F.3d 93 (2d Cir. 2009).........................................................................................45

*United States v. Tanner,*
   No. 17 Cr. 61 (S.D.N.Y.) ....................................................................39, 44, 46, 48

*United States v. Tomko,*
   562 F.3d 558 (3d Cir. 2009).......................................................................................44

*United States v. Walters*,
    87 F.3d 663 (5th Cir. 1996) .........................................................................43

**Statutes**

18 U.S.C. § 3553(a) ............................................................................ *passim*

18 U.S.C. § 3553(b) ...................................................................................36

U.S.S.G. § 1B1.......................................................................................34

U.S.S.G. § 2B1.1.............................................................................. *passim*

U.S.S.G. § 3B1.3.....................................................................................25

U.S.S.G. § 3C1.1.................................................................................25, 35

U.S.S.G. § 5K2.0................................................................................36, 38

**Other Authorities**

26 C.F.R. § 1.61-62...................................................................................31

A. Mitchell Polinsky and Steven Shavell, *On the Disutility and Discounting of
    Imprisonment and the Theory of Deterrence,* 28 J. Legal Studies 1, 12 (1999).....................45

Alan Ellis, John R. Steer, Mark H. Allenbaugh, *At a "Loss" for Justice Federal
    Sentencing for Economic Offenses,* Crim. Just., Winter 2011, at 34, 35 ................38

December 21, 2017 Meeting Minutes, NYS Urban Development Corporation,
    *available at* https://esd.ny.gov/sites/default/files/news-articles/ESD-
    21Dec2017-BM-Posting.pdf.........................................................................32

James E. Felman, *Testimony on Behalf of the American Bar Association Before
    the United States Sentencing Commission's Hearing on Proposed
    Amendments Federal Sentencing Guidelines Regarding Economic Crimes,*
    Mar. 12, 2015, at 4-8, *available at*
    http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-
    hearings-and-meetings/20150312/Felman.pdf.........................................................48

Frank O. Bowman, III, *Sentencing High–Loss Corporate Insider Frauds After
    Booker,* 20 Fed. Sent'g. Rep. 167, 169 (2008) .......................................................38

Peter J. Henning*, Is Deterrence Relevant in Sentencing White-Collar Criminals*
    Wayne L. Rev. 27, 49 (2015), *available at*
    http://digitalcommons.wayne.edu/cgi/viewcontent.cgi?article= ...............................45

Rachel Mathisen, *Disproportionate Sentencing Guideline Recommendations in
    Fraud-on-the-Market*, 35 Rev. Litig. 321, 321-22 (2016)........................................37

Sune Haugbolle, The Historiography and the Memory of the Lebanese Civil War,
    Mass Violence and Resistance - Research Network, October 25, 2011,
    *available at* https://www.sciencespo.fr/mass-violence-war-massacre-
    resistance/fr/document/historiography-and-memory-lebanese-civil-war ..............................12

Timeline, BBC News, April 25, 2018, *available at*
    https://www.bbc.com/news/world-middle-east-14649284; ......................................................12

U.S. Sentencing Comm'n, *Report to Congress: Increased Penalties Under the*
    *Sarbanes-Oxley Act of 2002* (2003) .........................................................................................37

U.S. Sentencing Commission, *Sourcebook of Federal Sentencing Statistics, Fiscal*
    *Year 2017 Guidelines Sentences, Southern District of New York*, *available at*
    http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-
    reports-and-sourcebooks/2017/stats_NYS.pdf .......................................................................46

Defendant Alain Kaloyeros respectfully submits this memorandum of law in connection with his sentencing, presently scheduled for December 11, 2018.

I.   **INTRODUCTION**

Alain Kaloyeros is a good man.  He is a loving and devoted father, educator, and friend. He is also an exceptionally talented nanotechnology researcher.   Alain's hard work, perseverance, and integrity earned the respect and admiration of countless colleagues throughout higher education, from students to campus staff to fellow researchers to CEOs.  Decades earlier, it was those very same qualities that so impressed his teachers in Lebanon that he was able to escape the civil war-torn country with a scholarship to pursue his research and education.  Most of his colleagues were not so lucky, and some would not even survive the war.

Alain arrived in the United States with a physics degree in hand and the hopes of his mother, his sisters, and the friends he left behind in Lebanon.  There is no doubt that this responsibility has driven Alain to "dream big" ever since.  In his career, Alain aspired for more than a professorship or a lucrative position as a researcher at a private company.  He dreamed of making upstate New York a new Silicon Valley, with his university—an affordable public university, open to *any* student with a passion for research—as a "Berkeley on the Hudson."  In his family life, Alain provided his sons the love and stability that his childhood often lacked.  Of course, Alain's conviction places much of what he built in jeopardy and has undermined the institutions that he built, the goals he had for his university, and the people who counted on him. Alain feels deep remorse for his actions and will carry this burden for the rest of his life.

These factors, among others, make both the Guidelines range of 135 to 168 months and the PSR's recommended sentence of 48 months excessive.  Indeed, a sentence below or at the low end of the correct Guidelines range of 4-10 months is warranted for three reasons.

*First*, the correct Guidelines offense level is 9, yielding a range of 4-10 months. While Probation asserts that the correct Guidelines range is between 11 and 14 *years*, its Guidelines calculation is wrong, relying on inapplicable sentencing enhancements. Most significantly, its calculation is almost entirely driven by the application of a 22-level gain enhancement under Section 2B1.1 of the Guidelines based on the total amounts spent on each project multiplied by each developer's construction management fee. This gain-based enhancement is prohibited because the Government has not proven that Fort Schuyler Management Corporation ("Fort Schuyler") suffered any loss. Its argument for sending Alain to prison for many years rests on speculative testimony now offered for precisely the purpose prohibited at trial. *See* Tr. 1485:13-18 (admitting testimony provided that it did not address "what the . . . fee[s] ought to have been in this case"). This enhancement bears little relationship to the loss, and even less to Alain's culpability, for an offense that did not make him a dime.

*Second*, even if the PSR's Guidelines calculation was correct, the circumstances here call for a dramatic downward departure. This is primarily because: (1) that enhanced Guidelines range dramatically overstates the seriousness of the offense; and (2) the circumstances here are not adequately captured by the applicable Guidelines range. Put simply, a Guidelines sentence in these circumstances would elevate "the guidelines' fetish with abstract arithmetic" over "common sense" and produce a "travesty of justice." *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (Rakoff, J.) (decrying "the harm that guideline calculations can visit on human beings if not cabined by common sense.").

*Third*, the Section 3553 sentencing factors warrant a sentence below (or at the low end of) the correct range of 4-10 months. Alain is a self-made man, generous, and devoted to his

family.   The offense yielded no financial gain for Alain and was aimed furthering CNSE's[1] mission.   He has lost his career and his income.   He is not a danger to society and his conviction has already sent a powerful message throughout the state.   A below-Guidelines sentence would also prevent unwarranted sentencing disparities given recent practice.

Probation itself recognized that a "significant variance" below the Guidelines range was warranted under Section 3553(a).   (PSR at 38).   Despite using its erroneous Guidelines calculation as a starting point, it recognized that the loss-based enhancement substantially overstates the seriousness of the offense, and recommended a 48-month sentence instead.   (*Id.* (citing U.S.S.G. § 2B1.1 cmt. n.20(c)).   The same factors that Probation concluded warranted a significant variance also militate in favor of a sentence below (or at the low end of) the correct Guidelines range of 4-10 months.

## II.   <u>ALAIN KALOYEROS'S PERSONAL HISTORY AND CHARACTER</u>

Alain grew up in war-torn Beirut, where he was the victim of a terrorist attack.   He persevered to immigrate to the United States and earn a Ph.D. in physics.   That alone would make his story remarkable, but he went further: he became a beloved faculty member, a successful entrepreneur, and one of the most-recognized nanoscience researchers in the United States.   All the while, he supported his family and community and treated those he encountered with respect and kindness.   The events underlying his conviction, in other words, are a humiliating aberration in a career devoted to his students, his research, and his adopted home.

### A.    Early Life

Alain was born in Beirut, Lebanon in 1956.   (PSR ¶ 94).   Both his family and the surrounding political climate made his childhood an extraordinarily difficult one.   Alain's father

---

[1]    "CNSE" refers to the Colleges of Nanoscale Science & Engineering, which later became a part of the SUNY Polytechnic Institute ("SUNY Poly").

was an abusive alcoholic who brutalized his family.  When Alain was lucky, his father's drinking spells would end in prolonged absences from the family—wreaking havoc on their finances. (PSR ¶¶ 96, 98).  They were forced to move around constantly to keep a roof over their heads and food on the table.  (*Id.*).  When Alain was unlucky, his father's drinking spells led to violent abuse.  (PSR ¶ 98).  Alain's father beat his mother so severely that she had to be hospitalized on multiple occasions.  (*Id.*).  When Alain tried to intervene, his father attacked him as well.  (*Id.*). Alain was hospitalized twice due to this abuse: at age nine for bruised ribs, and at age fourteen for a head injury severe enough to cause unconsciousness.  (*Id.*)

Despite these obstacles, Alain performed well enough in secondary school to attend the American University of Beirut in 1973.  (PSR ¶¶ 99, 117).  His timing could not have been worse.  By late 1975, tensions between a patchwork of sectarian militias had exploded into a full-fledged civil war.[2]  The violence eventually spiraled out of control and killed thousands of civilians in a matter of days.  Members of different sects were forced out of their neighborhoods into segregated enclaves.  Christians, including Alain, clustered on the East side of the Green Line dividing the city.  (PSR ¶ 99).  Militia checkpoints controlled access to Balkanized neighborhoods.  Explosions and artillery fire became normal background noise.  Despite the chaos, Alain continued to attend classes—albeit at Lebanese University, which was on the right side of the Green Line.  (*Id.*).

