# EXHIBIT 49

0ASURUTS

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ---------------------------------x

 3   UNITED STATES OF AMERICA

 4          v.                          03 CR 1452(LMM)

 5   DAVID RUTKOSKE,

 6                Defendant.

 7   ---------------------------------x

 8                                      New York, N.Y.
                                        October 28, 2010
 9                                      4:30 p.m.

10

11   Before:

12                 HON. LAWRENCE M. McKENNA

13                                      District Judge

14                     APPEARANCES

15   PREET BHARARA
         United States Attorney for the
16       Southern District of New York
     BY:  ANTONIA M. APPS
17       Assistant United States Attorney

18   ANDREW G. PATEL
         Attorney for Defendant
19

20

21

22

23

24

25
```

```
 1              (Case called)

 2              THE COURT:  Good afternoon.

 3              I have a couple of questions first.

 4              First, I want to tell you what I have relative to

 5    sentencing.  Believe me, I have very few sentences where I have

 6    as much paper as I have on this case, but I want to make sure I

 7    am not missing something I am supposed to have.

 8              I have the presentence report which is dated May 11,

 9    2006, the decision put on the record.  I am sure you are

10    familiar with it.  This was originally Judge Casey's case.

11    When the Court of Appeals reversed or remanded to the District

12    Court, by that time Judge Casey had died and it was reassigned

13    to me.

14              I should mention, unlike most cases, especially where

15    there is a trial, I know a lot about the case.  I really don't

16    know what I would normally know in this case because I haven't

17    been through the trial.  I have read the presentence report and

18    everyone's briefs, so I know what those tell me, but it is not

19    like I sat in a trial and heard the witnesses and so forth.

20              Anyway, I have that and I have the first memorandum.

21              I have the government's presentencing memorandum which

22    doesn't seem to have a date on it, but I got it on December 8

23    of 2009.  That's when Mr. Brodsky was the AUSA on the case.

24              I have Mr. Patel's presentencing memorandum of May 17,

25    2010.
```

0ASURUTS

```
 1              I have the government's reply sentencing memorandum

 2    that is dated October 12, 2010 which contains a substantial

 3    appendix.

 4              And then, finally, I have Mr. Patel's presentencing

 5    reply memorandum which replies to the government reply

 6    memorandum of October 25.

 7              Is anybody aware of anything else that has been

 8    submitted that I should have read that I haven't mentioned?

 9              MS. APPS:  Your Honor, I may have misheard the date

10    for the PSR, but I have something dated May 23, 2006.  It is

11    the one with the recommendation.

12              THE COURT:  What I have is, I believe, the original

13    draft that was -- I think Ms. Apps sent me whatever I have.

14              MR. PATEL:  What it is, there is a cover memorandum

15    dated May 11, but the presentence report is actually dated May

16    23rd.

17              MS. APPS:  Mr. Patel is correct.  He has clarified the

18    confusion.

19              THE COURT:  That's right.  I don't know how they

20    managed to send a cover letter on May 11 enclosing something

21    written on May 23.  I have the same thing.  So that resolves

22    it.