Alain's attempts to avoid the war ended when he and two friends were stopped at an Amal checkpoint on the way to East Beirut.  (*Id.*).  Alain was knocked unconscious, and woke up

---

[2]   *See* Lebanon profile – Timeline, BBC News, April 25, 2018, *available at* https://www.bbc.com/news/world-middle-east-14649284; Sune Haugbolle, The Historiography and the Memory of the Lebanese Civil War, Mass Violence and Resistance - Research Network, October 25, 2011, *available at* https://www.sciencespo.fr/mass-violence-war-massacre-resistance/fr/document/historiography-and-memory-lebanese-civil-war.

in the hospital to find his wrists slit and one of his friends killed.  (*Id.*).  Alain still bears the scars

from this incident.  (PSR ¶ 107).

 At this point Alain was drawn into the war.  He voluntarily joined the Lebanese Forces, a

Christian militia fighting Amal, the Palestinian Liberation Organization, the Syrian Army, and

the predecessors to Hamas and Hezbollah.  (*Id.*)  He fought in several battles, was briefly

captured and detained, and was wounded by shrapnel while driving a Red Cross van full of

injured militiamen.  (PSR ¶ 108).  These horrors did not deter Alain from pursuing his education.

He attended school during cease-fire periods and eventually graduated in 1978.  (PSR ¶ 117).

His hard work and perseverance earned him a scholarship that encouraged top Lebanese students

to finish their education in the United States.  (PSR ¶ 101).

### B. Doctoral Studies

 Alain immigrated to the United States on January 6, 1980 to enroll in a physics Ph.D.

program at the University of Miami.  (PSR ¶¶ 101, 118).  He later transferred to the University of

Illinois to study with a Nobel prize-winning professor he admired.  (PSR ¶ 118).  He graduated

in 1987 with a Ph.D. in experimental condensed matter physics.  (PSR ¶ 119).  During his time at

the University of Illinois, he also met his future wife Paula Woller.  (PSR ¶ 102).  They eloped

and began to build a family together.  (Ex. 2).[3]  Alain, who had been considering returning to a

somewhat calmer Lebanon, decided to make the United States his permanent home to build a

family and pursue a career.  (*Id.*).

### C. Academic Career

 After graduation, Alain searched for a faculty position at an American university.  (*Id.*).

At that time, then-Governor Mario Cuomo was making a major push to bring young science and

technology researchers to New York state universities.  As part of these efforts, Alain was

---

[3]  "Ex." refers to the Exhibits filed concurrently with this memorandum.

recruited to the University of Albany as an Assistant Professor in 1988.  (PSR ¶ 123).  His research, which focused on improvements to semiconductor manufacturing, quickly attracted support and talented collaborators.  He received a Presidential Young Investigator award from the National Science Foundation in 1990.  (PSR ¶ 120).

While Alain's success at Albany led to more demands on his time for research and administrative work, he remained (and continues to be) deeply devoted to his students. Throughout his career, he insisted that he continue teaching and mentoring graduate and undergraduate students.  Recognizing the importance of reaching students at early ages, Alain also took a leadership role on several committees focused on supporting the next generation of STEM students in New York State.  He taught STEM at the elementary, middle, and high school levels, spoke to local organizations, and worked to open his community's eyes to the world of science.

Alain takes the most pride in his accomplishments as a mentor, and his success may be best measured by the countless students that he has helped throughout his career.  He began mentoring graduate and undergraduate students immediately after arriving at the University of Albany.  He has since supervised 36 Ph.D. dissertations and over 100 Master's theses.  His students have offered great praise for his personal involvement as a mentor.  Katarzyna Topol, a student from Poland, states:

> As a student from different country, speaking a foreign language, starting this internship—I didn't know what to expect and I wasn't sure if I would make it ok. . . .  I think that Dr. Kaloyeros saw that.  He helped me right away.  As my advisor he told me that this is only in my head, that all truly depends on me and that it was my choice what I would do and how I would do it.

(Ex. 42).  Spyridon Gallis, a successful former student, has a similar take on Alain's personal involvement:

> It was not only his uniqueness in providing me with succinct explanations and
> clear guidance, but also his belief in me that made him even more special as an
> advisor. To this end, when everything in my world seemed to be falling apart,
> Dr. Kaloyeros supported and guided me to move forward with my graduate
> studies.

(Ex. 11).  Karl Barth, another former student, explains: "Dr. Kaloyeros believed in me at a time

when I barely believed in myself.  Without his help and support I do not think I would have been

able to obtain a Ph.D. in physics."  (Ex. 10).

Many of Alain's mentees have gone on to promising careers.  Dr. Barry Arkles, a

longtime collaborator, writes:

> Independent of my interaction with Alain, I have met a number of recent
> graduates from the school Alain founded that grew up in the Albany area. They
> were inspired by the profile of Dr. Nano (Dr. Kaloyeros' local appellation) and
> the access to the School of Nanotechnology to consider a college education. One
> young man I knew from childhood, who would probably not otherwise have
> considered academics, completed his undergraduate in Nanotechnology in Albany
> and is now finishing a Ph.D.

(Ex. 14).

Alain's efforts have focused particularly on supporting the careers of women and people

of color, who are systemically underrepresented in scientific fields in general and

nanotechnology in particular.  He aggressively recruited these students to his program.  Once

they arrived, he met with them individually regarding their classes, introduced them to industry

leaders, and advised them on their careers well after their graduations.  Dr. Bushra Alam, a

successful plasma process engineer, writes that "[a]s a minority woman in STEM, I attribute

most of my personal and professional successes to opportunities that were provided to me at

CNSE under Dr. Kaloyeros' leadership.  Dr. Kaloyeros has been a great role model, mentor and

also a good friend since my time at CNSE."  (Ex. 9).  Alain also actively supported campus

organizations aimed at furthering these goals.  Genevieve Kane, a materials science researcher,

14

writes that "I am also currently serving on the Board of Directors of a global professional organization serving women in STEM, directly thanks to the initial leadership opportunities CNSE and Dr. Kaloyeros provided to me." (Ex. 8). Dr. Mary Graham, a Process TD Engineer at Intel Labs, describes her experience:

> In this highly technical industry, that I have lovingly become a part of, I must accept that I wear three minority hats: that I am female; that I am black; and, that I am American. At one point in time, I felt that a person like myself did not have a place in this industry. But Dr. Kaloyeros gave me a seat at the table.

(Ex. 7).

Alain's interest in education and STEM fields also benefitted the community at large. Dr. Alam recalls that "CNSE hosted hundreds, probably even thousands of children from the entire state of NY and beyond for outreach events," including two programs that brought local Girl Scouts to campus for open houses and summer camps. (Ex. 9). Archie Blais, a SUNY Poly employee, remembers Alain hosting hundreds of middle and high school students, and showing them "everything from Clean-room Protocol to operating photovoltaic powered vehicles through the halls." (Ex. 23). Alain expected CNSE students to participate in these events, both to serve as role models for participants and to establish a habit of community service among students. He even "built a High School on the Albany Campus" to encourage more students to go into STEM fields. (*Id.*). The resulting Tech Valley High School focuses on project-based learning and offers classes in Mandarin and various scientific fields. John Cavalier, one of the school's co-founders, praises Alain's involvement:

> Dr. Kaloyeros helped us to design the curriculum, worked closely with our administrators and teachers, and made sure that students had the opportunity to take advanced college-level courses at SUNY Poly. He spent hours with the students to educate them on how important STEM education could be for the future. He even set aside space on his modern tech campus for the high school to relocate—a rare chance which gave the school a permanent home. Having

watched him talk to the students at TVHS, I know that he cared deeply about their futures and saw each of them as a potential scientist.

(Ex. 22).



**Figure 1: The Tech Valley High School at SUNY Poly in Albany, NY**

### D.    Service to New York State

Alain has been a driving force in bringing the nanotechnology industry to Albany and New York State more broadly.  In the early 1990s, Albany and the surrounding region seemed to be disintegrating.  While employment rates steadily increased throughout much of the country, the region had lost thousands of high-paying jobs at Xerox, Kodak, and other companies.  The Albany campus also faced difficulties.  While its nanotechnology programs were growing, Alain realized that a strong academic department was not enough to support his students.  Without access to actual semiconductor manufacturing equipment or relationships with leading companies in the private sector, his students would remain isolated in the world of academia.  He recognized an opportunity to serve his students and his community.

Alain, together with Pataki administration officials, helped to focus the state's efforts on semiconductor manufacturing.  They used a combination of state incentives and investment in physical facilities to draw factories and companies like IBM, AMD, Applied Materials, and

Tokyo Electric to the Albany area.  Each state incentive led to massive investments by private partners, and tens of billions of dollars poured into the Capital Region.  The campus expanded its facilities from 70,000 thousand square feet to over 1.5 million.  CNSE students got full access to these facilities and the private sector researchers working there.  Dr. Pradeep Haldar comments on this success:

> In a relatively short period we increased the faculty to over 50 professionals attracted from top-notch institutions including Berkeley, MIT, Northwestern, Cornell, etc. . . .  During the period when he built the academic institution, Dr. Kaloyeros also almost singlehandedly grew the industry research partnerships that attracted top talent, resources, and equipment by over $20 billion.

(Ex. 13).

In large part due to Alain's leadership, CNSE quickly evolved into the largest and best-funded nanotechnology research facility in the United States.  The CNSE campus in Albany now hosts four "NanoFabs"—advanced buildings that contain cleanrooms for research and manufacturing of computer chips as well as classrooms.  Within these buildings, a few thousand of the leading researchers in the global nanotechnology industry along with university scientists, professors, and students work jointly to develop innovations in computers and servers, ultra-high speed telecommunications, green energy, drug discovery and delivery, and medical treatments.