23              So is there anything else that I should have?

24              MR. PATEL:  Your Honor, the only thing -- and I don't

25    think it is really phenomenally critical -- we had made a
```

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    reference to the letters that were attached to the original

2    presentence submission by Mr. Rutkoske's prior counsel.  They

3    are generally letters of support.

4           THE COURT:  I don't think I have ever seen those.

5    Now, letters like that very often disappear after a sentence.

6    This sentence occurred sometime around 2004, 2005, something

7    like that.

8           MR. PATEL:  I believe it was 2006.

9           Your Honor, there are two letters attached to my

10   presentencing memorandum, the one from May.

11          THE COURT:  Those I have.

12          MR. PATEL:  I think those are really relevant to the

13   issue before your Honor.

14          THE COURT:  I have those, and I have read them.

15          I am not too sure where I would find them.  I think we

16   could probably try to requisition the file.  I don't know where

17   the file is.  If you want me to read those letters, I could

18   postpone this.

19          MR. PATEL:  Your Honor, I think that we can go

20   forward.

21          THE COURT:  I assume that the letters are of the type

22   that I am very familiar with.  They are from family members and

23   friends who know him personally.  Since this is a first

24   offense, probably some of them say, I can't believe he did

25   something like this, and some of them testify to that he is a

1    good family man, etc., etc.  I would expect letters like

2    that --

3           MR. PATEL:  That is exactly correct.  The only thing

4    that was remarkable about them is that there were 65 of them.

5           THE COURT:  That's a lot.

6           Whatever you want me to do, I will do.

7           MR. PATEL:  Your Honor, I think that we should go

8    forward.

9           THE COURT:  My next question is a question of Mr.

10   Patel, and that is, have you reviewed the presentence report

11   with Mr. Rutkoske?

12          MR. PATEL:  I have, your Honor.

13          THE COURT:  Finally, does either side have any

14   disputes regarding any facts reported in the presentence

15   report -- I am not talking about guidelines calculations or

16   anything like there, but facts?

17          MS. APPS:  Not from the government, your Honor.

18          MR. PATEL:  Not such that would require a hearing,

19   your Honor.  Obviously, Mr. Rutkoske has maintained his

20   innocence.

21          THE COURT:  I have read a lot of papers, but you may

22   want to summarize or add to what you've submitted in writing.

23          Mr. Patel, you go first.

24          MR. PATEL:  Your Honor, I think what this case really

25   comes down to is, is there evidence before the Court that would

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1   warrant a finding that the government has established a factual

2   basis for the Court to find that there was a loss enhancement

3   under the guidelines.

4          Our position is that there is not, that under the

5   teachings of this case from the Second Circuit, the methodology

6   for determining the loss -- and when I say "the loss," it is

7   the loss caused by the fraud -- and in this case, there may

8   have been market losses or investment losses by individual

9   investors, but there has been no proof, certainly no proof by

10  the method required by the Second Circuit, to establish that

11  anyone at Lloyd Wade caused that loss.

12         In the case most favorable to the government, what the

13  government established and what the Court of Appeals affirmed

14  was transactional causation, that is, but for the statements of

15  the brokers, these investors may not have purchased -- may not

16  have purchased the stocks.  But there is nothing to establish

17  that anything that anyone at Lloyd Wade did to cause this loss.

18         Our expert has submitted to your Honor a report, a tax

19  form memorandum which indicates that this was a start-up

20  company.  It had earnings in 1996 of approximately $200,000 and

21  in 1997, $103,000.  This was a start-up company.  There were

22  hundreds of such start-up companies.  It didn't make it.

23         The one fact that is absent from any of the

24  government's proof is, as the Court of Appeals said, why this

25  scheme unraveled.  If the brokers at Lloyd Wade were

1  controlling this stock in the way the government argues, there

2  is absolutely no reason based on what Lloyd Wade did that

3  NetBet shares aren't trading at $16 a share today.  That

4  doesn't mean that Mr. Rutkoske -- he was convicted by the jury,

5  and that conviction was affirmed.  And we are here in front of

6  you to be sentenced today.

7          The question is, has the government established

8  sufficient evidence or, in this case, any evidence by the