**Figure 2: The SUNY Poly Campus in Albany, NY**

This expansion had a concrete positive impact on the Albany area.  It created thousands of semiconductor manufacturing jobs, which in turn benefitted the entire local economy. Downtown Albany, Schenectady, and Troy were revitalized, as new stores opened to cater to technology workers.  Alyson Willsie, a local financial professional, explains:

> The growth that began on the SUNY Poly campus has spread throughout the region, creating thousands of new job opportunities, not only for technology professionals, but for those industries that support that growth. In my current position working for a financial institution, we have benefited from the tremendous movement into this area, not only in the form of new clients, but also in the mortgage and lending areas. The difference in the market has been discussed repeatedly at strategy sessions and planning meetings.

(Ex. 19).  David Pirri, who owns a treadmill repair business, notes that the technology growth in Albany "has insulated our area from recession" and has helped his and other businesses grow. (Ex. 38).  Chris Wessell, a local recruiter, adds that "there is a ripple effect that extends beyond just the jobs on the campus, as I have personally hired multiple time for companies who are peripheral to the campus but directly benefited from the growth there."  (Ex. 15).

18

Economic development figures and journalists throughout New York have recognized Alain's accomplishments in Albany.   David Catalfamo, a Republican political consultant, explains that Alain's contributions to the Capital Region have been "profound."  (Ex. 39).  Fred Dicker, a journalist who has covered Upstate politics for over a decade, states:

> Business leaders have told me over many years that Dr. Kaloyeros' vision and accomplishments were the single greatest hope for the economic rejuvenation of the Capital District and a good part of upstate New York. Indeed, several said Dr. Kaloyeros and his accomplishments actually contributed to their staying in New York.

(Ex. 33).  John Scheib, an expert in the Capital Region's economic development, explains that Alain "created a massive, sustainable, growth engine that has been a substantial economic driver for the state and benefited many. Over the years I have come to know the creativity, the passion and the unique skill set it took for him to achieve the kind of success that is now present here." (Ex. 36).

### E.    Family

Alain married Paula Woller during his time at the University of Illinois.   (PSR ¶ 102). They have two children, Nick (age 25) and Alexander (age 22).  (PSR ¶ 103).  Though Paula and Alain separated in 2008 and she moved out of the family home last year, they remain friends and co-parents.  In her PSR interview, she described him as "the hardest working man she knows and the smartest person she knows."  (PSR ¶ 104).  Paula writes warmly of Alain's commitment to his children:

> I will never forget the incredible contributions he has made to my life, and the contributions he continues to make to our boys' lives.  He has and continues to give so much to make sure that the boys have all the support they need to be happy and successful, and without the struggles he experienced as a young man. He is quite simply indispensable to them.  The boys still rely heavily on him for support both emotionally and financially.  Our younger son especially lives with Alain and relies on his guidance and financial support to complete his degree in nanotechnology.  They both *need* their father.

19

(Ex. 2).  Her parents, Eugene and Julia Woller, have similar appreciation for his importance in

their grandsons' lives:

> Once when I was visiting, the boys were not minding their mother when she told
> them to pick up their games.  They knew they were in trouble when Alain set
> them both at the table together…..Was it a "time out"?—NO…Math Problems!!
> So instead of setting doing nothing in a "time out", they had to do math problems
> that their father gave them and learn in the process.    And they had to stay till
> they got them right!  And I thought then, what a good way to channel that energy!
> Why didn't I think of that!!   It was witnessing this form of discipline that
> impressed me as the boys were growing up.  When they got to misbehaving, as
> children do, that energy was channeled into a learning experience.

(Ex. 5).

Alain is an essential part of his children's lives.  He continues to support both of his sons

in every sense of the word.  Alexander is presently an undergraduate student at SUNY Poly

striving to become a physicist like his father.  He lives with Alain and relies on him for tuition

and living expenses.  Nick is presently out of college but still relies on his father for some living

expenses and ███████████████████████████████████████████  Despite a

grueling work schedule, Alain never wavered in putting his family first.  His son Alexander

explains that he supported the family ████████████████

> ██████████████████████████████████████████████
> ███████████████████████████ This time in our lives was really
> scary for all of us and I remember my dad constantly reassuring all of us both in
> what he said and what he did. He stepped up to fill every role he could. This
> included driving me to school every morning because arriving at school early was
> calming for me and helped me ease into my day.  As a kid who was thrust into a
> difficult situation, having this familiar routine was so important looking back.
> Until we could drive ourselves, my dad drove my brother and me to school every
> day.  I have since come to realize that all of this happened while his Nano college
> was starting to really take off, and his responsibilities were increasing.  Of course,
> I didn't really notice this effort at the time.  In fact, I wasn't at all aware of how
> significant his work was becoming, which is a testament to all he was doing for
> me.

(Ex. 4).  His son Nick remembers how his father spent his nights helping them with their math or science homework, taking care to guide them to solutions to problems instead of immediately giving them the answers.  He describes how his father woke up early every Sunday to make pancakes for the family and "made it clear to us that we always came first for him."  (Ex. 3).  Alain's commitment to being his sons' strength has been steadfast throughout his arrest and trial.  As Nick describes, "throughout all the pain and uncertainty, he has never stopped being who he has always been." (*Id.*).

It is clear that Alain succeeded in giving his sons a better life than his father provided to him.  His continued presence remains important to their well-being.

Although Alain's parents are deceased, he has always been a vital source of strength and support to his sisters.   Edith Kaloyeros witnessed first-hand how Alain's experience going from a difficult childhood to a civil war to scientific success is an inspiration to her and her sister's children. (Ex. 6).  In addition, Edith describes her own health struggles and Alain's irreplaceable emotional and financial support to her and her family:

> His continued involvement in my life became particularly important ▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Alain has supported me both emotionally and financially throughout
> this process whether I needed money for a hospital bill or just someone to talk to.
> I am not sure what I will do if he is unable to continue to help me.   I and my two
> children have come to rely on his constant mental and monetary support to afford
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Alain keeps my family
> going in so many ways.

(*Id.*)

F.      **Workplace**

Alain worked alongside numerous employees during his time at CNSE and SUNY Poly developing a reputation as a dedicated, hard-working, and egalitarian leader.  Carl J. Kempf, who served Vice President and General Counsel of SUNY Poly, observes:

> I worked side-by-side with Alain and witnessed first-hand his passion, deep dedication, and tireless efforts as a public servant for envisioning, establishing, and delivering big science research and development programs at CNSE and it successor SUNY Poly to create jobs and economic opportunity for thousands of individuals and their families.

(Ex. 46).   John Cavalier, a board member of the Albany-based Fuller Road Management Company described Alain as a leader who showed "utmost integrity."  (Ex. 22). Gary Lee, a former employee, explains that "[w]hile I was expecting the 'big' personality that is often portrayed in the media, Dr. Kaloyeros was warm, personable, and easy to talk to."  (Ex. 31). Pierre Torch, a fire systems technician, describes it best: "He treated everyone the same, he would take the time to speak with his colleagues that held PhD's right down to the cleaner that took out the garbage.  What I am trying to say is that no one was below him in his eyes." (Ex. 21).   Wayne Flores, a police officer assigned to campus, concurs: "It was obvious Dr. Kaloyeros cared greatly about the college and all of its outreach, but it was just as obvious to me that he cared about the employees as well.  Whether it was at such an event or just a passing in the hallway, Dr. Kaloyeros always went out of his way to be friendly and make you feel as much a part of the team as anyone else."  (Ex. 27).

Alain was also known for remembering and recognizing events important to his employees.  Nicolle Otty, who worked for him for five years, explains that "some of the things I noticed over the years that proved his deep caring and consideration for others was his keen observation skills; Dr. K would always recognize milestones such as awards, recognitions, celebrations.  If you were not having the best day, he would also notice and cared enough to ask

how he could help.  If there was a way he could help, he did so without hesitation."   (Ex. 45).

Olga Bogdanova describes how "Dr. Kaloyeros was also aware of and personally involved in his

friends' and colleagues' life milestones: from boasting when his friend had his first child, to

being a father-like supportive and wise figure for a friend when she was going through tough

times at home."  (Ex. 12).

### G. Kindness to Friends and Care for the Community

Alain has shown remarkable kindness to his friends and his community.  As in his

academic career, he gave helpful advice to anyone who asked for it.  Brian Corrigan, the founder

of a videogame development company, describes how "Dr. Kaloyeros kindly offered his advice

anytime I needed it to help keep my company afloat as well; no strings attached. I'm not sure

how he had time to answer phone calls from me in addition to his role at SUNY Poly, but he

always did. Over the years I found his advice and guidance to be invaluable."  (Ex. 20).  Alain's

former trainer and friend, Juliano Caprara, writes about Alain's impact on his life:

> He's taught me so much about work ethic, discipline, and being there for people
> who need you.  As I graduated university and went on to a job in the corporate
> world, Alain has been there as a support system and has offered many different
> words of advice to guide me through tough situations at work.  When I made the
> transition into the corporate work environment, I was filled with anxiety and
> wasn't sure I'd be able to thrive. Alain filled me with confidence and assured me
> that I could handle it.  When I'd have issues managing time and work, he'd give
> me advice and walk me through the process.  I recently took a promotion into
> management, and I can easily attribute that to the support and professional advice
> that Alain has given me.

(Ex. 24).

Alain has also generously contributed to various charities in the Albany area.  Unlike

many other wealthy people in town, he largely does so anonymously.  Leah Slocum, a board

member for local charities including the Leukemia and Lymphoma Society and the Make a Wish

Foundation, describes his contributions:

23

> Doctor Kaloyeros has always been very quiet and private about the charitable initiatives that he supports. He was never one to do it for publicity, or for recognition. He's given support to organizations that have directly impacted sick children and their families in our local area. . . . I've known of several occasions when Doctor Kaloyeros has not only given from his own pocket, but he has also rallied to help raise funds and donate a significant amount of money, anonymously, to area charities.