9  method outlined by the Court of Appeals to establish a loss

10  enhancement.  There just is no evidence of that.  So the

11  enhancement that raised Mr. Rutkoske's guideline level by 16

12  levels, we would suggest and we think the evidence shows, is

13  just unsupported.

14          The other thing, just to pass on briefly, your Honor,

15  we are talking essentially guidelines issues here.

16  Mr. Rutkoske also received a four-level enhancement for

17  leadership role.  As we said in our papers, we believe that

18  there is a confusion there between his corporate role and his

19  role in the conspiracy.  He was in Texas.  The fraud was

20  working out of a New Jersey office.  He visited it five times.

21  And the undisputed evidence is that the first time he went

22  there, any fraudulent activity stopped.  And there is equivocal

23  evidence as to whether it was ongoing on the other occasions,

24  but everyone remembers, the first time he came, they just shut

25  it down.  We acknowledge in our papers that this ship may have

0ASURUTS

1    sailed, so to speak, but we still think it is appropriate in

2    the interests of justice to raise it at this point.  And that

3    is an additional four points.

4           Your Honor, that's the guideline issues that we have

5    with the presentence report, but there are what we believe are

6    some very compelling 3553(a) factors that we would ask your

7    Honor to consider in determining Mr. Rutkoske's sentence.

8           And I don't know if your Honor wants me to go into

9    those now --

10          THE COURT:  You go ahead, and I will let the

11   government respond to everything at once.

12          MR. PATEL:  Your Honor, Mr. Rutkoske has two

13   11-year-old twin children, a boy and a girl, and attached to

14   our presentence memorandum is a letter from the principal of

15   their school and, essentially, the counselor at the school,

16   both describe the dramatic impact that Mr. Rutkoske's

17   incarceration had on his children and how they have rebounded

18   since he has been home.

19          Mr. Rutkoske has served, effectively, a 21-month

20   sentence and I believe he has learned his lesson.  He has gone

21   on and the projects that he is working on now, including clean

22   energy technology and developing wind turbine farms in Texas

23   are socially sound, environmentally protective, and he has

24   disclosed these activities to the government.  He has disclosed

25   his conviction to people who he is working with on these

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    projects, and they are going forward.  These projects, a wind

2    farm in Texas will generate hundreds of job, if not thousands.

3    Just the construction of these projects is an enormous thing.

4    I am sure your Honor is well aware of the positive environment

5    impact these projects have, carbon-free electricity.

6            So he has been putting his life back together in a

7    positive way.  And I think to send him back to prison now would

8    really serve no useful purpose, would be detrimental to the

9    projects that he is working on.  Most importantly, it would be

10   devastating for his children.  Children are always the innocent

11   victims of any criminal conduct.  It is one thing for a person

12   to go away and then come back, but for a parent to go away and

13   come back and go away again, it is very, very difficult for a

14   child, and I would ask for your Honor not to allow that to

15   happen.

16           THE COURT:  Mr. Rutkoske, is there anything that you

17   would like to say?

18           THE DEFENDANT:  Absolutely, if that's OK with you?

19           THE COURT:  Yes.

20           THE DEFENDANT:  Thank you for the opportunity to talk.

21           I am sorry to the Court for this whole matter coming

22   up.  I am remorseful about it.

23           I am disappointed that NetBet didn't make it as a

24   company when they had the games up and running.  We were in

25   operations with revenues and everything and had a casino, and

1    it was just the wrong time.  The Internet was coming, and they

2    were just a little early and it didn't make it.  The sad part

3    about that is investors lost money because NetBet didn't make

4    it because it was early.

5         As Mr. Patel has said, this whole experience has been,

6    nonetheless, very, very traumatic for myself and my wife and my

7    kids, as I am sure you can appreciate.  We were raising a good

8    family.  And it has been so hard on all of my family.  My wife

9    is not here today because my kids were so petrified that I was

10   coming here today that she had to stay home to kind of hold

11   their hand and make sure they were going to be OK.

12        The things that happened to me -- trauma happens in

13   people's lives and it is kind of what you do with it.  I've

14   always tried to remake myself and learn from the past and go