(Ex. 16).  Jessica Decker, a friend, has experienced this generosity more directly:


Alain was always there to provide emotional support, and our experience got him interested in the ▮▮▮▮▮▮. He now makes a generous annual donation at the ▮▮▮▮ every year.

(Ex. 17).  CJ Kempf, a former SUNY Poly employee, describes how Alain reacted when he learned that ▮▮▮▮▮▮▮▮▮▮▮.  (Ex. 46).  Alain not only donated personally to the ▮▮▮▮▮▮▮▮ but also threw CNSE's weight behind it and hosted a fundraiser that raised thousands of dollars.  Kempf describes how Alain, CNSE, and ▮▮▮ were all honored at the Foundation's annual ▮▮▮▮▮ Celebration. (*Id.*).

More generally, Alain's friends have described how Alain has enriched both the region and their own lives.  Joseph Valenti, a good friend, notes that Alain is "very honest, kind, hard-working, gracious, very generous, respectful and loyal and most of all incredibly funny.  Alain's heart is bigger than life, and to know him is to love him."  (Ex. 30).

### III.   THE CORRECT GUIDELINES RANGE IS 4-10 MONTHS.

The Probation Department calculates Alain's offense level as 33 and criminal history category as 0.  (PSR ¶¶ 77-92).  That calculation is based on: (1) a base offense level of 7; (2) a 22-level enhancement under U.S.S.G. § 2B1.1(b)(1)(L) based on a gain of $34.65 million; (3) a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of a position of public trust; and (4) a two level enhancement under U.S.S.G. § 3C1.1 based on the Government's claim that Alain

deleted emails to thwart the investigation of the offense.  (*Id.*).  It calculated the Guidelines imprisonment range as 135 to 168 months.  (PSR ¶ 136).

Alain agrees that a two-level enhancement for abuse of a position of public trust applies, but that is the only appropriate enhancement.  Combined with a base offense level of 7, the correct Guidelines level is 9, resulting in a Guidelines range of 4 to 10 months.

### A.    The 22-Level Gain Enhancement Is Inappropriate.

The PSR bases its 22-level enhancement on an unproven calculation that is divorced from reality.  Setting aside that Alain did not gain a penny from the offense, the Government relies on a series of erroneous assumptions to apply an enormous gain-based enhancement.  The Government's speculation cannot support this nearly *ten-year* increase in sentence.

The gain enhancement is prohibited unless the Government has shown by a preponderance of the evidence that: (1) there was in fact a loss; (2) that loss reasonably cannot be determined; (3) gain is a reasonable alternative measure of the loss; and (4) the gain was reasonably foreseeable to Alain.[4]  The Government has not established any of these elements.

### 1.    The Gain Enhancement is Prohibited Because the Government Failed to Prove Loss.

A gain enhancement is prohibited because the Government failed to prove any loss.  Gain is relevant only where the Government establishes that a pecuniary loss occurred, but cannot reasonably be determined.  U.S.S.G. § 2B1.1(b)(1) cmt. n.3(B); *United States v. Romano,* 794 F.3d 317, 338-39 (2d Cir. 2015) (under § 2.B.1.1, gain is "an alternative measure of loss" only where there is a loss in the first place).  The Government has the burden to demonstrate both the existence and the amount of "pecuniary harm" by a preponderance of the evidence.

---

[4]    *See* U.S.S.G. § 2B1.1(b)(1) cmt. n.3; *see also United States v. Rigo*, 649 F. App'x 107, 107–08 (2d Cir. 2016); *United States v. Mitrow*, No. S3 13 CR. 633 PAE, 2015 WL 5245281, at *5 (S.D.N.Y. Sept. 8, 2015); *United States v. Ghavami*, No. 10 Cr. 1217 (KMW) (S.D.N.Y.), Sentencing Tr. at 8:7-12, July 23, 2013 ("*Ghavami* Transcript"), ECF No. 424; *United States v. Dickler*, 64 F.3d 818, 826 (3d Cir. 1995).

U.S.S.G. § 2B1.1(b)(1) cmt. n.3(A)(i); *United States v. Cuti,* No. 08-CR-972 (DAB), 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011).   Though the goal is a reasonable estimate of loss, courts in the Second Circuit have recognized that these determinations are fact-driven and therefore require the Government to offer a rigorous methodology.[5]   The Government cannot satisfy this burden by engaging in speculation about what the loss might have been.  *See United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993) (reversing and remanding for resentencing where district court engaged in "pure speculation" in calculating loss); *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) ("[A] district court's findings must be grounded in the evidence and not derive from mere speculation.").

Here, there is simply no evidence before the Court that would allow for a determination of loss.  *See Crummy*, 249 F. Supp. 3d at 485 ("[T]here is no evidence before the Court that would allow it to compare the fair market value of the services that [the defendant's corporation] provided on the contracts to the contract price.").[6]   The Government's suggestions to the contrary miss the mark for three reasons.

*First*, the verdict itself is not proof of loss, because the jury's instructions required only that it find *potential* economic harm.  *See* Tr. 2885:6-15 (allowing conviction even absent

---

[5]     *See, e.g.*, *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007); *United States v. Rutkoske*, No. 3 Cr. 1452 (LMM) (S.D.N.Y.) (McKenna, J.), Sentencing Tr. at 19:3-20:19, Oct. 28, 2010 (concluding, after remand, that there was no loss); *United States v. Cuti*, No. 08 Cr. 972 (DAB), 2011 WL 3585988, at *4-6 (S.D.N.Y. July 29, 2011) (rejecting government's loss estimate due to flaws in government expert's methodology); *United States v. Block*, 16 Cr. 595 (JPO) (S.D.N.Y.), Sentencing Tr. at 38:12-16, Nov. 8, 2017 (noting that the loss to shareholders was "surely in the millions," but declining to apply a loss enhancement because the government's methodology was highly speculative).

[6]     *See also United States v. Martin*, 796 F.3d 1101, 1111 (9th Cir. 2015) ("The premium, if any, paid by the government on the contracts in this case is presumably a determinable amount."); *United States v. Harris*, 821 F.3d 589, 607 (5th Cir. 2016) ("On remand, the government will bear the burden of proof to show any difference between the contract price and the fair market value[.]"); *United States v. Morales*, 664 F. App'x 228, 232 (3d Cir. 2016) ("Yet even when showing an exact amount proves elusive, it remains within the government's power to present evidence that would aid in forming a well-grounded estimate.").

evidence "that the defendant actually realized any gain" or "that Fort Schuyler actually suffered any pecuniary loss").

*Second*, the calculation set forth in the PSR is highly speculative.  For example, it takes the total value of the projects and imputes every penny to the two *corporations*—COR and LPC. (PSR ¶¶ 68-69).  It thus ignores that hundreds of millions of dollars were paid to entirely unrelated entities to pay for tools and equipment.  *See* GX 388 (suggesting that 66% of the $750 million total would be spent on equipment rather than construction); Tr. 487:21-24 (noting that the overall project cost "included both construction costs and what people call tools, the equipment").  The calculation also ignores that the funds that flowed into COR and LPCiminelli did not flow directly into the pockets of Alain's co-defendants.  Indeed, Mr. Aiello and Mr. Gerardi held only partial shares in COR.

More fundamentally, the calculation relies on testimony from executives from other construction management firms, untethered to the specific facts of this case or these projects, that construction management fees were "often lower."  (PSR ¶ 69).  Even crediting the testimony in question, it is far too speculative to support a finding of pecuniary loss.  The Court admitted testimony from Steven Bills and Mark Balling, over objections, for the expressly limited purpose of showing that other developers charged "a range of fees," not to show that the fees charged here were too high.  Tr. 1363:11-24.  The Court cabined this testimony because Bills and Balling lacked the knowledge necessary to judge specific fees—because, in the Court's words, "I have no idea how Mr. Balling has any idea what the development fee ought to have been in this case." Tr. 1485:14-16.  Bills and Balling, for example, did not examine the contract and thus did not realize that it was design-build, that it had a guaranteed maximum price, that the construction site was a brownfield with environmental risks, or that there were harsh liquidated damages

provisions.  As a result, neither Bills nor Balling testified that the construction management fees charged for these specific projects were too high.  Their testimony, admitted for a limited purpose at trial and held to be unfounded for the broader purpose of showing that Fort Schuyler overpaid, may not now be used precisely for that unfounded purpose at sentencing.  *Cf. United States v. Ferguson*, 676 F.3d 260, 273-74, 277 (2d Cir. 2011) (vacating conviction where Government was permitted to introduce stock price-drop evidence for limited purpose of establishing materiality, but used it in summation to argue unfounded and prejudicial theory that individual investors had lost that full amount).

Bills and Balling also acknowledged that such fees could be higher.  Bills, for example, submitted a proposal to Fort Schuyler that noted fees that could range from 3-10% for the Rochester RFP.  *See* Tr. 2310:25-2311:11.

*Third*, the Government cannot avoid its obligation to present evidence by making assumptions about theoretical anticompetitive effects.  The Government suggests that the Court should assume that a competitive preferred developer selection process would have resulted in lower construction management fees.  (PSR ¶ 69).  In *United States v. Ghavami*, however, Judge Kimba Wood rejected a very similar invitation.  No. 10 Cr. 1217 (KMW) (S.D.N.Y.), Sentencing Tr.  10:8-21, July 23, 2013, ECF No. 424.  While acknowledging the possibility that a municipal bond bid-rigging scheme "may have caused municipal issuers to receive less than they otherwise would have received," *id.,* Judge Wood nonetheless rejected the government's gain estimate, explaining:

> I agree that defendants' fraudulent manipulation of the market may have caused municipal issuers to receive less than they otherwise would have received and that the Treasury may have been deprived of the use of some money. *The fact that there may have been losses, however, is insufficient to meet the government's burden to show that the victims did sustain a loss.* It is possible that this bidding process, although anticompetitive, had the same result as it would have absent the

28

defendants' fraud. Faced, as I am, with competing inferences and lacking any affirmative evidence either way, I cannot conclude that the victims sustained a loss on the escrow transactions, on most of them. Absent such a finding, I must also reject the government's regression analysis that attempts to calculate gain to UBS as a proxy for any loss.