15   forward in a better way.  And I even give an analogy to the

16   movie, if everyone remembers, back in the '50s, a Christmas

17   movie, It's a Wonderful Life with Jimmy Stewart --

18             THE COURT:  I think it is even older than that.

19             THE DEFENDANT:  I thought it was '54 or something like

20   that, anyway, we all know the movie.  But he was taken away

21   from his life and he got a chance to see what life was without

22   him and was able to come back.

23        Well, I have had that same opportunity to see what

24   life was like without me around while I was incarcerated with

25   both my kids and my wife and even reflect back on the events of

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1   Lloyd Wade Securities, and it makes you certainly appreciate

2   your wife and kids more and it makes you appreciate things of

3   the past, investors and their aspirations.  That is why I have

4   learned quite a bit from that, how to be more appreciative of

5   my family -- which I was before, but it is really a

6   It's-a-Wonderful-Life type of event.  I certainly have a bigger

7   appreciation for trying to keep better controls on people that

8   are out there representing you, make sure that people don't

9   misrepresent you in the future, because that's important,

10  obviously.

11          As Mr. Patel said, in looking to go forward in my

12  life, I really tried to focus on something that I felt would be

13  giving back and accomplishing something for my community or the

14  state of Texas as well as this country.  And the wind farm that

15  I have been working quite heavily on, it is at 740 megawatts,

16  which is enough to light about 350,000 homes.  It represents

17  about 7 percent of the total wind power in the state of Texas,

18  and something of that magnitude, it makes a difference in terms

19  of helping our country and Texas lessen our dependence on

20  foreign oil.  Our job report says that we will create 3,260

21  jobs.  So I have tried to focus on something that gives back

22  and is good for me and good for the state of Texas and good for

23  the United States of America because I love my country.

24          I guess, in closing, your Honor, I leave it to you but

25  I ask you for your mercy, not to send me back to prison and

1   incarcerate me again.  I have a lot going for me with the wind

2   projects and my family, but I leave it up to you.

3           The last thing I would ask, if it is possible to give

4   me a recommendation to have my civil rights or civil liberties

5   restored, please.

6           Thank you.

7           THE COURT:  Ms. Apps.

8           MS. APPS:  Your Honor, with respect to loss, Mr. Patel

9   argues that there is no proof that anyone at Lloyd Wade caused

10  the loss.  This was a case about a pump and dump scheme.  The

11  evidence at trial involved deliberate attempts to acquire large

12  blocks of NetBet stock and then use boiler room tactics to dump

13  them on unwitting investors.

14          So the notion that Lloyd Wade in no way caused any of

15  the loss here seems to me to defy common sense, particularly in

16  light of the fact that the evidence was that at various points

17  in time, Lloyd Wade brokers controlled 90 percent of the market

18  share.  So the question ultimately is, what is the loss.  On

19  that factual record, it absolutely had to have been and was

20  caused by Lloyd Wade brokers.

21          So the question is, how do you measure this?  And

22  there were various attempts previously to measure this with

23  giving some value to NetBet stock by the government's expert at

24  trial, really just to give some kind of measure of things.

25          Following the Court of Appeals decision, the

1    government obviously submitted to the Court the record evidence

2    about the true value of NetBet stock.  And I think that the

3    evidence did show that this stock was, effectively, worthless.

4    It was the subject of this pump and dump scheme.  There was the

5    research person, Mr. Ardt, who testified that it was worthless.

6    The government certainly argued at trial that it was nothing

7    but a shell company.  So the Court has that information set out

8    in the papers.  That is one possible approach to measuring the

9    loss here.

10           The other approach is to look at the victims who

11   testified at trial.  Mr. Patel, I just heard him say that this

12   but-for causation, the investors wouldn't have bought but for

13   the loss, doesn't cut it under the Court of Appeals decision.

14   But that simply is not case.

15           This is a different methodology than was previously

16   before the Court of Appeals in this case.  The Rutkoske Court

17   of Appeals was considering an analysis which just took the

18   whole outstanding shares and multiplied it by a number, very

19   different analysis.

20           If you look at it just from the victims' point of