*Id.* at 10:8-21 (emphasis added).[7]  She concluded that loss cannot just be "general" or "theoretical." *Id.* at 8:3-5, 14:13-16.  In other words, she rejected the Government's efforts to simply rely on the potential benefits of competition to meet its burden of proving loss.  Because loss was not established, Judge Wood refused to rely on a regression analysis offered by a Government expert that calculated defendants' gains.  *Id.* at 10:19-21.  So too here.  The Court need not reach the Government's gain calculation—which was hardly as rigorous as that in *Ghavami*—because it failed to prove loss in the first place.

## 2.   Any Loss Could Have Been Reasonably Calculated.

Even if the Court concludes that a loss was proven, the Government cannot use a "gain" enhancement unless loss cannot be reasonably calculated.  The Government breezes past this requirement by asserting, *ipse dixit*, that "it is impossible to determine what the competitive fees would have been in this instance."  (PSR ¶ 69).  But the Court should not accept such a conclusory statement.  Courts across the country have concluded that the Government cannot merely assert that the loss is not reasonably calculable without presenting any evidence or making any effort to calculate it.  In *United States v. Morales*, for example, the government described the task of calculating the loss "impossible," and failed to present any reliable evidence on it.  664 F. App'x 228, 232 (3d Cir. 2016).  The Third Circuit rejected this bald assertion, explaining that "even when showing an exact amount proves elusive, it remains within the government's power to present evidence that would aid in forming a well-grounded

---

[7]     The evidence for loss was far stronger in *Ghavami*.  In that case, the defendants' employer had already reimbursed specific victims—strongly suggesting a substantial loss—but Judge Wood noted that she was limited to the record before her.  *Id.* at 9:11-23.

estimate." *Id.*; *see also United States v. Foster*, 728 F. App'x 112, 115, 119 (3d Cir. 2018) (accepting government's loss estimates where it submitted evidence of the average fees for comparable transactions); *United States v. Martin*, 796 F.3d 1101, 1111 (9th Cir. 2015) ("The premium, if any, paid by the government on the contracts in this case is presumably a determinable amount."). Here, the Government could have retained an expert, gathered data, and/or relied on industry averages for similar services to ascertain what, if anything, was "lost" by Fort Schuyler. The Government simply chose not to.

### 3.     Any Loss Was Minimal.

There was no significant loss here for four reasons. *First*, there was no loss because Fort Schuyler's costs for the buildings were equal to their fair market value. The Guidelines are clear that loss must be reduced by "[t]he fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E). Here, the loss would be the costs of the projects to Fort Schuyler minus their fair market value: zero.[8] There is no evidence to suggest that Fort Schuyler paid anything more than fair market value for the construction management fees (and the projects as a whole). Nor is there any evidence to suggest that any other company could have produced better buildings at the same cost or equal buildings at a lower cost. *Cf.* Tr. 825:16-23 (Fort Schuyler Board member Robert Geer testifying that price is

---

[8]     The Guidelines provision for procurement fraud would not add a substantial amount to the costs. This provision adds the costs of "repeating or correct[ing]" the procurement action, "plus any increased costs to procure the product or service involved that w[ere] reasonably foreseeable." U.S.S.G. § 2B1.1 cmt. n.3(A)(v)(II). There was no need to repeat the procurement action or procure alternative services here, given that the projects were completed on time and to Fort Schuyler's satisfaction. Moreover, even if Fort Schuyler had incurred such costs, they would include only the minimal costs of advertising in local newspapers. *See, e.g.*, DX1238 (invoice for $765.20 for Buffalo News RFP notice); DX318 (invoice for $172.14 for Syracuse Media Group RFP notice).

only part of an evaluation of a "best partner", and in the area of development, you may choose

the partner who is "best able to do the development" over the "cheapest one").

The minimal evidence offered at trial only supports that Fort Schuyler did not pay any

kind of premium for the services in question.[9]  The fees charged were negotiated at arm's length

between experienced parties.[10]  Tr. 491:3-10, 494:1-4.  These negotiations were hard-fought and

protracted.[11]  And, with respect to the Film Hub project—which had fee percentages comparable

to the larger SORAA project and *higher* than the even larger Silevo project—the New York

Development Corporation hired a third party construction management firm to audit the costs.

The firm concluded that "the overall payments to be made to COR for construction of the film

hub"—necessarily including the construction management fee—"are reasonable."  December 21,

2017  Meeting  Minutes,  NYS  Urban  Development  Corporation,  *available  at*

https://esd.ny.gov/sites/default/files/news-articles/ESD-21Dec2017-BM-Posting.pdf.   Consistent

with the third-party firm's conclusions, there is no evidence to believe that Fort Schuyler paid a

premium for the developers' services.  *See Ghavami* Tr. 13:7-25 (refusing to consider broker fee

---

[9]     This is not a case in which Fort Schuyler would not have entered into any construction contracts "but for"
Defendants' alleged misrepresentations.  *See*, *e.g.*, *United States v. Butler*, No. 08-cr-370 (E.D.N.Y. Jan.
22, 2010), Sentencing Tr. 40:21-41:10, ECF No. 347 (explaining that victims would not have entered any
transactions but for the defendant's misrepresentation).   Fort Schuyler was going to award these
construction projects to a developer or developers regardless of the alleged conspiracy here.

[10]    *See, e.g.*, 26 C.F.R. § 1.61-62 ("If the services are rendered at a stipulated price, such price will be
presumed to be the fair market value of the compensation[.]"); *United States v. Carrington*, 96 F.3d 1, 6
(1st Cir. 1996) (noting that arm's length negotiations meant that sale prices were fair market value); *Faller
Grp., Inc. v. Jaffe*, 564 F. Supp. 1177, 1184 n.3 (S.D.N.Y. 1983) ("An agreed contract price reached at
arms' length by experienced professionals was, in the circumstances of this case, far more reliable evidence
of fair market value than" forecasts based on past pricing); *United States v. Gennuso*, 967 F.2d 1460, 1463
(10th Cir. 1992) ("To the contrary, the wholesale price of $50 may be a more realistic indicia of value
because there were actual sales . . . at that price between the defendant and the manufacturer.").

[11]    COR's witness described negotiations with Fort Schuyler as "protracted and somewhat frustrating . . . or
maybe a lot frustrating, and tense at times."  Tr. 2213:13-18.  LPCiminelli's negotiations were similarly
hostile and unforgiving.  *See, e.g.*, Tr. 1464:19-24 (negotiations protracted and contentious), 1380:7-13 (Dr.
Kaloyeros described as "AK-47" due to toughness in negotiations).   As the Court put it, Dr. Kaloyeros
"seems to take a lot of pride in the fact that he was a pain in the tush to negotiate with."  Tr. 798:5-7.

31

as loss where services were actually performed and there was no evidence to "ascribe a certain proportion of the broker fees to the competitiveness of the bidding process.").

*Second*, courts have refused to find any loss where (as here) the Government fails to prove that the buildings were not constructed "to the perfect satisfaction of the contracting agency." *Schneider*, 930 F.2d at 558. In *United States v. Near,* for example, the National Science Foundation and NASA accused a researcher of pocketing funds he claimed would be distributed to an engineer and technician. *See* 708 F. App'x 590, 600 (11th Cir. 2017). The defendant successfully argued at sentencing that the value of his "labor—along with labor, equipment, and materials provided by [others]—was worth more than any loss suffered by the government." *Id.* at 603. The trial court concluded (and the Eleventh Circuit affirmed) that "the Government got exactly what it contracted for" and determined that the loss amount was zero. Sentencing Tr. 174:9-13, *United States v. Near*, 14-cr-0271 (N.D. Ga. Dec. 21, 2015) Sentencing Tr. 174:9-13; *Near*, 708 F. App'x at 603; *see also United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991) (noting that defendants would not go unpunished, but rather that "the Guidelines award bonus punishment points for different levels of proven loss. . . . The government did not earn a bonus in this case.").

*Third*, the failure to follow the alleged rules of the preferred developer process itself was not a loss. It ultimately had no effect on whether the buildings were constructed to specifications and on budget. The Second Circuit drew such a distinction in *United States v. Canova*, 412 F.3d 331 (2d Cir. 2005). There, the defendants falsely represented that pacemakers were tested to Medicare specifications. *Id.* at 352. The court found economic harm despite the defendants' assertion that the testing was still "clinically sound." *Id.* The court contrasted that situation with *United States v. Maurello*, 76 F.3d 1304, 1314 (3d Cir. 1996), where a victim received a

building constructed "according to certain specifications" and thus received "the services for which he bargained" but received the services from someone not legally authorized to perform them. *Canova*, 412 F.3d at 352. The facts here fall much closer to *Maurello.* The purported defect in procurement procedure did not prevent Fort Schuyler for getting what it ultimately wanted—well-constructed buildings. Indeed, the case for procedural injury is particularly weak here, given that Fort Schuyler was created for the very purpose of providing speed and flexibility in procurements.[12]

### 4.    The Gain Is Not a Reasonable Approximation of Any Loss.

Even if loss existed and was not reasonably determinable, the gain amount here would not be a reasonable approximation of the loss. To use gain as a substitute for loss, the Government must prove a "logical relationship between the victim's loss and the defendant's gain so that the latter can reasonably serve as a surrogate for the former." *United States v. Dickler*, 64 F.3d 818, 826 (3d Cir. 1995); *see also United States v. Andersen*, 45 F.3d 217, 221 (7th Cir. 1995) (gain could not be used as an alternative to loss because "the relationship between the defendants' gain and any loss suffered by consumers or competitors is, at best, extremely tenuous"); *United States v. Haddock*, 12 F.3d 950, 964 (10th Cir. 1993) (same); *Ghavami* Tr. 8:7-12 (requiring that gain be a "reasonable alternative measure of the loss"); *United States v. Kilbride*, No. CR 05-870-PHX-DGC, 2007 WL 2774487, at *4 (D. Ariz. Sept. 21, 2007) (applying logic of prior section, § 2F1.1, to § 2B1.1). As set forth above, any loss must be offset by the value Fort Schuyler received on contracts negotiated at arm's length.