21   view, what you have is a case of some victims who wouldn't have

22   bought the stock but for the fraudulent boiler room tactics.

23   And the Court of Appeals decision in Leonard, which comes after

24   Rutkoske is on all fours with this case, and that decision

25   says, what you do is, you basically rescind the residuary

0ASURUTS

1    measure of damages, essentially, and you go back to zero, but

2    you give some credit to the defendant for whatever value of an

3    asset that is bestowed.  In other words, if you cannot

4    completely unwind, you give them credit.

5          And what the government did in its alternative loss

6    methodology that we put forth in our recent papers was to add

7    up the amount that these four victims who testified at trial

8    invested and subtracted from that whatever the value was of the

9    NetBet stock on the last NetBet statement that they got from

10   Lloyd Wade, not because we think that that value is true, but

11   that is just a way -- a very generous or a conservative way, I

12   should say -- of measuring whatever the value was, what they

13   got on the last statement, what the investors got back.  The

14   numbers, obviously, are set forth in our brief, but that is

15   just an alternative way to measure the loss in this case.

16         Actually, I just want to mention one other thing that

17   was put forth in Mr. Patel's reply papers which we didn't

18   respond to, obviously, but a very similar argument put forth

19   where what Mr. Patel does, he sets up this sort of straw man

20   argument, if you like, because he says, these cases all have to

21   be considered in the accounting fraud rubric type case.  You

22   have to have what he calls loss causation.

23         And the next step in Mr. Patel's analysis is, in order

24   to get any loss at all under that analysis, you have to have a

25   date certain when the fraud was revealed to the market.  And

1   then he said, well, you can't have a date certain in a case

2   like this because, of course, nothing like an accounting fraud

3   case, there isn't some public announcement revealing the fraud,

4   but that was an entirely, we submit, circular argument.  It

5   sets out this notion that the only way to look at loss in a

6   case like this is to fit the case within the accounting fraud

7   rubric and then say you can't possibly ever find loss there

8   because it is not like an accounting fraud case and doesn't

9   have a date of a public announcement.  So that, we submit, is

10  not an appropriate or the right way to look at loss in this

11  case.

12          As I said before, the Court could either go, depending

13  on the Court's view of the analysis of NetBet being worthless

14  with that loss amount, which is obviously very high, in the 10

15  to 12 million range, or it would be the four victims for which

16  we have concrete evidence in the trial record that they would

17  not have purchased their stock but for the fraudulent tactics

18  of the Lloyd Wade brokers.

19          May I just turn to the leadership role argument, your

20  Honor?

21          I think that argument is foreclosed.  The case law

22  which we set forth in our papers is very clear that when the

23  Court of Appeals issues a mandate back to the District Court

24  for a very narrowed or limited purpose, that does not authorize

25  the District Court to go back to the issues that were not

1    remanded.  And in this case, the Court of Appeals decision is

2    very clear that it is just being remanded on the loss issue.

3         In any event, to the extent the Court considers this,

4    under Section 3553(a) factors, we would submit that Rutkoske

5    was very much involved in the pump and dump scheme in this

6    case.  He had to sign a broker agreement to get the blocks of

7    stock and he had to approve various trading activity, so he was

8    very much involved in the scheme in terms of his role.

9         Your Honor, the only point I would make under 3553(a),

10   as the Court is aware, this was a serious offense.  Many

11   co-defendants were sentenced already in this case.  And Mr.

12   Rutkoske was the head of Lloyd Wade, I believe, and a senior

13   member of this fraud.  And it is a serious, serious offense.

14        So if the Court has nothing further, I have nothing to

15   add.

16        THE COURT:  Mr. Patel.

17        MR. PATEL:  May I very briefly, your Honor?

18        The scheme or the methodology that I laid out, it was

19   not my idea to say that you had to come up with a reveal date

20   for the fraud.  That was the instruction of the Court of

21   Appeals.  I simply followed what the Court of Appeals said we

22   were supposed to do.  And this is just that the evidence that

23   the Court of Appeals said was needed for this loss enhancement

24   wasn't there.  It is just what the court said.

25        In terms of the looking at the victims, that is simply

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