---

[12]     *See United States v. Block*, No. 16 Cr. 595 (S.D.N.Y. Nov. 8, 2017), Sentencing Tr. 70, ECF No. 179 (Oetken, J.) (an "ambiguous regulatory environment . . . may have led to an assumption on the defendant's part of more leeway . . . and may to some degree diminish the degree of culpability"). Moreover, Fort Schuyler's Director of Procurement testified that the RFP process was "fair and competitive" and the language contained in the RFPs was "fair and clear." Tr. 908:17-22. Subsequent preferred developer RFPs were "substantially the same." Tr. 995:17. Finally, the Chairman of Fort Schuyler's Board was aware of some of the allegedly improper conduct because he was present when it occurred. See DX1182; DX700.

There is, thus, no logical relationship between any minimal loss to Fort Schuyler and the enormous "gain" attributed to Alain.

### 5.      Neither Gain Nor Loss Was Reasonably Foreseeable.

Finally, Alain could not reasonably foresee gain or loss.  Gain or loss can only be attributed to him where the relevant activity was (1) within the scope of the jointly undertaken criminal activity; (2) in furtherance of that activity; and (3) reasonably foreseeable to Alain.  *See* U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Getto*, 729 F.3d 221, 234 (2d Cir. 2013); *United States v. Khandrius*, 613 F. App'x 4, 7 (2d Cir. 2015).  The Government's case against Alain concerned the *identity* of the developer, not the terms of the transaction.  Alain was largely not involved in the day-to-day negotiations over construction management fees.  *See* Tr. 491:3-10, 494:1-4.  To the extent that Alain was involved in the unpleasant and protracted negotiations between LPCiminelli, COR, and Fort Schuyler personnel, the evidence at trial shows that he took a hard line with his counterparties.  *See, e.g.*, Tr. at 1464:19-24 (negotiations protracted and contentious), 1380:7-13 (Alain nicknamed "AK-47" due to his aggressive posture in negotiations).  With respect to the Buffalo project, the Government relies on a $750 million contract value.  Putting aside the fact that this figure refers to the total state investment in the project (not the construction costs), it did not become remotely "foreseeable" until negotiations with SolarCity began (June 2014 at the earliest).  *See* GX388.  By that date, the RFPs had already been purportedly "rigged" and LPC had already been selected to do the work.  No one—including Alain—could have foreseen such a turn of events.

*        *        *

There is insufficient evidence to apply a 22-level gain enhancement here.  The Government has failed to prove any loss, or even make the most minimal attempt to quantify it.

The Government's gain calculation is a completely disproportionate measure of any loss. Finally, neither gain nor loss was foreseeable to Alain, who was not involved in negotiating fees.

### B.  The Court Should Not Apply an Enhancement for Obstruction of Justice.

The obstruction enhancement is inappropriate because there is no evidence that Dr. Kaloyeros deleted his emails in order to obstruct the Government's investigation into the RFP processes at issue in this case (the "Buffalo Billion investigation").  Section 3C1.1 only applies if the Government proves *specific intent* to impede the investigation into the "*instant offense of conviction*," *i.e.*, into the conspiracy to rig the Fort Schuyler RFP process in Buffalo and Syracuse.  *Id.* (emphasis added); *see also United States v. Khedr*, 343 F.3d 96, 102 (2d Cir. 2003); *United States v. Bazazpour*, 690 F.3d 796, 806 (6th Cir. 2012); *United States v. Jamieson*, 427 F.3d 394, 418 (6th Cir. 2005) (reversing obstruction enhancement where defendant shredded files after learning another broker was under investigation, because government failed to prove when he shredded the files and whether he knew he was under investigation at that time).

Here, the Government has not established that Dr. Kaloyeros deleted emails with specific intent to impede the Buffalo Billion investigation.   The Government's proof at trial established at best that a universe of 1,000 to 1,500 emails were deleted from Dr. Kaloyeros' email account between October and December 2015.  *See* Tr. 393:1-8; 1721:22-25.  That universe included correspondence with Todd Howe but also "a mix of personal e-mails, business e-mails, and spam."  Tr. 1742:8-13; *cf. United States v. Korfhage*, 683 F. App'x 888, 893 (11th Cir.), *cert. denied*, 138 S. Ct. 205 (2017) (relying on fact that defendant erased *"only incriminating pictures on his phone."*) (emphasis added).  And notably, that universe of deleted emails did not include communications with the beneficiary of the alleged conspiracy—Louis Ciminelli.  *See* Tr. 1744:6-11.  Indeed, among the emails preserved was GX 321, which the Government identified as a key piece of evidence at trial.  *See* Tr. 2442:4-6 (noting that GX 321 was the "words of

Alain Kaloyeros" and show "more than enough" that Dr. Kaloyeros "kn[e]w exactly what he was doing, that he was defrauding Fort Schuyler").

Thus, even assuming that Dr. Kaloyeros was aware that some kind of investigation was ongoing, the deletion of emails with *one alleged co-conspirator but not the other* simply does not support an inference that Dr. Kaloyeros intended to impede the Buffalo Billion investigation.

## IV.   IF THE COURT ACCEPTS THE PSR'S GUIDELINES CALCULATION, A SIGNIFICANT DOWNWARD DEPARTURE IS WARRANTED.

Where the circumstances of an offense are not adequately taken into consideration, the Guidelines permit a departure from the relevant Guidelines range.  *See* U.S.S.G. § 5K2.0; 18 U.S.C. § 3553(b).  If the Court accepts the PSR's offense level calculation, there are at least two grounds for departure here.

### A.   The Offense Level Overstates the Seriousness of the Offense.

The Guidelines suggest that a downward departure is appropriate when "the offense level determined under this guideline substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1 cmt. n.21(C).  This is consistent with the Supreme Court's admonition that courts reject Guidelines calculations not based on "empirical data and national experience," *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).  Courts, academics, and even the Commission have recognized that the Guidelines' draconian loss table "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices" but instead assembled in response to national media attention on infamous frauds. *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring) (citing *Kimbrough*, 552 U.S. at 109–10); Rachel Mathisen, *Disproportionate Sentencing Guideline Recommendations in Fraud-on-the-Market*, 35 Rev. Litig. 321, 321-22 (2016); U.S. Sentencing Comm'n, *Report to Congress:  Increased Penalties Under the Sarbanes-Oxley Act of 2002*, at 7

(2003) (noting that Sarbanes-Oxley sentencing enhancements responded to the high-profile accounting scandals of the early 2000s).

More and more courts are recognizing that the policy (or lack thereof) behind the loss enhancement table is wrong. Judges have criticized the loss enhancement Guidelines as:

- "Patently absurd on their face." *Adelson*, 441 F. Supp. 2d at 512 (Rakoff, J.).

- A "black stain on common sense." *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.).

- "Broken," leaving judges "without meaningful guidance in high-loss cases." *Corsey*, 723 F.3d at 378 (Underhill, J.).

- "Mindless acceleration" that "unfairly balloons" sentences "beyond any reasonable proportion" to the crime committed. *United States v. Faibish*, No. 12 Cr. 265, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) (Vitaliano, J.).

- "Ridiculous, absurd, barbaric" and "bear[ing] no relationship" to "any of the factors set forth in Section 3553(a)." Sentencing Tr. 28, *United States v. Lumiere*, No. 16 Cr. 483, (S.D.N.Y. Jun. 14, 2017) (Rakoff, J.).

- "[M]uch more typical of a brutal regime than of a proud American legal system." *Id.*

Applying a total offense level of 33—a level identical to the base offense level for attempted murder—to the offense here would implicate these concerns. *Accord Adelson*, 441 F. Supp. 2d at 509 ("An offense level of 55 is a level normally only seen in cases involving international narcotics traffickers, Mafia dons, and the like. How could it possibly apply here?"). As Professor Bowman, a leading commentator on sentencing issues, has noted:

> While corporate fraud is certainly a serious offense, it is hard to argue that it is more serious than murder and several orders of magnitude more serious than armed robbery. In 2005, the average sentence actually imposed on a robber with no prior criminal record was 57 months, or less than 5 years.

Frank O. Bowman, III, *Sentencing High–Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent'g. Rep. 167, 169 (2008); *see* Alan Ellis, John R. Steer, Mark H. Allenbaugh, *At a "Loss" for Justice Federal Sentencing for Economic Offenses*, Crim. Just., Winter 2011, at 34, 35 ("As applied by federal judges around the country, the fraud guideline often results in widely unwarranted sentencing disparity and a lack of certainty in sentencing, and produces sentences grossly disproportional to the actual seriousness of the offense."). These same concerns warrant a dramatic downward departure if the PSR's proposed Guidelines calculations are accepted.