```
 1     repackaging the very same method on a smaller scale.  So

 2     instead of saying we are going to look at all the investors, we

 3     are just going to look at the four that testified.  But the

 4     methodology doesn't advance the requirement the Court of

 5     Appeals found.

 6             Leonard does not help the government because Leonard

 7     did not involve the market, and that is what the government

 8     would like -- the effect of the market is what the Court of

 9     Appeals was saying had to be considered in terms of determining

10     the loss.  No one is suggesting that the investors didn't lose

11     money.  That is why the Court of Appeals affirmed his

12     conviction.  But there is a method that the Court of Appeals

13     required.  I merely followed the path laid out by the Court of

14     Appeals and looked for the evidence in the record and it wasn't

15     there.

16             THE COURT:  By the way, I didn't mention it before,

17     but I have read the Court of Appeals decision remanding the

18     case to the District Court a number of times, and I am quite

19     familiar with it.

20             I repeat again, this was not my case, not my trial.

21     The original sentence was not mine.  I have tried to stay

22     within the green band and as close as possible to what I

23     perceive to be Judge Casey's thinking on the issues that were

24     not remanded, that were not the subject of the appeal, and I

25     come out as follows.
```

1      In the Court of Appeals decision in this case, the
2  court said, "We see no reason why considerations relative to
3  loss causation in a civil fraud case should not apply at least
4  as strongly to a sentencing regime in which the amount of loss
5  caused by a fraud is a critical determinant of the length of
6  the defendant's sentence."

7      In United States v. Olis which is a Fifth Circuit case
8  at 429 F.3d 540, the year is 2005, which is cited by the Court
9  of Appeals in this case with approval, the Fifth Circuit said,
10 "There is no loss attributable to a misrepresentation unless
11 and until the truth is subsequently revealed and the price of
12 the stock accordingly declines."  That is at page 546.

13     The Second Circuit in this case notes that in Olis,
14 the Fifth Circuit was applying the teachings of the Supreme
15 Court in Dura, a pharmaceuticals case.

16     Now, the government has not identified or even
17 suggested a point in time in this case when the truth was
18 revealed -- indeed, if it ever was revealed.  I don't think the
19 conclusion suggested by the case law can be avoided on the
20 ground that the stock was worthless.  There was evidence that
21 it did have some computer infrastructure and actual games on
22 the Internet at some sort of an office although, apparently, it
23 was not a very impressive office.  And it did have some income,
24 and it was, I think, owed a fairly substantial amount of money
25 by somebody else.  A company isn't worthless if it is a very

0ASURUTS

1    small company and it is not doing very well.  It had something,

2    and it was not worthless in my estimation.

3          The government's recent suggestion that more should be

4    based on the specific situation of the four NetBet stockholders

5    which was set forth in the government's reply is not, in my

6    view, consistent with the Court of Appeals remand which

7    requires a recalculation of the total loss as found by Judge

8    Casey according to Olis.

9          I would add that the Confredo and Leonard cases cited

10   by the government really relate, in my mind, to different

11   situations than what we are dealing with here.  Confredo was a

12   bank fraud where somebody sent in a very large number of -- I

13   forget what it was -- fraudulent loan applications which were

14   accepted by the bank.  Money was received.  All in one fell

15   swoop.

16         In the Leonard case, I think the distinguishing factor

17   there is that the securities were illiquid, and that was the

18   difficulty that the Court of Appeals was dealing with.  After

19   it went through some -- I hate to use the word "contortions,"

20   but some sort of steps which convinced them that they were

21   dealing with security -- no, that is Confredo, I think.  In any

22   event, in the Leonard case, the securities were illiquid

23   securities, and that's why they had to deal with them the way

24   they did.  And I do not think that is the case here.  Indeed

25   here, as the whole record shows, there was a market, whether

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    thin or not thin really does not make too much difference, but

2    there was a market in NetBet stock.  Anybody having NetBet

3    stock could sell it on the market.

4              Finally, we get to role enhancement.

5              I do not think the Court of Appeals mandate extends to

6    my reconsideration of Judge Casey's findings as to role

7    enhancement.  I don't think that is before me at all.

8              I obviously have to, first, in any case determine the

9    guidelines range.  So I find here that the correct guideline,

10   calculation is a total offense level, after I take out 15 for

11   the amount of loss to be 16, with a criminal history category I

12   which results in a guidelines range of 21 to 27 months.

13             Counsel for the defendant has shown that defendant has

14   served, prior to release on bail, 18 months and 27 days and

15   would be entitled to good time credit in an amount that leads

16   to the conclusion that he has now served the equivalent to 21

17   months, which is the bottom of the guideline range.  And I am

18   sentencing Mr. Rutkoske's to 21 months of imprisonment which

19   is, in effect, time served.

20             Now, I am going to impose the same conditions of

21   supervised release that Judge Casey did.  Again, I don't think

22   that is part of the remand.  And I understand from the docket,

23   from the 255 goes to include two years of supervised release on

24   each of Counts, I think, it is 1 and 2, to run concurrently

25   with each other; $117,000 in restitution without interest, and

1  then there would be in addition $200 in special assessments.

2          I think I have that right.  If Ken says it is right,

3  it is.

4          MR. PATEL:  I just wondered, how much was the

5  restitution, because the restitution has to be based on the

6  loss amount, in my understanding of the statute.

7          THE COURT:  I do not think that's true.  I think the

8  restitution was not part of the remand.  The loss amount, as it

9  affected the sentence was what was remanded, and I don't know

10  how Judge Casey calculated it -- but this isn't before me on

11  remand.  He set a restitution amount of $117,000.  That wasn't

12  the --

13          MR. PATEL:  Your Honor, actually, if I may have a

14  moment, your Honor.

15          Your Honor, I believe on page 180 of the Second

16  Circuit opinion, it says, "The District Court's basic failure

17  at least to approximate the amount of loss caused by the fraud

18  without even considering other factors relevant to the decline

19  in NetBet share price requires a remand to re-determine the

20  amount of loss, both as far as the purpose of sentence and

21  restitution."

22          Your Honor, under the statute, to the best of my

23  recollection, restitution is pegged to the amount of the loss.

24          THE COURT:  I can make a final restitution order, I

25  believe, within 30 days of sentencing.  So why don't you submit

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

0ASURUTS

1  that in writing.  I just don't have the entire recall of all of

2  the papers in this case because it is an old case.  I know that

3  the docket reflects that it is $117,000, which is what I

4  thought from the docket that's --

5         MR. PATEL:  Your Honor, one other point I would like

6  to ask your Honor to consider.

7         THE COURT:  Give me a minute.

8         MR. PATEL:  Sure, your Honor.

9         THE COURT:  I want to refer you to the judgment as

10  reflected in the docket resulting from Judge Casey's sentence

11  of 108 months on each count to run concurrently, $117,000 in

12  restitution.  I guess I am going to have to revisit all of

13  that.

14         Get something out within five days with a copy to the

15  government and the government can respond.  I have 30 days.  It

16  is a 30-day window to deal with restitution.  I was assuming

17  that the docket accurately reflected what was actually was

18  going on in the judgment, but I may be wrong.

19         MR. PATEL:  I think, actually, that the amount of

20  restitution that was ultimately ordered was the amount that the

21  loss was based on which was 12 million.

22         THE COURT:  That may well be the case which I didn't

23  realize.

24         MR. PATEL:  Right.  The loss and restitution under the

25  statute to the best of my recollection --

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