### B.  The Circumstances Are Not Adequately Captured by the Guidelines.

Similarly, U.S.S.G. § 5K2.0(a)(3) broadly permits a departure where there are circumstances that are not adequately captured by the applicable Guidelines range. *See Smirlock v. United States*, No. 04 Civ. 9670, 2005 WL 975875, at *2 (S.D.N.Y. Apr. 25, 2005) (Lynch, J.) (criticizing the "arbitrary quality" of the Guidelines' loss calculation and noting "what does really matter is the culpability of the defendant"). The Guidelines' use of loss as a proxy for culpability often leads to unjust outcomes. While the Guidelines place enormous weight on this single factor, in many cases the amount at issue "is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.). As Judge Preska observed, in connection with an honest services fraud conviction, it would be "patently unfair" to allow financial loss to "become[] the single most important consideration in sentencing" where such a loss "played no role at trial." Sentencing Tr. 69:24-70:2, *United States v. Tanner*, No. 17 Cr. 61 (S.D.N.Y.) (Preska, J.) ("*Tanner* Tr."). She further concluded, "The amount of money that changes hands is

not necessarily an accurate measure of the deprivation of the intangible right to honest services." *Id.* at 69:21-23.[13]

Such is the case here.  As described above, Alain did not "gain" the amount imputed to him and there is no evidence that the winning bidders received a deal any more favorable than if another bidder had won.   As Judge Wood observed in *Ghavami*, the Guidelines do not distinguish between cases like this one—where the victims essentially receive the benefit of their bargain—and Ponzi schemes where "defendants personally receive the money that their victims lose and victims are rarely, if ever, made whole."   *Ghavami* Tr. 5:22-6:2.   Nor do they adequately distinguish between defendants who actually profited from a fraud and those who did not.   The Court should consider the Government's failure to prove any financial harm to Fort Schuyler or gain to Alain as it considers his sentence.

## V.   A LOW-END OR BELOW-GUIDELINES SENTENCE IS WARRANTED EVEN UNDER THE CORRECT, LOWER GUIDELINES CALCULATION.

While the Guidelines form the starting point of this Court's analysis, they are just that – a starting point.  *United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010) ("[W]e have held that . . . 'the Guidelines are guidelines—that is, they are truly advisory.'") (quotation omitted); *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) ("A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors . . . ."); *Nelson v. United States,* 555 U.S. 350, 352 (2009).  The Court has wide latitude to vary from the Guidelines based upon the factors enumerated in 18 U.S.C. § 3553(a) to ensure that the punishment "fit[s] the offender and not merely the crime."

---

[13]     A sentence at or above the PSR's Guidelines calculation would represent "a severe punishment that is patently unnecessary" and would violate the Eighth Amendment's prohibition of cruel and unusual punishment. *Furman v. Georgia*, 408 U.S. 238, 281 (1972).  The D.C. Circuit in *Slatten* warned that lengthy sentences for a first time offender should be reserved for instances where the defendant "intentionally committed a heinous crime that either harms the most vulnerable of our society or has the potential to result in wide-spread devastation." *United States v. Slatten*, 865 F.3d 767, 818 (D.C. Cir. 2017).

*Pepper v. United States*, 562 U.S. 476, 488 (2011).  The Court should exercise that discretion here.  Applying 18 U.S.C. § 3553(a)'s sentencing factors, a Guidelines sentence would be inappropriate even following the correct, lower Guideline range.  Instead, a sentence below the correct, lower Guideline range is appropriate.

### A.      The PSR's Recommendation

We agree with the PSR's conclusion that a non-Guidelines sentence is appropriate, given Alain's education, employment, and lack of a criminal record.  But, as described below, we respectfully submit that Probation's recommendation of 48 months is far greater than necessary considering the factors set forth in 18 U.S.C. § 3553(a).

### B.      History and Characteristics of the Defendant

The "history and characteristics of the defendant," a factor under 18 U.S.C. § 3553(a)(1), supports a below-Guidelines sentence.  As Judge Rakoff put it:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*Adelson*, 441 F. Supp. 2d at 514-15.

As detailed in Part I of this submission, despite serious obstacles, Alain's life has been one of hard work, dedication to family, and care for others.  Alain endured a civil war— including being captured, wounded, and tortured—and came to America in order to pursue his education.  Alain has lived an otherwise law-abiding life, given back immeasurably to his community, and consistently puts the needs of others before his own.

Once he became a professor, Alain was beloved by students, devoting much of his life to teaching and advising them.  He made a difference in the lives of countless students and

promoted science education in upstate New York.  He has led and continues to lead an accomplished professional life, enjoying widespread admiration from his colleagues for his hard work, respect and care for others, and integrity.  Even as he prepares to be sentenced, Alain continues to work on his research.  He has co-authored five scientific articles and submitted four patent applications since his arrest.  His most recent article, "Emerging Molecular and Atomic Level Techniques for Nanoscale Applications," is to be published in the Electrochemical Society's Winter 2018 journal. Finally, he has made lasting contributions to New York state as a whole—bringing world-class nanotechnology facilities and leading technology firms to upstate New York.  With these firms have come thousands of high quality jobs for New Yorkers and billions of dollars in economic development to the region.

Alain's family life weighs against a substantial term of incarceration.  While the PSR suggests that Dr. Kaloyeros's family will be able to endure the financial hardship of his incarceration, (PSR at 37), it is clear that his sons and sister will be substantially burdened. Indeed, Alain is extraordinarily close with his sons—Nick and Alexander—and continues to provide substantial support to both of them (both financial and otherwise).  *See United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (upholding departure where defendant provided substantial support for two children).  Alain also provides financial and emotional support to ██ ███████████████████████████████.  Any term of incarceration would have a crippling financial impact on those who rely on Alain.

At bottom, Alain still has much to give both to society and to his family.

### C.    The Nature and Circumstances of the Offense

The "nature and circumstances of the offense," another factor under 18 U.S.C. § 3553(a)(1), support a below-Guidelines sentence for several reasons.

### 1.    Alain Did Not Seek to Personally Profit from the Relevant Conduct.

41

The Government did not argue at trial that Alain financially benefitted from his conduct. *See* Tr. 2475:7-13. Indeed, the Government's primary "motive" theory—that Alain wanted to curry favor with the governor's office to receive his own SUNY campus—did not result in any increase in Alain's compensation. *See, e.g.*, PSR ¶¶ 123, 133.

The fact that Alain neither expected to nor did personally profit from the offense conduct is a significant mitigating factor. In *United States v. Collins*, Judge Preska recognized that a law firm partner "did not personally receive or even attempt to receive any profit from the fraud," which took the case "far outside the heartland of fraud cases[.]" Sentencing Tr. 21:19-23, No. 07 Cr. 1170 (S.D.N.Y. July 15, 2013) (Preska, J.), ECF No. 244 ("Collins Tr."); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (noting that much of the gain enhancement was the product of others' "monetary gain, in which Mr. Gupta did not share in any direct sense"), *aff'd*, 747 F.3d 111 (2d Cir. 2014); Sentencing Tr. 64:4-13, *United States v. Graham*, No. 06 Cr. 137 (D. Conn. Apr. 30, 2009) (Droney, J.) ("An important factor here that is different from so many other corporate fraud prosecutions is that Mr. Graham did not personally gain in a direct way from his criminal conduct, and his motivation was not one of obtaining direct personal gain."); *United States v. Prosperi*, 686 F.3d 32, 44 (1st Cir. 2012) (accepting district court's conclusion that "the defendants did not seek to enrich themselves personally and did not personally benefit from the scheme. . . . [T]hese findings distinguished them from typical white-collar defendants."); Sentencing Tr. 337:12-338:18, *United States v. Kipnis*, No. 05 Cr. 727 (N.D. Ill. Dec. 10, 2007); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) ("In the present case, defendant did not act for personal gain."); *see also United States v. Walters*, 87 F.3d 663, 671 (5th Cir. 1996) (affirming departure where defendant "did not receive any of the misappropriated funds").

Alain did not share *any* of the financial gain from the offense in *any* sense, direct or indirect.  If the Court chooses to apply the gain enhancement, this fact thus calls for a significant variance.

### 2.   The Victim Suffered No Economic Harm.

The lack of any tangible harm also differentiates this case from the average white-collar prosecution.  *See supra*, § III.A.3.  The alleged scheme here had no established impact on the *terms* of the transaction.   Rather, the scheme centered on the *selection* of the particular developers—both of whom were qualified.  *See* Tr. 1224:17-19 (LPCiminelli was "qualified to do the work at Riverbend[.]");  *see also* Tr. 223:2-9 (Andrew Kennedy states that he believed LPCiminelli was qualified); Tr. 346:11-14 (Dean Fuleihan states that LPCiminelli was qualified); DX703 (evaluation committee concludes that COR is qualified); GX114 ("Ciminelli's greater experience with public-private partnerships and its larger legal, employment, and construction capacity better suited it to the larger Riverbend project, though both developers are qualified").   The Government has not even attempted to argue that the developers were unqualified or that the buildings were not constructed "to the perfect satisfaction of the contracting agency."  *Schneider*, 930 F.2d at 558.  Because Fort Schuyler ultimately received exactly what it contracted for, there is no pecuniary harm.

### D.    Protection of the Public

Alain poses no danger to the public.  *See* PSR at 42 (concluding that Alain is a good candidate for voluntary surrender).

Alain is a first-time offender who has suffered extreme public shame and upheaval in his life as a result of his trial and conviction.  His career as a SUNY administrator and professor is over.  He will not again occupy a position of any public significance.  Moreover, defendants over 40, like Alain, especially warrant non-Guidelines sentences, as they "exhibit markedly lower

43

rates of recidivism in comparison to younger defendants." *United States v. Carmona-Rodriguez*, No. 04 CR. 667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (imposing below-Guidelines sentence in part because defendant was a 55-year-old first-time offender); *United States v. Hernandez*, No. 03 CR. 1257, 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005) (same); *United States v. Ruiz*, No. 04 Cr. 1146, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (same, citing U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines,* at 28 (2004)).

### E. Seriousness of the Offense and Deterrence

A below-Guidelines sentence would nonetheless adequately reflect the seriousness of the offense and the need for deterrence, as required by 18 U.S.C. § 3553(a)(2)(A)-(B).  *See Tanner* Tr. 79:8-10 ("even a relatively short sentence has a very devastating effect on defendants and certainly has a strong deterrent effect in general.")  This is so for several reasons.