```
 1          MS. APPS:  No.

 2          MR. PATEL:  Ms. Apps.

 3          MS. APPS:  Forgive me.  I have had a long day.

 4          MR. PATEL:  Yes, you have.

 5          THE COURT:  I don't think that's the case.

 6   Restitution and intended loss for guideline purposes have to be

 7   the same.

 8          Government, do you have anything on it?

 9          MS. APPS:  No, I don't think they have to be the same.

10          THE COURT:  But isn't there a law that says in the

11   fine restitution, one thing you do have to look at is the

12   ability of a person to pay restitution and, obviously, $117,000

13   and $10 million or something, would make a difference in

14   somebody's ability to pay that?  I couldn't pay either one of

15   them.

16          MR. PATEL:  Your Honor, the other issue that I wanted

17   to ask your Honor to consider, Mr. Rutkoske has been on,

18   essentially, supervision since his release on May 23, 2008

19   which means that he would have effectively already served two

20   years of supervised release.  If your Honor were to nunc pro

21   tunc the date of his supervision to that date.

22          And I can assure you, your Honor, I have spoken to his

23   pretrial services officer in Texas, both of them.  They have

24   enough.  He has the thickest folder in the office.  It is not

25   that he is a problem child, it is just that they have to write
```

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

0ASURUTS

```
1    monthly reports -- no problem, no problem.
2            THE COURT:  Pretrial and post sentence supervision are
3    different names.  They are in this district, and I assume it is
4    the same in Texas, supervision would be transferred from
5    pretrial services officer to probation.
6            MR. PATEL:  I think it may be literally --
7            THE COURT:  It may be different in Texas.
8            MR. PATEL:  Apparently, it is the same office.
9            THE DEFENDANT:  It is the same office, the same
10   people.
11           THE COURT:  I will leave it like this.  I am leaving
12   the sentence the way it is.  Obviously, the appropriate officer
13   who is dealing with this in Texas, if they think it should be
14   terminated -- and I have had this from probation officers over
15   the years, they ask me or tell me if they think it should be
16   terminated.
17           MR. PATEL:  Very good, your Honor.
18           THE COURT:  One thing I should have said, though, when
19   I said I was imposing conditions of supervised release,
20   supervised release in this particular case is to be by the
21   district in Texas, by the Eastern District of Texas, not by
22   this district.
23           MR. PATEL:  Thank you, your Honor.
24           May I have a week to get that brief on restitution in
25   to you?
```

```
 1              THE COURT:  Yes.

 2              And then Ms. Apps can have a week to respond to it.

 3              MS. APPS:  Thank you.

 4              MR. PATEL:  Just one other request, your Honor.  Now

 5      that sentence has been imposed and Mr. Rutkoske is no longer on

 6      bail, may his passport be returned to him and may he travel

 7      abroad?

 8              THE COURT:  His passport will be returned to him, yes.

 9      He may travel abroad with the permission of whatever officer is

10      supervising him.  I do not have an objection to him doing it,

11      but I think that should go before the officer.  The objection

12      that I had prior to sentencing isn't applicable anymore.  I

13      know this came up before and I said that he can travel all

14      through the U.S but not overseas.  I have no objection to that

15      anymore, but it is a decision to be made, in the first

16      instance, by whoever is in charge of his supervised release.

17      You may report my views on that to them.

18              MR. PATEL:  Actually, what I was going to do, your

19      Honor, is ask to get an expedited copy of the sentencing --

20              THE COURT:  I will authorize that if you just fill out

21      the form.

22              MR. PATEL:  Thank you very much.

23              THE COURT:  Thank you all.

24

25                            o    0    o
```