First, the Court need not give Alain a significant sentence of incarceration to "send a message" to Albany.  While Alain's trial was among the final chapters of a series of high-profile trials of defendants with ties to Albany, the characteristics of the offense are distinct. This is not the case of a prototypical politician who gives in to her desire for a larger house, a nicer car, or a more comfortable retirement.  There was no bribe, no kickback, no low-show job, and no shakedown.  While one can question whether Alain had dual motivations for the offense conduct, there can be no dispute that his underlying goal—to build SUNY Poly into a Berkeley on the Hudson—was widely shared by New Yorkers.  Any sentence, while condemning his means, should recognize the distinction between simple greed and misguided ambition.

Second, even short sentences send a strong message to potential white collar offenders. *See Adelson*, 441 F. Supp. 2d at 514 (describing the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders");

*United States v. Tomko*, 562 F.3d 558, 573 (3d Cir. 2009) (declining to adopt government's argument that district court's probation-only sentence in complex securities fraud case, which government described as a "100% variance," would harm general deterrence); A. Mitchell Polinsky and Steven Shavell, *On the Disutility and Discounting of Imprisonment and the Theory of Deterrence*, 28 J. Legal Studies 1, 12 (1999) (noting that "less-than-maximal sanctions, combined with relatively high probabilities of apprehension, may be optimal" for promoting general deterrence in white-collar cases).[14]

Third, a felony conviction is itself a lifetime punishment. Alain faces the lifelong stigma and legal disabilities of a felony conviction, amplified by the widespread reporting on his case. *See United States v. Stewart,* 590 F.3d 93, 141 (2d Cir. 2009) ("[T]he need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant." (internal quotation marks omitted)); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (urging sentencing courts to consider the collateral consequences facing a convicted felon). His reputation—something that is essential for any scientist seeking to get his research funded—may never recover. *See Collins* Tr. 31:9-10 (citing the fact that defendant, an attorney, "lost his law license and his considerable standing in the legal community" as a factor favoring a significantly below-guidelines sentence).

F.    The Need to Avoid Unwarranted Sentencing Disparities

A Guidelines sentence would result in an unwarranted sentencing disparity proscribed by 18 U.S.C. § 3553(a)(6).

---

[14]    *See also* Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals,* 61 Wayne L. Rev. 27, 49 (2015), *available at* http://digitalcommons.wayne.edu/cgi/viewcontent.cgi?article= 1099&context=lawfrp (noting that more frequent enforcement and prosecution of white collar crime, rather than longer sentences, are the most effective deterrents of would be white collar criminals).

First, as a general matter, courts in this District regularly sentence below the Guidelines. In 2017, just 24.7% of defendants received Guidelines sentences and 1% received above-Guidelines sentences.[15]   A quarter of defendants received below-Guidelines sentences on a Government recommendation and approximately 52% of defendants received below-Guidelines sentences without Government recommendation.[16]

Second, a Guidelines sentence would result in unwarranted sentencing disparities with respect to similar conduct.   District courts in the Second Circuit routinely impose below-Guidelines sentences where defendants are convicted of serious misconduct—including fraud. For example:

- In *United States v. Tanner,* No. 17 Cr. 61 (S.D.N.Y.) (Preska, J), the defendants were convicted of concealing an arrangement where one defendant, the CEO of a mail-order pharmacy,  paid the other defendant, an executive at Valeant Pharmaceuticals, a $9.7 million bribe to induce Valeant's acquisition of the pharmacy.  *See* October 30, 2018 Sentencing Tr. 4:18-25.  Judge Preska varied from a Guidelines range of 10 to 12.5 years to a year and a day.  *Id.* at 80:4-7.

- In *United States v. Kang*, 16 Cr. 837 (S.D.N.Y.) (Oetken, J.), the defendant, the director of fixed income for the New York State pension fund, was convicted of concealing the receipt of $100,000 in gifts and bribes ranging from "trips, lavish meals, and concert tickets to cash, drugs, and luxury watches" in violation of his fiduciary duties to the fund. Sentencing Tr. 24:12-23, July 12, 2018.  The defendant also "went to great efforts to cover up his conduct, even going as far as to lie to the SEC and to obstruct a grand jury investigation."   Judge Oetken varied from a Guideline range of 24 to 25 *years* to 21 months.  *Id.*

- In *United States v. Lumiere*, No. 16 Cr. 483 (S.D.N.Y.) (Rakoff, J.), the parties stipulated that the gain resulting from the fraud was between "$1.5 million and $3.1 million. Sentencing Tr. 2:2-16, ECF No. 115, June 14, 2017.  Judge Rakoff found that the defendant had a substantial role in the scheme, that he did so "not aberrationally one day or one week, but for years, for months."  Sentencing Tr. 29:14-16.  The Guidelines range

---

[15]     U.S. Sentencing Commission,  *Sourcebook of Federal Sentencing Statistics, Fiscal Year 2017 Guidelines Sentences, Southern District of New York*, *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/stats_NYS.pdf.

[16]     *Id.*

was 87 to 108 months. *Id.* at 2:17-19. Judge Rakoff imposed a sentence of only 18 months. *Id.* at 30:8-10.

- In *United States v. Block*, No. 16 Cr. 595 (S.D.N.Y) (Oetken, J.), Judge Oetken concluded that the CFO of a publicly-traded company planned and executed a fraud "brazenly by simply making up numbers to plug a gap[.]" Sentencing Tr. 68:7-16. Judge Oetken found that the defendant "directly caused a significant amount of actual loss to ARCP shareholders . . . surely in the millions of dollars" and noted in passing that the government estimate of $300 million "is probably about right." *Id.* at 38:12-39:11. He rejected the loss enhancement, however, because he was unable to separate out confounding factors, and imposed a sentence of 18 months. *Id.* at 38:4-11, 72:6-7.

- In *United States v. Ghavami*, No. 10 Cr. 1217 (S.D.N.Y.) (Wood, J.), Judge Wood described the defendant's conduct as a "very serious" bid-rigging scheme that "spanned years" and "victimized many municipalities as well as other bond issuers across the United States and the IRS and the U.S. Treasury." Sentencing Tr. 123:11-17, July 24, 2013, ECF No. 426. Judge Wood denied the Government's request for a 210-month Guidelines sentence, instead calculating a Guidelines range of 41 to 51 months and varying to a sentence 18 months. *Id.* at 109:8-11, 158:19-22.

- In *United States v. Collins*, No. 07 Cr. 1170 (S.D.N.Y.) (Preska, J.) the defendant was a lawyer at Mayer Brown who the court determined had played an "indispensable role" in fraud at Refco—"that of preparing legal documents over years for the transactions planned by company insiders to effect the fraud." *Collins* Tr. 21:8-14. The government contended that there were thousands of victims and billions of dollars in losses, *id.* at 17:7-9, Refco was defendant's main client, and defendant's participation was not aberrant, but rather went on "year after year," *id.* at 15:15-23. Although the Guidelines called for life imprisonment, the court imposed a sentence of one year and one day in prison, based in substantial part on the fact that the defendant did not directly personally profit from the fraud (although Refco was an important client that contributed to his income). *Id.* at 20:21-21:1, 21:19-22:16, 30:1-5, 35:9-12.

- In *United States v. Graham*, No. 06 Cr. 137 (D. Conn.) (Droney, J.), a lawyer at a reinsurance firm was convicted of fraud that caused a loss of over $500 million. Judge Droney noted that the defendant "was aware of how harmful his conduct could be to the integrity of the market," and "had a substantial role in creating the phony documents" supporting the fraud. Sentencing Tr. 64:14-25, Apr. 30, 2009. The court further noted that the defendant "suggested the method of structuring the transaction to help conceal it," "drafted the actual sham contracts," and acted to conceal the fraudulent nature of the transaction. *Id.* at 65:19-66:14. The court varied from a Guidelines sentence of life imprisonment and imposed a sentence principally of one year and one day, based in part on his lack of direct personal profit. *Id.* at 64:4-13, 64:25-65:18, 69:18-21.

A similar variance from the Guidelines here would help to prevent unwarranted disparities.  *See Tanner* Tr. 79:21-23 (observing that, for a below guidelines sentence, "any perceived disparity . . . is because of the unworkability of the fraud guidelines at the far end.").

Third, a Guidelines sentence would create a disparity in the prevailing recognition that the § 2B1.1 loss table, which is the main driver of Alain's offense level here, produces sentences that overstate the seriousness of the offense.  Indeed, courts in the Southern and Eastern Districts of New York have consistently rejected long sentences that are driven by the loss table.[17]

## VI.    THE GOVERNMENT HAS NOT SOUGHT FORFEITURE OR RESTITUTION.

The Government has indicated that it does not intend to seek forfeiture or restitution at sentencing.  *See* PSR ¶¶ 70, 148-150.  Should the Government thereafter identify property or assets allegedly subject to forfeiture or restitution, Alain reserves the right to respond at that time.

## VII.   CONCLUSION

For all these reasons, Alain respectfully requests that the Court consider alternatives to incarceration and impose a sentence at the low end of the correct Guidelines range of 4-10 months.  Such a sentence would appropriately reflect the unique circumstances present here where: (1) there was no pecuniary harm to Fort Schuyler; (2) Alain did not profit from the offense conduct; and (3) Alain has lived an otherwise law-abiding life characterized by hard work, decency, and dedication to family and friends.  In the words of Alain's son Nick, Alain Kaloyeros "has given so much to so many over his life, and I know if given the chance he will do amazing things again."  (Ex. 3).

---

[17]    James E. Felman, *Testimony on Behalf of the American Bar Association Before the United States Sentencing Commission's Hearing on Proposed Amendments to the Federal Sentencing Guidelines Regarding Economic Crimes*, Mar. 12, 2015, at 4-8, *available at* http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150312/Felman.pdf (listing cases).

Respectfully submitted,

/s/ Michael C. Miller
Michael C. Miller
Reid H. Weingarten
Michael G. Scavelli
David B. Hirsch
Meghan L. Newcomer
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

*Counsel for Alain Kaloyeros*

Dated: November 19, 2018

49