# EXHIBIT 50

1        UNITED STATES DISTRICT COURT

2        DISTRICT OF CONNECTICUT

3

4        UNITED STATES OF AMERICA,  )
                   Plaintiff,  )      NO: 3:06CR137(CFD)
                             )

5        vs.                     )
                             )      April 30, 2009

6        ROBERT D. GRAHAM,     )
                  Defendants. )

7        _____

8                       450 Main Street
                     Hartford, Connecticut

9

10                      SENTENCING

11        B E F O R E:
             THE HONORABLE CHRISTOPHER F. DRONEY, U.S.D.J.

12

13        A P P E A R A N C E S:

14

15        For the Plaintiffs   :   ERIC J. GLOVER, AUSA
                                   U.S. Attorney's Office
                                   157 Church Street, 23rd Floor

16                                   New Haven, CT 06510

17                                   RAYMOND E. PATRICCO, AUSA
                                 U.S. Attorney's Office

18                                   2100 Jamieson Avenue
                                 Alexandria, VA 22314

19

20

        Court Reporter    :       Martha C. Marshall, RMR, CRR

21

22

23

24

25        Proceedings recorded by mechanical stenography, transcript
        produced by computer.

1

      A P P E A R A N C E S:
2     (Continued)

3

4     For the Defendant,  :      ALAN M. VINEGRAD, ESQUIRE
      Robert D. Graham            DOUGLAS BLOOM, ESQUIRE
5                                PAM CARTER, ESQUIRE
                                 Covington & Burling
6                                1330 Avenue of the Americas
                                 New York, NY 10019
7
                                 WILLIAM F. DOW, III, ESQUIRE
8                                Jacobs, Grudberg, Belt, Dow &
                                 Katz, P.C.
9                                350 Orange Street
                                 New Haven, CT 06503.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT: Good morning. This is the case of the

2     United States of America versus Robert Graham. It's our

3     criminal number 3:06CR137.

4          If I could have the appearances of counsel for the

5     record, please.

6          MR. PATRICCO: Good morning, your Honor. Ray

7     Patricco and Eric Glover on behalf of the United States.

8          MR. VINEGRAD: Good morning, your Honor. Alan

9     Vinegrad on behalf of Rob Graham. With me is Doug Bloom,

10    Willie Dow, and Pam Carter.

11         THE COURT: Thank you.

12         The record should also reflect that Senior United

13    States Probation Officer Brian Topor is present with us in

14    the courtroom.

15         On February 25, 2008, Mr. Graham was convicted by

16    a jury on Counts One through Sixteen of the Superseding

17    Indictment which charged him with conspiracy, securities

18    fraud, false statements to the SEC, and mail fraud.

19         A Presentence Report was prepared for the court by

20    the United States Probation Office. And I have reviewed

21    that report dated June 12th, 2008, and its addenda of August

22    7th, 2008 and November 10th, 2008 in consultation with their

23    principal author, Senior United States Probation Officer Ray

24    Lopez as well as Mr. Topor.

25         Additionally, I've reviewed the defendant's

1    sentencing memos dated September 5, 2008 and November 25 --

2    I'm sorry, November 21, 2008, as well as the Government's

3    memos of September 5, 2008 and September 19, 2008. I've

4    also reviewed the letters of July 22, 2008 and August 4th,

5    2008 from Attorney Vinegrad, and we'll deal with the

6    objections to particular paragraphs of the Presentence

7    Report later that are set forth in those letters.

8            I have reviewed the materials submitted by the

9    parties concerning loss calculation, number of victims, and

10   restitution and issued my opinion on those matters

11   previously.

12           I've also reviewed the many letters submitted

13   concerning the sentencing of Mr. Graham. The defendant has

14   objected to certain aspects of the Presentence Report and is

15   seeking a role adjustment, a downward departure, and a

16   non-guidelines sentence, as we'll discuss more fully later

17   in this sentencing.

18           Mr. Vinegrad, is what I've just summarized an

19   accurate assessment of the current state of the record with

20   respect to this sentencing?

21           MR. VINEGRAD: Yes, your Honor.

22           THE COURT: Have you reviewed the PSR in this

23   case?

24           MR. VINEGRAD: Yes, I have.

25           THE COURT: Do you have any additional objections

1      to it?

2                    MR. VINEGRAD:  No, I do not.

3                    THE COURT:  Mr. Graham, have you reviewed the

4      Presentence Report in your case?

5                    THE DEFENDANT:  Yes, your Honor.

6                    THE COURT:  Have you gone over it with

7      Mr. Vinegrad?

8                    THE DEFENDANT:  Yes, your Honor.

9                    THE COURT:  Mr. Patricco, you're going to be

10     speaking for the Government today, is that right?

11                   MR. PATRICCO:  Yes, your Honor.

12                   THE COURT:  Do you have any additional objections

13     to the Presentence Report?

14                   MR. PATRICCO:  No, your Honor.

15                   THE COURT:  Let me start with a list of topics and

16     we'll see if you have any others before we hear your general

17     sentencing comments.

18                   First, is there any additional comments on the

19     issue of loss calculation, number of victims, and

20     restitution other than an argument for a downward departure

21     or a non-guideline sentence?  Does the Government want to

22     add anything?

23                   MR. PATRICCO:  No, your Honor.

24                   THE COURT:  How about you, Mr. Vinegrad?

25                   MR VINEGRAD:  No, your Honor.

1          THE COURT:   Then I'll incorporate my opinion of

2     October 31, 2008 as rulings on those issues today.  And in

3     accordance with that ruling, 30 levels will be added for the

4     Court's finding on amount of loss, and 6 levels will be

5     added for the Court's finding of more than 250 victims.

6          And I know you preserve your objections to that,

7     Mr. Vinegrad.

8          MR. VINEGRAD:   Thank you.

9          THE COURT:   The second is the defendant objected

10    to the Presentence Report's application of the abuse of a

11    position of trust enhancement pursuant to United States

12    Sentencing Guidelines Section 3B1.3.  And it appears that

13    the Government agrees that an enhancement should not apply

14    for abuse of position of trust, but it argues that an

15    enhancement should apply under that section for use of

16    special skill.  Is that fair to say?

17         MR. PATRICCO:   That's correct, your Honor.

18         THE COURT:   And do you object to that, Mr.

19    Vinegrad?

20         MR. VINEGRAD:   We did not take issue with that.

21    Instead, we argued that if that enhancement were applied it

22    would further support our motion for a downward departure on

23    the ground that the offense level overstates the

24    seriousness of the offense.

25         THE COURT:   Thank you.

1          The next is the defendant argues that he should

2     receive a four-level reduction for a minimal role pursuant

3     to 3B1.2(a).  And the Government objects to that, disagrees

4     with it.  And I'll address that issue later in the

5     sentencing and give a chance to comment on it, Mr. Vinegrad

6     and Mr. Patricco.

7          The defendant previously objected to the PSR's

8     finding that the Mandatory -- this was the finding of the

9     PSR -- that the Mandatory Victims Restitution Act, 18 U.S.

10    Code Section 3663A, is applicable in this cases.  As

11    explained in my October 31, 2008 ruling, because the Court

12    finds that an order of restitution is inappropriate under 18

13    U.S. Code Section 3663A(c)(3), it is unnecessary to address

14    the defendant's objection that the offenses charged are not

15    encompassed by the MVRA.

16         Next, in your letter of July 22, 2008, Mr.

17    Vinegrad, you had certain objections to certain inaccuracies

18    in the Presentence Report, but I think those have all been

19    corrected.  Are you satisfied with that?

20              MR. VINEGRAD:  Yes, I am.

21              THE COURT:  And then the Government objected to

22    the PSR's finding that the loss cannot be reasonably

23    determined but I, in my opinion of October 31, 2008, ruled

24    on it, that issue.

25              You're satisfied with that resolution, is that

1          right, Mr. Patricco?

2                    MR. PATRICCO:  Yes, we are, your Honor.

3                    THE COURT:  Let's see.  There should be certain

4          statutory -- corrections to the statutory penalties for some

5          of the counts in the PSR, especially securities fraud and

6          false statements to the SEC or, namely, those two areas.  On

7          July 30, 2002, 15 U.S. Code Section 77ff was amended to

8          increase the maximum penalty from 10 years imprisonment and

9          a one million dollar fine to 20 years imprisonment and a

10         five million dollar fine.  Counts Two, Three, Four, Five,

11         Six, Seven, Eight, and Eleven were charged for conduct on

12         dates prior to July 30th, 2002, and therefore the maximum

13         penalties on each of those counts are 10 years imprisonment

14         and a one million dollar fine.  Counts Nine, Ten, Twelve,

15         and Thirteen were charged for conduct on dates after July

16         30th, 2002, and therefore the maximum penalties on each of

17         those counts are 20 years imprisonment and a five million

18         dollar fine.

19                   And additionally, I think that pursuant to the

20         United States Sentencing Guidelines Section 5E1.2(c)(3)-(4),

21         the PSR should reflect that the correct guideline fine range

22         is $25,000 to 5 million dollars.

23                    Do you agree with all that, Mr. Vinegrad?

24                    MR. VINEGRAD:  Yes, I do.

25                    THE COURT:  And you, too, Mr. Patricco?

1          MR. PATRICCO:  Yes, your Honor.

2          THE COURT:  We'll order those changes then.

3          Role in the offense.  You want to be heard on that

4     now, Mr. Vinegrad?

5          MR. VINEGRAD:  I have nothing further to add in

6     addition to what we said in our papers.

7          THE COURT:  How about you, Mr. Patricco?

8          MR. PATRICCO:  Same as we addressed in our

9     papers.

10         THE COURT:  So I'll rule on role in the offense at

11    this time.

12         Mr. Graham argues that a four-level downward

13    adjustment is warranted under United States Sentencing

14    Guidelines Section 3B1.2(a) for a minimal role in the

15    offense or a two-level adjustment for minor role.  And the

16    Government disagrees.

17         That section of the guidelines provides a range of

18    adjustments for a defendant who plays a part in committing

19    the offense that makes him substantially less culpable than

20    the average participant.  And that's a quote from

21    Application Note 3(A).

22         The Sentencing Guidelines Section 3B1.2(a)

23    provides for a four-level downward adjustment "if the

24    defendant was a minimal participant in any criminal

25    activity."  More specifically, the minimal participant role

1      adjustment "is intended to cover defendants who are plainly

2      among the least culpable of those involved in the conduct of

3      a group. The defendant's lack of knowledge or understanding

4      of the scope and structure of the enterprise and of the

5      activities of others is indicative of a role as minimal

6      participant." The Application Note also explains that the

7      Commission "intended that the downward adjustment for a

8      minimal participant will be used infrequently." And that's

9      from Application Note 4.

10      Additionally, United States Sentencing Guidelines

11      Section 3B1.2(b) provides for a two level downward

12      adjustment "if the defendant was a minor participant in any

13      criminal activity." In United States v. Lopez, the Second

14      Circuit explained that the minor participant adjustment

15      "applies to a defendant who is less culpable than most other

16      participants, but whose role could not be described as

17      minimal."

18      A reduction is not available under Section 3B1.2

19      "simply because the defendant played a lesser role than his

20      co-conspirators; to be eligible for a reduction, the

21      defendant's conduct must be minor or minimal as compared to

22      the average participant in such a crime." And that's a

23      quote from the Rahman case from the Second Circuit, 189 F.3d

24      88, page 159, a per curiam decision in 1999. Further,

25      "under United States Sentencing Guidelines Section 3B1.2,

1    the District Court is required to gauge the appellant's

2    culpability relative to the elements of the offense of

3    conviction as well as in relation to the co-conspirators."

4    And that's a quote from the Neils decision from the Second

5    Circuit in 1998. In evaluating a defendant's role, we look

6    to factors such as "the nature of the defendant's

7    relationship to other participants, the importance of the

8    defendant's actions to the success of the venture, and the

9    defendant's awareness of the nature and scope of the

10    criminal enterprise." That's a quote from the Garcia

11    decision from the Second Circuit in 1990.

12        Having considered the factors identified in the

13    guidelines and the case law, I find that Mr. Graham's role

14    in the offense does not warrant a downward adjustment under

15    3B1.2.

16        Mr. Graham was involved in this transaction from

17    November 2000 through at least May 2001, and was important

18    to its success. Specifically, he prepared the contract that

19    completed the paper trail of the LPT fraud, and he reviewed

20    and offered advice to his co-conspirators about the contents

21    of the fake offer letter.

22        Mr. Graham also knew about and understood the

23    scope and structure of the LPT fraud. Although Mr. Graham

24    argues that no one told him the underlying contracts were

25    already reinsured, his knowledge of the fraudulent nature of

1 the LPT can be inferred from other evidence.  First, Mr.

2 Graham participated in the November 20, 2000 meeting with

3 Monrad, Garand, Napier, and Milton in which Monrad told

4 Milton that Gen Re would deposit account for the

5 transaction.  Following that meeting, Mr. Graham sent an

6 e-mail to Napier, Garand, and Monrad in which he explained

7 the benefit of using a non-U.S. entity so that reviewers

8 would not be able to "connect the dots to CRD and beyond."

9 Mr. Graham also revealed his knowledge of the true nature of

10 the deal when he expressed his concern about it to

11 Mr. Napier following the November 20th meeting.  Next, on

12 December 22, 2000, Mr. Graham updated Gen Re's General

13 Counsel, Timothy McCaffrey, about the transaction, telling

14 him that "our group will book the transaction as a deposit,

15 but how AIG books it is between them, their accountants, and

16 God; there is no undertaking by them to have the transaction

17 reviewed by their regulators."  Finally, in a March 7, 2001

18 phone call, Mr. Graham discussed how AIG's approach to

19 compliance issues was different than Gen Re's, and said that

20 he was "pretty comfortable that our own skirts are clean,

21 but that they have issues."

22   Because the Court finds that Mr. Graham was aware

23 of the nature and scope of the LPT and played a significant

24 role in its success, he is not substantially less culpable

25 than the average participant, and will not receive a

1      mitigating role adjustment.

2              And so I've completed my finding on that issue.

3      I've dealt with the use of special skill and will apply

4      that.  And I'll make the following finding about that.

5              That adjustment under 3B1.3 applies when a

6      defendant used a special skill in a manner that

7      significantly facilitated the commission or concealment of

8      the offense.  Application Note 4 defines special skill to be

9      "a skill not possessed by members of the general public and

10     usually requiring substantial education, training or

11     licensing," and specifically includes lawyers as an example

12     of those possessing special skill.  Here, Mr. Graham's

13     special skill as a lawyer significantly facilitated the

14     commission and concealment of the LPT fraud.  Mr. Graham

15     used his skill and experience to draft the contract and

16     review and suggest edits to the fake offer letter, and to

17     otherwise provide legal counsel on the transaction.

18              Why don't we turn to downward departures at this

19     time, Mr. Vinegrad.  I'm going to list what I understand to

20     be your bases for a downward departure and I'm going to ask

21     you whether you agree with me.

22              The first is the offense level substantially

23     overstates the seriousness of the offense under 2B1.1 of the

24     Guidelines, Application Note 19(C);

25              The second is the cumulative effect of

1    substantially overlapping enhancements results in a

2    significant increase in the sentencing range minimum not

3    adequately considered by the Sentencing Commission;

4           The third is Mr. Graham's conduct represented

5    aberrant behavior;

6           The fourth, Mr. Graham was not motivated by

7    personal gain;

8           Fifth, Mr. Graham's extraordinary civic and

9    charitable works;

10           Sixth would be the unique and significant

11    collateral consequences that Mr. Graham has faced and will

12    face from his prosecution and conviction;

13           Seventh is a combination of those factors under

14    the Rioux case from the Second Circuit and the Koon case

15    from the United States Supreme Court; and

16           Lastly, the Sixth Amendment to the U.S.

17    Constitution would require a jury determination as to the

18    amount of loss and number of victims.

19           And the Government objects to those, Mr. Patricco,

20    right?

21           MR. PATRICCO:  Correct, your Honor.

22           THE COURT:  Is that a fair statement of your

23    arguments?

24           MR. VINEGRAD:  Yes, your Honor.

25           THE COURT:  And you're seeking a non-guidelines

```
 1          sentence also based on those reasons, but also the

 2          application of the other factors under 18 U.S. Code Section

 3          3553(a), right?

 4                    MR. VINEGRAD:  Yes, your Honor.

 5                    THE COURT:  And the Government objects to it.

 6                    Does the Government object to a non-guidelines

 7          sentence or the extent of the non-guidelines sentence, Mr.

 8          Patricco?

 9                    MR. PATRICCO:  To the extent of the non-guidelines

10          sentence.

11                    THE COURT:  The Court adopts the factual

12          statements in the PSR as to which there are no objections.

13          I direct the Official Court Reporter to make a written

14          record of the colloquy today on these matters.  I Also

15          direct the Clerk and the U.S. Probation Office to append a

16          copy of this written record to any copy of the Presentence

17          Report that is hereafter made available to the U.S. Bureau

18          of Prisons.

19                    Next, what I'd like to do is to state what I

20          believe the Sentencing Guidelines calculations are following

21          my decisions on those issues.

22                    The adjusted offense level would be 47;

23                    Criminal History Category for Mr. Graham is I;

24                    The imprisonment range is life under the

25          guidelines;
```

1             Supervised release range is two to three years;

2             Probation would not be available, absent a

3       downward departure or a non-guidelines sentence;

4             A fine of $25,000 to 5 million dollars is called

5       for.

6             And lastly, the special assessment of $1600.

7             Do you agree with those, Mr. Topor?

8             MR. TOPOR:  I do, your Honor.

9             THE COURT:  Mr. Patricco, you too?

10            MR. PATRICCO:  Yes, your Honor.

11            THE COURT:  Mr. Vinegrad, I know that you object

12      to the guidelines, but do you agree to the math at least

13      that I've gone through?

14            MR. VINEGRAD:  Yes, I do.

15            THE COURT:  Would the Government care to address

16      the court about an appropriate sentence in this case?

17            MR. PATRICCO:  Yes, your Honor.

18            Your Honor, to put Mr. Graham's crime into its

19      proper perspective, you must begin with his personal history

20      and characteristics.

21            Mr. Graham was a lawyer -- is a lawyer who twice,

22      in both Connecticut and Delaware, took a solemn oath to

23      uphold the law in all circumstances.  He's a former criminal

24      public defender in Delaware.  At Gen Re he was the company's

25      expert on reinsurance regulations and accounting rules.

1      Indeed, he was an industry industry expert. Back in 2004,
2      he testified under oath in a lawsuit involving Gen Re that
3      "I've served as the principal draftsman of most of the
4      reinsurance related model laws and regulations and
5      accounting rules since 1986."

6          In addition, when Gen Re was a public company, Mr.
7      Graham was responsible for preparing its 10-K reports and
8      its other financial filings with the SEC. And perhaps most
9      importantly for purposes here, back in 1997, he gave a legal
10     opinion in an e-mail on the very issue that is at the heart
11     of this case. In an e-mail entitled "Side Letters" he
12     advised Chris Garand and others in no uncertain terms that
13     they should put oral side understandings in writing and
14     state explicitly to auditors and regulators that these are
15     non-enforceable or else you might have "fraud and RICO
16     problems" and "go to jail." He explained that this is
17     because oral side understandings might "eliminate the
18     reasonable possibility of significant risk of loss to the
19     reinsurer which is one of the conditions to reinsurance
20     accounting under both GAAP and SAP."

21         It's no over-statement to say that no one involved
22     in the LPT was more sensitized to what was at stake and what
23     the potential repercussions were than Mr. Graham. So in
24     November of 2000, when he was presented with the prospect of
25     this deal, there should have been no equivocation. There

1     should have been no gray areas.  Rob Graham should have been

2     as blunt with his bosses on this deal as he apparently was

3     with them on others.  He should have told them, no, this is

4     wrong, I'm not getting involved, and neither should you.

5     Because that is the duty of in-house corporate counsel, to

6     protect business people from themselves.  And the facts in

7     this case have made clear he completely failed in that duty.

8          Now, what is also clear as to Mr. Graham is that

9     he didn't just put his head in the sand in this case and

10    fail to act, he became an active participant in the LPT

11    deal.

12          First, as the court noted just before, he applied

13    his vast knowledge of reinsurance and accounting

14    regulations, and advised his co-conspirators to structure

15    the LPT in a way that might conceal it from auditors and

16    regulators.

17          Secondly, he drafted and edited the fraudulent

18    documents in this case that, in case regulators and auditors

19    did ever look at this transaction, they would be misled as

20    to its true nature.

21          The court recalls, and I'll be brief on this,

22    Government's Exhibit 43, Mr. Graham's e-mail to Ms. Monrad,

23    Mr. Garand, and Mr. Napier after the November 20th

24    conference call wherein he suggested that AIG use an

25    offshore entity as the contracting party for the deal

1    because "the benefit of this approach would be that since

2    the AIG U.S. entities would report the AIG non-U.S. entity

3    as cedants on Schedules F and P, any review of AIG U.S.

4    entity statements wouldn't be able to connect the dots to

5    CRD and beyond."

6         The court also recalls Government's Exhibit 57

7    which is an e-mail from Rick Napier to Rob Graham and

8    others.  That e-mail forwarded the November 17th e-mail that

9    contained the secret side deal in this case about the one

10   percent fee and the two percent rebate, along with the draft

11   slip that made actually no mention of them.  Mr. Graham's

12   response was not to question this fee rebate and omission

13   from the slip contract, but only to advise that "since the

14   fee rebate will be coming from the CCA Commission, we should

15   be careful with inter-company transfers.  If they are

16   reportable under the Holding Company Act, a curious outside

17   party could deduce that there is a link between the

18   transactions."

19        He also, your Honor, went so far later in the

20   conspiracy, as your Honor noted, to advise John Houldsworth

21   point blank on tape, on Government's Exhibit 137, that AIG's

22   "organizational approach to compliance issues has always

23   been pay the speeding ticket which is different from our

24   organizational approach.  So I'm pretty comfortable that our

25   own skirts are clean, but that they, AIG, have issues."

1             Together, your Honor, Rob Graham's advice had the

2     effect of galvanizing this conspiracy.  That's because when

3     a lawyer advises you how to conceal a transaction, it gives

4     you comfort that you won't get caught.  And even if you do

5     get caught, you know that his involvement in the transaction

6     will provide you with some cover, especially when he tells

7     you that it's the other company's problem, not yours.  So

8     even as Mr. Graham claims that his overall participation in

9     the LPT deal took only a few hours of his time, those were

10    some of the most crucial hours of this conspiracy, given who

11    Rob Graham was, what he represented to the other

12    co-conspirators in this case, and what he said and did.

13            Now, in his papers, your Honor, Mr. Graham claims

14    that he tried to do the right thing by raising his concerns

15    about the LPT in an e-mail to his boss, Tim McCaffrey.  But

16    any objective reading of Government's Exhibit Number 84

17    reveals a much less noble purpose.

18            As the court recalls, Mr. Graham wrote:  Our group

19    will book the transaction as a deposit.  How AIG books it is

20    between them, their accountants, and God.  Ron, et al have

21    been advised of and have accepted the potential reputational

22    risk that U.S. regulators, insurance and securities, may

23    attack the transaction and our part in it.

24            No where in this e-mail does Mr. Graham say that

25    he's concerned about the transaction.  No where does he say

1          he's uncomfortable.  And nowhere does he suggest that

2          Mr. McCaffrey talked to Mr. Ferguson about the wisdom of

3          going forward with this transaction.  This e-mail, in an

4          objective reading, is nothing more than someone seeking

5          cover from their boss by copying them on an e-mail they

6          received.  The simple message to Mr. McCaffrey is that the

7          ship has sailed on this transaction and that he shouldn't

8          interfere with it.  So far from trying to do the right thing

9          in this case, the e-mail assured that this deal would go

10         forward unimpeded by the general counsel of Gen Re.

11              And what's truly perplexing about Mr. Graham's

12         statement that he tried to do the right thing is that over

13         the years since the LPT, he had many opportunities to have a

14         crisis of conscience about the deal and to do something

15         about it.  In the wake of the PNC and AIG, Brightpoint cases

16         and the Enron cases, he was repeatedly warned point blank

17         about the dangers of improper documentation and side

18         agreements and aiding and abetting unscrupulous clients.

19         But every time he had the chance to do the right thing and

20         raise his voice about the LPT deal and try to reverse it, he

21         apparently did nothing and remained silent.  I'll point to a

22         couple of e-mails and notes taht he received through the

23         years, your Honor, very briefly.

24             In March of 2002, Mr. McCaffrey sent him an e-mail

25         entitled "Finite Risk Contracts" that summarized a

1    conversation in an executive committee meeting that

2    Mr. Brandon had with Mr. McCaffrey and others.  In that Mr.

3    McCaffrey and Mr. Brandon also says that all provisions and

4    understandings of financial reinsurance contracts need to be

5    recorded and contained in a single document.  No side

6    letters, no use of multiple contracts.

7            Later in 2002, in July, Mr. Brandon sent an e-mail

8    entitled "SEC Findings on PNC/AIG Transactions," where he

9    wrote to Mr. Graham and others:  Below is the SEC findings

10   on PNC financial transactions with AIG that were designed to

11   remove non-performing assets from PNC's balance sheet and

12   income statement.  Lots of parallels to some financial

13   reinsurance transactions.  Avoiding reputational risk in all

14   of our transactions, traditional or non-traditional, is

15   paramount.

16           In 2003, in the summer, Mr. Brandon attached a

17   note from Warren Buffett and a New York Times editorial

18   regarding Citigroup and J.P. Morgan aiding and abetting

19   Enron in committing a fraud.  In that note, Mr. Brandon

20   warned, "simply put, we cannot enter into any transaction

21   that helps a client deceive, mislead investors or

22   regulators.  If anyone has a question about a particular

23   transaction, please discuss it with either Tad or me."

24           And two months later, the last one, your Honor, in

25   October of '03, Mr. Brandon sent him another note from

1 Mr. Buffett and news about the PNC/Brightpoint/AIG

2 settlement.  He attached an article called "Son of Enron"

3 that discussed companies cooking their books through finite

4 insurance policies and attached an IBNR Weekly article that

5 said:  "The recent SEC settlement with AIG highlighted in a

6 very public forum the practice of side letters written to

7 supersede the formal reinsurance contract.  In the AIG

8 example, the agreements were meant to eliminate any risk

9 transfer in the original agreement shown to auditors."  And

10 then on the cover note Mr. Brandon stated this is another

11 reminder we cannot enter into any transaction that helps a

12 client deceive or mislead investors or regulators.

13 Your Honor, despite all these red flags over the

14 years from Mr. Brandon that other companies were engaging in

15 being investigated into similar conduct as the LPT, Rob

16 Graham apparently did nothing to suggest reversing this deal

17 to his bosses or to anyone else.  Now, of course, we

18 recognize that it would have taken some courage for him to

19 do this especially since the evidence in this case showed

20 that Mr. Brandon and Mr. McCaffrey were involved in the LPT,

21 but that is what is expected of in-house corporate counsel.

22 That was his job and apparently he did not do it.  Simply

23 put, your Honor, Mr. Graham had many chances to take

24 responsibility for this crime before he got caught and he

25 failed in those chances.  So in light of those missed

1    opportunities, any expressions of responsibility or remorse

2    here today by Mr. Graham should be met with some skepticism.

3    Especially since, as your Honor noted, Mr. Graham was

4    drafting contracts well through -- into the year 2001.

5           Mr. Graham also seeks leniency in his papers

6    because he claims unique collateral consequences as a result

7    of him being a lawyer.  Specifically, he claims to lose his

8    law license and will be unable to pursue a post Gen Re

9    career as a reinsurance arbitrator.  Even putting aside the

10   fact that the loss of his law license as a result of his

11   conviction in Connecticut is by no means a sure thing, and I

12   presume his arbitration practice would be based here in

13   Connecticut, his argument should carry little weight with

14   the court for another reason.  That's because Rob Graham

15   voluntarily allowed his Connecticut law license to lapse

16   even before this trial began.  According to the Connecticut

17   Bar's website, on May 22, 2007, seven months before this

18   trial began and well before any finding of guilt, Mr.

19   Graham's bar license was administratively suspended by the

20   Bar due to his failure to pay the mandatory client security

21   fund fee, which this court wells knows is a fund set up by

22   the bar to reimburse innocent clients with their attorneys

23   steal from them.  In addition, according to the website,

24   your Honor, he's not provided a new forwarding address to

25   the Bar since he's left Gen Re.  I say this because I find

1    it curious that Mr. Graham would now claim that his law

2    license is so important to him and that he'll suffer

3    disproportionate punishment as a result of potentially

4    losing it.  And even if he does eventually lose his bar

5    license and his ability to practice law, as your Honor

6    knows, the Second Circuit in Cutler held that this is a

7    consequence that every lawyer who engaged in fraud --

8    engages in fraud should expect.

9         In conclusion, your Honor, I'd like to just

10   briefly address general deterrence.  As I've said in other

11   sentencing hearings in this case, in enacting Section 3553,

12   Congress was very much concerned with deterrence of

13   white-collar criminals.  As a subset of white-collar

14   criminals, deterring lawyers from crime is particularly

15   important.  That's because, as I alluded to earlier, lawyers

16   who participate in white-collar crimes legitimize the crimes

17   in the minds of other would be white-collar criminals and

18   can galvanize a conspiracy in ways that most layman cannot.

19   And if I could just quote from a 1964 Second Circuit case,

20   United States v. Benjamin, another securities case involving

21   a defendant lawyer, Judge Friendly wrote:  "In our complex

22   society, the accountant's certificate and the lawyer's

23   opinion can be instruments for inflicting pecuniary loss

24   more potent than the chisel or the crowbar."

25        As this Court is well aware and has found, Rob

1 Graham and his co-conspirators inflicted a tremendous

2 pecuniary loss in this case, at least 544 million dollars to

3 AIG shareholders. I would submit to your Honor that at some

4 level Rob Graham always knew that this result was coming.

5 That's why he wrote back in 2000 that securities regulators

6 may attack this transaction and our part in it. But that

7 revelation did not deter him from participating in the LPT

8 transaction, nor did the fact that he was a regulatory --

9 reinsurance accounting and regulator expert, nor did the

10 fact that he once prepared financial statements for a

11 publicly-traded company, nor did the fact that he once gave

12 advice that you could go to jail for oral side

13 understandings.

14   I'd submit, your Honor, if an otherwise

15 well-intentioned lawyer like Mr. Graham, armed with this

16 knowledge and experience, cannot be deterred, the only way

17 to deter other lawyers who are similarly situated and

18 perhaps less scrupulous, is to send them a message with an

19 appropriate prison sentence for Mr. Graham. In addition to

20 deterrence, such a sentence would promote respect for the

21 law and would be just punishment for what Mr. Graham did and

22 what he failed to do.

23   THE COURT: Thank you, Mr. Patricco.

24   Do you know of any victims who care to address the

25 Court today, Mr. Patricco?

1              MR. PATRICCO:  I'm sorry.

2              THE COURT:  Do you know of any victims?

3              MR. PATRICCO:  I do not.

4              THE COURT:  Thank you.

5              Mr. Vinegrad.

6              MR. VINEGRAD:  This is a tragic day.  A man with

7         an impeccable reputation in his profession, 35 years, a man

8         who has spent his entire adult life doing extraordinary

9         things for other people in both his professional and

10        personal life sits in a federal courtroom convicted of

11        serious crimes with his professional future and livelihood

12        destroyed because of his actions in this case.  I think

13        that's tragic.

14             And what I'd like to do, your Honor, this morning

15        is talk to you for a few minutes about why the same

16        discretion, the same leniency that your Honor has displayed

17        in the prior sentencings in this case, and I'm referring

18        specifically to the sentencings of the other so-called Gen

19        Re defendants, because Mr. Graham is a member of that group,

20        why Mr. Graham deserves that same measure of discretion of

21        leniency and, in fact, for reasons that I'll explain why, I

22        submit to you, he is deserving of the greatest degree

23        leniency of anyone.

24             Now, your Honor, I am mindful of what your Honor

25        has done and said at the prior four sentencings in this

1       case.  And I think your Honor already has spelled out on the

2       records of those proceedings the factors that support

3       Mr. Graham deserving, at a minimum, an equal measure of

4       leniency.

5              First, Mr. Graham did not gain anything directly

6       or personally as a result of this transaction, nor was that

7       his motive, nor was that his intent.

8              Secondly, he has lived a life of extraordinary

9       works, both with respect to his civic service, his

10      charitable service, his public service, as well as a

11      multitude of acts of a more discrete, of a more personal

12      nature throughout his lifetime, is well documented to the

13      letters that have been submitted to this court.

14             Third, he has led an extraordinary professional

15      life, an exemplary and, until this case, unblemished career,

16      not just representing people diligently and faithfully as

17      was his obligation as a lawyer, but in helping others, in

18      teaching others, in mentoring others.  And I'm not just

19      talking about friends and I'm not just talking about

20      colleagues.  I'm talking about regulators, I'm talking about

21      competitors, and even people that he had never met before in

22      his life before he taught them and helped them and mentored

23      them.  And that's special.

24             Fourth, he is like the other defendants, a

25      first-time offender who, I submit to the court, presents no

1          risk of recidivism.

2                  And finally, and in this respect I think he is

3          more comparable to Mr. Garand than he is to Mr. Ferguson or

4          Ms. Monrad, was his level or his role, his place in the

5          so-called corporate ladder.

6                  As your Honor has already found during the

7          sentencing, I believe, of Mr. Ferguson, your Honor described

8          people who were involved in this case, and Mr. Graham I

9          think fits squarely within this description, as underlings

10         who were papering the deal, who were lower level people

11         documenting the transaction at the direction, under the

12         supervision, and at the behest of their superiors.  So

13         unlike Mr. Ferguson, the CEO, who initiated, oversaw,

14         supervised, and directed the transaction virtually from

15         beginning to end, and who had the ultimate decision to make

16         about whether this transaction should proceed, unlike

17         Ms. Monrad, the CFO who your Honor recently found had a

18         managerial and supervisory role in this transaction, who

19         supervised the activities of others, including Mr. Graham,

20         not saying that what he did was not important, but I think

21         it bears recognition, and the Second Circuit case law

22         supports this, in discerning the relative levels of

23         culpability that what he did was at the behest and at the

24         direction of others.  And under those principles, the Cavera

25         case, for example, that talks about the wide variability in

1        culpability, even in significant fraud cases with large

2        losses, that the court has the discretion to draw those

3        distinctions.  And I submit to you, if you look at the

4        evidence in this case and you look at that so-called

5        corporate ladder, Rob Graham, even as a lawyer, was at that

6        lower level that your Honor identified earlier, doing what

7        he did at the behest and at the direction of others.

8                But beyond that, Judge, I submit to your Honor, as

9        I said earlier, that there are certain aspects of this case

10       that are unique to Rob Graham that make him deserving of

11       even greater leniency than your Honor has demonstrated thus

12       far in this case.

13               Why do I think that's so?

14               First, and I'll say it, and I believe it, and I

15       believe it as much now as I did ten minutes ago, or as I did

16       a year ago, and I'll believe it until the day that I die, he

17       tried, in his own way, in his unsuccessful way, but he tried

18       in good faith to do the right thing and to share his

19       concerns and put a stop to this transaction.  Some of their

20       own evidence shows that.

21               I'm not here to argue Mr. Graham's guilt.  That

22       was last year.  You can accept everything the Government

23       says about what he did during the course of this

24       transaction, but it remains undeniable, I submit, that he

25       tried, he tried to put a stop to it.  He raised his concerns

1        with Mr. Napier, and that was the word that Mr. Napier used

2        on that witness stand, not the characterization that Mr.

3        Patricco used a moment ago.  He said Mr. Graham was

4        concerned.  He shared his concerns with Mr. Garand.  He

5        shared his concerns with Ms. Monrad.  Your Honor may recall

6        from that e-mail to Mr. McCaffrey that Mr. Graham wrote that

7        Ron, et al had been advised of the risk of the transaction

8        and what might happen.  And during his interview with the

9        Government back in 2005, and I don't think the Government

10       takes issue with this, Mr. Graham explained that his

11       reference to "et al" was Mr. Napier and Mr. Garand and

12       Ms. Monrad.  And he shared his concerns with Mr. McCaffrey.

13              Let me just pause on Mr. McCaffrey.  He was the

14       General Counsel.  My client was not.  He had ultimate

15       responsibility within Gen Re for this transaction and

16       whether it went forward.  He was the man that the Government

17       argued at trial was up to his eyeballs in criminality just

18       like everybody else in the courtroom.  The man who at the

19       other end of that e-mail that the Government viewed as so

20       essential to their case against everybody.  Rob Graham

21       shared his concerns with his boss.  And I say concerns,

22       Judge, and it was in good faith.  And Mr. Patricco stood up

23       here ten minutes ago and tried to give it a different

24       characterization.  So I'd like to take your Honor back to

25       what was said at the trial.

1           What was said at the trial about that exhibit,
2       about that e-mail was it was an exhibit which was about "Mr.
3       Graham expressing his concern over the transaction."  That's
4       the words that were used by Mr. Patricco.  And he may have
5       done it in colorful language, invoking God and reputational
6       risk and all the rest of it, but any fair reading of that
7       document to any General Counsel reading it in his in-box
8       would know that Rob Graham had serious and genuine concerns
9       about this transaction and was raising them up the chain of
10      command, just as he was supposed to.  So far up the chain of
11      command that as that e-mail reflects that Mr. Ferguson
12      himself, the CEO, number one in the company, was aware of
13      Mr. Graham's concerns.  And he knew it.  He went to the top.
14      And he failed.  No doubt about it, that's why we're here.
15      And he took actions that formed the basis of the verdict
16      against him.  That's why we're here.  But he tried.  And now
17      that we're here to talk about punishment and not guilt, that
18      should matter Judge, that should matter for something.  That
19      he took concrete, identifiable, specific steps to go up the
20      chain of command, five different executives, all the way to
21      the top, including the Chief Legal Officer, to warn them.  I
22      think in your Honor determining what just punishment is in
23      this case that factor has to be taken into account.
24          Secondly, and I think this also makes Rob Graham
25      unique amongst the five defendants in this case, is remorse.

1    At every single sentencing in this case before today, every

2    one of the four of them, the Government has gotten up and

3    made a strong point to your Honor about why serious terms of

4    imprisonment are necessary because, among other things, the

5    defendants showed absolutely no remorse, not a bit of

6    remorse, not an ounce of remorse.  The words changed but the

7    point was clear.  They didn't do that today.  And I commend

8    them for not doing that today.  And there's a reason they

9    didn't do that today.  Is because he is different and he has

10   shown remorse.  And I'm not just talking about the concerns

11   and the doubts that he had back in the day when this

12   transaction was being put together.  I'm talking about

13   throughout the course of the investigation and trial that

14   followed.  Not just today.  But way back then, the spring of

15   2005, when Mr. Graham went in and was interviewed by ten

16   different government agents for two full days, being

17   interviewed about this transaction, and it was candid and it

18   was forthcoming, it was remorseful.  It's hard to recreate

19   it, Judge, but I was there.  I was sitting by his side.  And

20   the remorse and the regret that this man felt was palpable.

21   They can contradict me if they can.  I don't think they can.

22   Because there was genuine remorse before he was indicted.

23   We've acknowledged it in writing.  We've acknowledged how he

24   failed.  The Government had a very stinging statement in

25   their brief about how he had failed his family and failed

1    his friends and failed his colleagues.  And we came right

2    back and agreed.

3            And throughout the course of this long case, over

4    four years, throughout the entire time that I have

5    represented this extraordinary and exceptional man, not

6    once, not once, has he displayed anything, anything other

7    than the absolute utmost respect for this Court and for the

8    criminal justice process that brings him here today.  There

9    were no post-verdict interviews from lawyers denouncing the

10   jury, denouncing the system.  There was no post-verdict

11   interview from Mr. Graham, on the record interviews blaming

12   the jury, blaming the system, blaming his lawyers for his

13   plight.  There was no effort to transfer assets out of his

14   name to avoid potential monetary obligations.  There was

15   none of that.  None of that.  And for anybody who knows Rob

16   Graham, and for any of the 95 people who wrote on his

17   behalf, the notion that he would do any of those things, or

18   even think about it, is unfathomable.  The letters, the

19   people who described how extraordinarily out of character

20   this episode is for Rob Graham when contrasted with the

21   extraordinary works of his life, and the personal torment

22   this he has put himself through, put himself through, for

23   years, not just the last six weeks, but for years as a

24   result of this case.

25           So, your Honor, I submit to you there is genuine

1      remorse.  Long standing remorse.  And just as the Government

2      said at the prior sentencings that the lack of remorse

3      should matter, I stand here before you today and argue that

4      the existence of genuine remorse should matter for Mr.

5      Graham.

6              And thirdly, are there collateral consequences.

7      He is licensed in Delaware.  He's authorized to practice law

8      in Delaware.  He's going to lose that license.  And not only

9      that license, he's going to lose his ability to practice or

10     work in this industry.  It's not just a matter about

11     drafting contracts.  I mean, let's be real.  He's out.  He's

12     out of the only profession he's ever known.  He's out of the

13     only industry he's ever known.  Any notion of working as an

14     umpire or an arbitrator or whatever else was being planned

15     is gone and it's gone forever.  Unlike Mr. Ferguson who had

16     retired long ago, unlike Mr. Garand who had retired long

17     ago, unlike Ms. Monrad or Mr. Milton who continued to work

18     during the course of this case, even after they were

19     indicted, were gainfully employed during the course of these

20     proceedings.  So the collateral consequences to Mr. Graham

21     are unique and they are devastating.  He has not worked a

22     day in three and a half years.  At a profession, that I hope

23     this came clear in the submissions to the court, a

24     profession that was not just his job, it was his life.  It

25     was his persona.  It was the essence of his being.  And I'm

1      not just talking, just to be very clear, Judge, I'm not

2      talking about the loss of income, although it is very

3      substantial, and if you do the math it's a very substantial

4      percentage of what his net worth is, but I'm not here making

5      a plea of poverty.  I'm talking about the loss of his

6      identity.  I'm talking about the inability to have the

7      dignity and the self-worth to do good, hard work at what you

8      know and what you are trained to do best.  That's a loss

9      that is painful.  That is a loss that is immeasurable and, I

10     submit, more significant to this man than the diminishing

11     balance of his bank account.

12           And if you add that up, if you add all those

13     considerations up, I submit to you there are many compelling

14     reasons why Rob Graham is particularly deserving of your

15     Honor's discretion and leniency.  More so than anyone who

16     has come before the Court in this case for sentencing.  And

17     that level of discretion, I submit, is born out and

18     supported by what courts have done in other cases, other

19     sentencings that are described in our brief, in our November

20     21st brief, cases involving lawyers convicted of frauds,

21     serious frauds, after trial, some of whom did not commit it

22     for personal gain, some who did.  Cases in which judges have

23     seen fit in recognition of the extraordinary consequences of

24     those convictions and the lack of gain and other factors

25     similar to those that we've presented to the court.  How

1        judges in those cases have seen fit to fashion sentences

2        like the one we propose today that does not require, as an

3        element, a term of incarceration.

4                Whatever message needs to be sent in this case has

5        been sent. And I'm not just talking about the prosecutor's

6        press release when the conviction took place last February

7        where they basically sent a strong message was sent simply

8        by virtue of the convictions, but everything else that has

9        happened to this man and everything else that will continue

10       to happen to this man for the rest of his days. Any lawyer,

11       any rational lawyer, would have to be nuts to do what

12       happened in this case and to risk suffering the consequences

13       that Rob Graham has suffered already and will continue to

14       suffer as a result of this case.

15               And so, your Honor, my plea is this:

16               My plea is to require Rob Graham to serve the

17       additional harsh sanction and punishment of a prison term is

18       truly not necessary. And that's the word that your Honor

19       knows is the bellwether under Section 3553(a) for

20       determining just punishment.

21               Everyone in this courtroom knows, Judge, that you

22       can impose such a sentence if you want to. That's obvious.

23       But you don't have to. And the Supreme Court of the United

24       States and the Second Circuit Court of Appeals have made

25       abundantly clear that for reasons similar to the ones we

1    have presented to the court today, your Honor has the

2    discretion not to impose such a sentence.  And so I ask your

3    Honor, force him to serve his community, if your Honor

4    thinks such a sanction is appropriate, and have him give

5    back and help members of society who are truly in need of

6    his help.  Make him a prisoner of his own home, if your

7    Honor feels that that substantial deprivation of his liberty

8    is necessary as a further component of his sentence.  But I

9    beseech your Honor to give Mr. Graham the opportunity to

10    begin now to try to put the pieces of his life back together

11    and to start anew with what remains of it.

12    I thank your Honor for listening to me this

13    morning.  And with your Honor's permission, I would like to

14    call a total of four speakers who would like to speak today

15    on Mr. Graham's behalf.

16    THE COURT:  Certainly.

17    MR. VINEGRAD:  The first speaker is Donna Lee, two

18    words, L E E, Williams.

19    THE COURT:  You want to come up to the podium.

20    MS. WILLIAMS:  Thank you, your Honor.

21    Good morning, your Honor.  My name is Donna Lee

22    Williams and I've been a member of the Delaware Bar since

23    1984.  From 1993 to 2005, I served as Delaware's Insurance

24    Commissioner, and I've known Rob Graham for well over 20

25    years.

1         I never in a million years would have expected

2    that I would have been here this morning to talk to you.

3    And I hope this morning that I can give you some sense of

4    how completely out of character this situation is, about how

5    well Rob is regarded by the insurance industry and by the

6    regulatory community, and how very much Rob Graham means to

7    me.

8         I first met Rob in 1987.  I joined a firm that Rob

9    Graham had left, the Bayard firm in Delaware, and began

10   doing insurance regulatory work and General Re Insurance was

11   a client of the firm and Rob was my primary contact.

12        I'll never forget the first time that I heard Rob

13   Graham speak in public.  It was March 1988, in Santa Fe, New

14   Mexico, at a meeting of the regulators, National Association

15   of Insurance Commissioners meets quarterly.  I remember

16   thinking at the time that this man was like E.F. Hutton.

17   You member the E.F. Hutton commercials, when E.F. Hutton

18   talks, people listen.  Rob Graham spoke, people listened.

19        I found Rob to be smart, he was eloquent, he was

20   articulate, self-confident, but very respectful.  And one of

21   the things I noticed most about Rob was that, unlike many

22   lawyers that I had seen, Rob wasn't the kind of guy who

23   would just throw everything out there and hope that

24   something would stick.  Rob's arguments were always very

25   well-reasoned and very well -- very credible.

1            Time went on and I became Insurance Commissioner

2     and Rob was so well regarded by both me and other regulators

3     and by the industry itself, that he was part of a small

4     group of folks that, folks like me, regulators called upon

5     to actually educate novice regulators about what reinsurance

6     is all about.  We trusted him.  I still trust him.

7            I was never more professionally proud of Rob

8     Graham than I was immediately after the circumstances of

9     9/11.  At that time I was still Delaware Insurance

10    Commissioner and I was asked by the President of the

11    National Association of Insurance Commissioners to chair a

12    committee on terrorism risk.  And one of the first things

13    that I did was to hold a public hearing.  Regulators were

14    very concerned about what was going to happen, were claims

15    going to be paid, how were we going to deal with this risk

16    going forward.  And Rob was one of the first people to

17    speak.  And he stepped up to the podium and you could hear a

18    pin drop in that room, because everyone was waiting to hear

19    what would the industry's response be.  And Rob spoke with

20    great compassion and with focus and with purpose, and he

21    told me and all of the regulators and all of the people who

22    were gathered in that room to learn what would happen next,

23    that even though not a penny in premium had never been

24    collected, the industry would pay because it was the right

25    thing to do.  And there were lots of things that we had to

1      deal with going forward in order to be able to plan now for

2      this risk.  But that General Re Insurance and Rob Graham, in

3      particular, would be there every step of the way to help us

4      to find that solution.

5              So I've told you a little bit about Rob's

6      reputation in the industry and Rob's reputation with

7      regulators, it was unparalleled.  There's no one that I know

8      of that is as well-respected by regulators as Rob.

9              Let me tell you a little bit about what Rob Graham

10     has meant to me personally.

11             I was a very young lawyer when I first met him and

12     he was my client, but he very quickly became more than a

13     client.  He became a mentor and a very, very dear friend.  I

14     will tell you without question that apart from my husband,

15     Rob has always been my most trusted friend and advisor.  And

16     I've talked with Rob about some of the most difficult

17     decisions that I have ever made.  I consulted with him in

18     1992, as a 31 year old lawyer, trying to figure out what I

19     wanted to do next.  There were folks in my party who were

20     encouraging me to run for Insurance Commissioner.  Boy, that

21     was an awful big risk.  I was running against a fellow who

22     was the President of the State Chamber of Commerce.  What

23     could this little girl from Dover, Delaware bring.  But he

24     had a lot of faith in me and helped me to find a lot of

25     faith in myself.

1           During the many years that I served as Insurance

2      Commissioner, I talked with Rob about so many different

3      things.  I talked to him about negotiating through the NEIC

4      and the various processes that go on.  The NEIC sometimes

5      means no action immediately contemplated.  And Rob helped me

6      to figure out, okay, if that's what you want to do, here are

7      some of the things you need to do to get that done.

8           I talked to him when the Medicare HMO's all pulled

9      out of Delaware and there were thousands of angry senior

10      citizens who no longer had health care.  And I talked to him

11      about how to do a public outreach program, how to help the

12      people in my community.

13           I talked to Rob when the med mal crisis came

14      about.  We were suddenly struck with a situation of having

15      no med mal coverage for the only trauma center in the state.

16           I talked with Rob about all sorts of procedural

17      and regulatory issues that I was facing, questions of first

18      impression in dealing with possible changes of control or

19      other transactions involving the state's Blue Cross and Blue

20      Shield organization, because it was very uniquely organized

21      under the law.

22           During all this time, your Honor, Rob Graham has

23      been a very, very trusted advisor and friend.  And I want

24      you to know that not once, not ever, did Rob Graham ever ask

25      anything of me.  He never asked for any favors.  He never

1      asked for any special consideration for his company, for

2      fellow insurance industry representatives who attended NEIC

3      meetings, or for himself.  He never ever asked for anything.

4              This conviction means that the career that he has

5      known and loved is over.  He is crushed, as I am.  Being a

6      lawyer meant everything to him.  Your Honor, I hope that you

7      know that this -- this is a lone transgression.  This is a

8      man who has always comported himself with utmost respect for

9      process and for integrity and for purpose.  And for me and

10     many, many others, this does not destroy the faith and

11     confidence that we have in him.

12             Now, I hope that you will give him the opportunity

13     to do things to continue to serve in some way.  Thank you,

14     your Honor.

15             THE COURT:  Thank you.

16             MR. VINEGRAD:  Your Honor, the next speaker is

17     Frank Parisi, P A R I S I.

18             THE COURT:  Thank you.

19             MR. PARISI:  Good morning.

20             THE COURT:  Good morning.

21             MR. PARISI:  Your Honor, my name is Frank Parisi.

22     I'm the director of Strategic Partnerships for the City of

23     Minneapolis, Minnesota.

24             I've live in Minneapolis and I've known Rob Graham

25     personally for about 30 years.  I appreciate the opportunity

Case 1:16-cr-00776-VEC Document 914-54 Filed 11/19/18 Page 45 of 75 Case 1:16-cr-00776-VEC Document 914-51 Filed 11/19/18 Page 45 of 75 PageID #: 4717

44

1    you've provided to allow me to tell you about the Rob that I

2    know.

3              I met Rob and his wife, Evelyn, when my wife and I

4    moved next door to them in Wilmington, Delaware.  We've been

5    connected as friends ever since.

6              Simply stated, Rob has been the kind of person one

7    can only hope to have as a friend.  He's always been steady

8    and reliable and a positive force in our lives and the lives

9    of our children virtually since the day we met.  Like most

10   people, our family has experienced its share of challenges.

11   We've counted Rob among our supporters during the happiest

12   days, like the births of our children, and during the most

13   difficult days when we experienced illness, despair, and

14   loss.  During those most difficult times Rob has, without

15   exception, delivered as one of the rare constants in our

16   lives.  He has always been there when we've needed help or

17   assistance of any kind.  He was a valuable supporter when my

18   wife was diagnosed with ovarian cancer, and he and his wife

19   stood with us during the entire nine years of her illness

20   right up to and through the day she died.  But their

21   involvement during that period was far beyond the scope of a

22   friend's sympathy.  As we encountered milestones, surgeries,

23   and chemotherapy treatments, for example, Rob would

24   regularly show up in Minneapolis, even in the dead of

25   winter.  Even if he was only able to come for an hour or two

1    and visit us at the hospital, he would come.  As somebody

2    who frequently traveled in his work, I suspect that the very

3    last thing he looked forward to doing at the end of a busy

4    week was the prospect of going back to the airport for one

5    more time and another flight from New York to Minneapolis

6    but he came, nonetheless, at his expense, and during his

7    very limited free time.

8              He was also the kind -- he is also the kind of a

9    friend that we could rely on for advice and counsel.

10             Some years ago my stepson entered a long and dark

11   period of drug and alcohol addiction that for a time

12   absolutely dominated our lives, sometimes even overshadowing

13   my wife's battle against cancer.  We received a great deal

14   of support and assistance from friends, not the least of

15   which came from Rob Graham.

16             I submit to your Honor that the true measure of an

17   individual's character is how and what that person does

18   during difficult, challenging times.  During my family's

19   darkest days over the last 30 years, Rob Graham has always

20   been there and always supported us.

21             Over these years, I have never worked with Rob

22   Graham and I don't pretend to fully understand the details

23   and intricacies in this case, but what I do know is that Rob

24   is a good person who has unselfishly supported others in

25   need over the last 30 years.  I hope that kind of admirable

Case 1:16-cr-00776-VEC Document 914-54 Filed 11/19/18 Page 47 of 75 Case 1:16-cr-00776-VEC Document 914-54 Filed 11/19/18 Page 47 of 75D #: 4719

46

1       behavior over such a long period of time will be considered

2       and taken into account as you make your determination about

3       Rob's future.

4              I've heard a poet observe that people may forget

5       what you've said and they may forget what you do, but

6       they'll never forget the way you make them feel.  I'm here

7       to tell your Honor that as one person whose encountered Rob

8       Graham over 30 years, he has always made me and my family

9       feel supported because he could always be counted on to be

10      standing right beside us.

11             Thank you.

12             THE COURT:  Thank you.

13             MR. VINEGRAD:  Your Honor, the next speaker is

14      Mary Lanning, L A N N I N G.

15             MS. LANNING:  Good morning, your Honor.

16             THE COURT:  Good morning.

17             MS. LANNING:  Thank you for allowing me to speak

18      today on behalf of my friend Rob Graham.  I work in the

19      financial services sector as a compliance professional and

20      occasionally as a lobbyist.  I'm a principal of my own

21      company, MLNG Associates.  MLNG provides assistance to

22      insurance businesses and their attorneys in regulated

23      transactions such as acquisitions and expansions.  I met Rob

24      many years ago in the course of this work.  Both of us

25      contributed regularly to the law-making process in state,

1    national, and international discussions.

2         I also am a nun, with nearly 53 years of helping

3    people and communities get beyond failures and go forward,

4    giving their own help to others along the way.  In that

5    capacity, I am president of a not-for-profit corporation

6    called Yes Solutions, an organization dedicated to helping

7    women, men, and children who live on the margins, children

8    of incarcerated parents, immigrant families unable to find

9    employment, widowed elders, the displaced poor, the sick,

10   the dying, and those who care for them.  These are my

11   community.

12        Most of them fall between the cracks of public and

13   private assistance or not yet able to keep their footing on

14   their own.  We support ourselves by our own labors and

15   generosity of others.  We help as many as we can.

16   Everything we do is accomplished by volunteers, by bringing

17   people who need relief and encouragement together with those

18   who once needed it themselves and are willing to give it.

19        I have one purpose, your Honor, and one only for

20   asking you to hear me today.  My people need the kind of

21   dedicated time and professional know-how that Rob Graham

22   could bring to us on a consistent basis for a period of

23   time.  I ask your Honor to consider what it would mean to a

24   small community like Yes Solutions to be the place where Rob

25   Graham might provide a concentrated period of community

1    service, where everyday of his sentence could directly help

2    someone else to leave a broken past behind, to learn new

3    skills, and to build a few life.  Let Rob work with us

4    one-on-one in teaching work habits and language usage and

5    personal financial management to men whose lives until now

6    have not managed to put these pieces together in any

7    functional way.  Let him work side by side with these men to

8    give them work experience that can open the door to paying

9    jobs for them.  Let him help them get those jobs.  Let Rob

10   teach them how to build the shelves that are needed in our

11   childrens classrooms and playrooms at Abraham House which is

12   our center for families whose lives have been affected by

13   the criminal justice system.  Let him teach these men, many

14   of whom have never been employed, how to use hand tools to

15   measure and count, to add and divide, to trust their eyes

16   and their judgment, and to care about the end product.  Let

17   him spend extra time with some of them to teach them a

18   technical vocabulary and business concepts, writing skills,

19   things that would translate into vastly different job

20   opportunities than are on their horizons now.  Let Rob spend

21   time with a dozen of our teenage boys this year who are only

22   beginning to think that a college education is a real

23   possibility.  Let him supervise and train our teenage summer

24   interns in their community service as they learn to

25   recognize the needs of elders and diabled people around

1    them, and to make their own choices to move obstacles and

2    make a kinder world.

3            Rob Graham was respected for good reason, your

4    Honor.  The core of his reputation was his integrity and his

5    fairness, but he was just as well regarded for his work and

6    his leadership, and certainly for his written and oral

7    presentation skills.  He was always a generous team worker.

8    I am privileged to have worked with him on national advisory

9    committees and task forces and to have shared the tiring

10   tasks of teaching and leading.

11           I know from personal professional experience what

12   it could mean to have Rob Graham on the Yes Solutions team.

13   In a nutshell, Rob would attract more financial support and

14   resources to Yes Solutions.  We provide hot home cooked

15   meals to almost 10,000 homeless people each year, on the

16   sidewalk, on the three lonely holidays, Thanksgiving,

17   Christmas and Valentine's.  Rob has been there with us.  We

18   provide essential school supplies, back packs, shoes,

19   sneakers, warm coats, books, to almost five hundred children

20   each fall.  All of this is paid for out of our own earnings

21   and what donations we can encourage others to give us.  We

22   help support dozen of children in alternative residential

23   facilities and college prep programs.  We provide respite

24   care for dozens of elders and end of life care to many more.

25           I truly believe that Rob Graham could lead more of

1    our industry colleagues to give some of their time and

2    resources to these services that touch so many lives.

3    Please consider letting him help me recruit and develop new

4    volunteers and new donors who will discover for themselves

5    how very far one person's moments of kindness can carry

6    someone else.

7        Last year I sat in your Honor's courtroom for all

8    but the first few days of this trial. I was moved deeply by

9    the dignity, the poise, and the equanimity with which Rob

10   carried himself as the trial proceeded. He was everything I

11   expected him to be. Dozens of his peers, our friends and

12   colleagues, made the journey to Hartford from all around the

13   United States on a self-initiated rotation to show him our

14   support. We all went home strengthened by his strength. He

15   still is held in the highest esteem by regulators and their

16   technical staff, by lawyers and public officials with whom I

17   work every day, who write to each other and to me every week

18   to inquire whether there's anything we might be doing to

19   help him. If Rob were working with Yes Solutions, I am

20   confident that many more of our colleagues and mutual

21   friends would rally around to help make anything he touches

22   a success.

23       Your Honor, Yes Solutions has worked with the

24   courts in New York and New Jersey before in providing

25   alternative sentences. We would seize the opportunity to

1    work with someone of Rob's caliber and competence.

2           Judge Droney, your judgment call on Rob's sentence

3    could change not only Rob's life, it could affect the lives

4    of hundreds of others now and for at least another

5    generation.  You could open possibilities in my community

6    that are nowhere in reach today.  You could bring real

7    beneficiaries into the balance.  Please consider giving the

8    Yes Solutions community this opportunity at a time when the

9    economic pressures on us are incrementally greater than on

10   many other segments of society.

11          Thank you for hearing me, your Honor.

12          THE COURT:  Thank you for coming.

13          MR. VINEGRAD:  The next speaker is Evelyn, E V E L

14   Y N, Graham.

15          MRS. GRAHAM:  I am Evelyn Graham, and I thank you

16   for the opportunity to speak to you about my husband, Rob

17   Graham.

18          This man who appears before you today is the man I

19   have chosen to share my life with for 37 years.  I not only

20   love Rob with all my heart, I deeply respect and admire him.

21          Rob and I met in college.  It was the late '60's.

22   Like many idealistic students of the time, we were going to

23   change the world.  And, clearly, we didn't do that, but Rob

24   did change the lives of many people he met over the years

25   for the better.

1        From the moment I met Rob, I felt his commitment

2    and passion, and I witnessed his integrity and leadership.

3    I watched with pride as he served as President of the

4    Student Government Association, demonstrating remarkable

5    skill in walking a tight rope between students and faculty

6    during the 60's, a time of considerable unrest.  Rob's duty

7    was to his fellow students, but he knew he could only serve

8    them by doing what was right.  He owed his success, in no

9    small measure, to the tremendous respect that he earned, not

10   just from the students, but from the faculty and the

11   administration.  Like me, your Honor, they admired Rob's

12   honesty, his integrity, and his willingness to speak his

13   mind.

14        As it turns out, these qualities were and are the

15   essence of Rob's life, whether taking a stand against the

16   Attorney General of Delaware for the unfair treatment of his

17   staff, or helping to revitalize our inner city Delaware

18   community, or serving as an elected official to protect and

19   promote our small Connecticut town, or fighting on behalf of

20   the industry he loves to this day, Rob approached each of

21   these responsibilities with honesty and integrity, never

22   setting aside his principles to serve his own needs.  To the

23   contrary, Rob has always put the needs of others ahead of

24   his own, volunteering to spend late nights working at Meals

25   on Wheels, hosting a fundraiser to help a friend with

1         Parkinson's disease, being by a friend's side after a

2         devastating car accident, giving guidance to a young college

3         graduate that he'd never met, or going out of his way to

4         make sure that his mother wasn't alone on holidays.  Rob

5         always looked out for others first and foremost.

6         Your Honor, even when it wasn't easy or popular, I

7         know that Rob committed to doing the right thing.

8         Obviously, I'm not privy to everything that transpired

9         between Rob and his clients, but over the years I saw and

10       heard enough to make it clear to me that Rob didn't win many

11       popularity contests at his company because of his insistence

12       that rules and principles had to be followed regardless of

13       the economic consequences.  I can't imagine Rob being any

14       other way.  He's a man whose worked hard his whole life,

15       never seeking glory or personal acclaim.

16       For the past 37 years, Rob and I have stood

17       together.  We've lived together, laughed together, cried

18       together, fought together, and endured together.  Through

19       the good times and bad, I have always wanted this man by my

20       side.  Of course, I can't claim our marriage is perfect.

21       Truth be told, these past few years have been the toughest

22       of our lives.  Ironically, though, they've proven to be some

23       of the most meaningful.  Through all of the uncertainty and

24       soul searching, I've gotten to see the true character of

25       this man.  I've watched with admiration as he's carried

1    himself with strength and dignity through these devastating

2    events.

3              I remember the day, October 26, 2005, Rob met with

4    his lawyer and learned that the Government intended to

5    charge him with a crime. He was devastated. He cried. And

6    quickly seemed to shrink before my eyes. But, your Honor,

7    just as quickly, I saw him put aside his own pain to comfort

8    and to protect me. Despite all that swirls around him, Rob

9    continues to put my needs and those of his friends and

10   family before his own, and he never blames others for his

11   current prediction amount. Rob certainly has his faults,

12   but I know now more than ever, that the core of this man,

13   the fundamental traits that I fell in love with and still

14   love to this day remain strong. But I also know that

15   despite his stoicism, Rob suffers tremendously.

16              Your Honor, while Rob is devoted to family and

17   friends, he was passionate about being a lawyer. Even

18   before I met him, Rob knew what he wanted to do, and for 35

19   years he lived and loved being a lawyer. For 35 years he

20   worked hard to build an impeccable reputation for serving

21   his clients with honesty and integrity. For Rob being a

22   lawyer wasn't just a job, it defined him as much as any job

23   can define a person. Rob knows those days are gone forever.

24   He's not only lost his career, but his reputation is

25   shattered. No matter how many people come forward to remind

1    Rob of the man they know him to be, no matter how many

2    friends and colleagues stood by his side during the trial,

3    no matter how much I remind him of all of the good that he's

4    done and accomplished, all Rob sees is his role in the

5    events that bring him here today.  Every day, for the three

6    and a half years of this ordeal, Rob has relived his role in

7    this one transaction.  He will never stop thinking about it

8    and nothing will ever make his anguish, torment, and regret

9    go away.  Those feelings haunt Rob from morning till night,

10   and they will continue to do so for the rest of his life.

11            Your Honor, in sentencing my husband, I beg you to

12   take the full measure of this man, the many good deeds he's

13   done, his service to his friends, family and community, and

14   the devastation he suffered and will continue to suffer for

15   the rest of his life.

16            Your Honor, I beg for mercy and compassion.

17            Thank you.

18            THE COURT:  Thank you.

19            Mr. Vinegrad, does Mr. Graham care to address the

20   Court?

21            MR. VINEGRAD:  Yes, he does.

22            THE DEFENDANT:  Your Honor, over the last four

23   years I've been sustained by the tremendous love and support

24   that I've received from family and from friends.  In

25   addition to those who have already spoken, some of those

1    friends are in the courtroom today.  I'm grateful for their

2    support, but I'm also very embarrassed and ashamed that the

3    reason they're here is because I stand before you to be

4    sentenced after conviction of some very serious crimes.

5         I'm old-fashioned.  Concepts like honor and shame,

6    service and duty, integrity and truth, are important to me.

7    I've always tried to help people and to do the right thing

8    in all of my dealings, personal and professional.  The

9    jury's verdict says that I've failed that standard

10   profoundly, and I've suffered severe consequences as a

11   result of that profound failure.

12        From a very young age, I always wanted to be a

13   lawyer.  I was privileged to become one, and for more than

14   30 years to work for and with some very good lawyers in a

15   variety of settings, in government, in private practice, and

16   in-house at a reinsurance company.  In a very real sense, I

17   always defined myself by the way I practiced my profession

18   and the way I did my job as a lawyer.  Over time I developed

19   a good reputation in the legal profession and in the

20   insurance and reinsurance business.  Being known as an

21   honest and reputable lawyer meant everything to me.  It gave

22   me peace of mind to know that I had the respect of my

23   colleagues and clients, and a reputation among them for

24   always doing the right thing.  That's all gone now.

25        Instead of my career and reputation as a lawyer

1    serving as a good example to others, as a disgraced and
2    disbarred lawyer they will serve only as a cautionary tale.
3    I'll never been able to practice the profession I love
4    again, I'll never be able to work in the insurance and
5    reinsurance business again.

6         As for peace of mind, for the past four years
7    there hasn't been a waking hour of any day that I haven't
8    thought about the AIG transaction and my role in it and what
9    I could or should have done differently.  I suspect that
10   will be true for the rest of my life.

11        I realize there are no do-overs in life.  Nothing
12   I can say or do now would change what has happened or its
13   impact on the lives of others or on me.  Your Honor, I
14   regret that more than words can adequately express.

15        Thank you.

16        THE COURT:  Thank you, Mr. Graham.

17        Anything else you had, Mr. Vinegrad?

18        MR. VINEGRAD:  No, your Honor.

19        THE COURT:  We'll take a short recess at this

20   time.

21        (Recess.)

22

23

24

25

1           THE COURT:  We are now ready to turn to the

2     imposition of the sentence.

3           Before we begin, I'd like to state the factors

4     that a District Court must take into consideration in

5     determining a particular sentence to be imposed under the

6     federal sentencing statute, which is 18 U.S. Code Section

7     3553(a).

8           And those factors are:

9           The nature and circumstances of the offense and

10    the history and characteristics of the defendant;

11          The need for the sentence imposed to serve the

12    various purposes of a criminal sentence, which I'll review

13    in a moment;

14          The kinds of sentences available;

15          The kinds of sentence and the sentencing range

16    established for the applicable category of offense committed

17    by the applicable category of defendant as set forth by the

18    Sentencing Guidelines I'm to consider today, as well as any

19    pertinent policy statement in those guidelines; and

20          The need to avoid unwarranted sentence disparities

21    among defendants with similar records who have been found

22    guilty of similar contact; and

23          Lastly, the need to provide restitution to any

24    victims.

25          Also, I must consider the U.S. Sentencing

1    Guidelines and their policy statements in determining

2    Mr. Graham's sentence. However, I'm not bound by those

3    guidelines. In other words, I may give him a sentence

4    within a guidelines range or outside of that range. I'm

5    also mindful of the guidance the U.S. Court of Appeals has

6    given the District Courts in United States v. Cavera

7    concerning our consideration of the U.S. Sentencing

8    Guidelines as well as the factors under 18 U.S. Code Section

9    3553(a).

10          I must also take into account the following

11   factors in arriving at the sentence for Mr. Graham. In

12   determining whether to impose a fine, and the amount of the

13   fine and how it would be paid, that is, as a lump sum or in

14   installments, as part of this particular sentence, I must

15   consider the factors set forth at 18 U.S. Code Sections

16   3553(a) and 3572. In determining whether to impose a term

17   of probation, its length and its particular conditions, I

18   must consider the factors set forth at 18 U.S. Code Section

19   3562 and 3553(a). In determining whether to impose

20   restitution and how it would be paid as part of a particular

21   sentence, I must consider the factors set forth at three

22   statutes, 18 U.S. Code Section 3663, 3663A and 3664. And in

23   determining whether to impose a term of supervised release

24   following any period of incarceration, including its

25   particular length and its particular conditions, I must

1    consider the factors set forth at 18 U.S. Code Sections
2    3553(a) and 3583.
3         And while I have taken into account all those
4    factors, I'll explain more particularly how I've reached a
5    decision as to the appropriate sentence for Mr. Graham.
6         First of all, I have reviewed the the Presentence
7    Report and its addenda prepared by the Probation Office.
8         I've considered counsel's memos, their remarks,
9    the letters that I have received, the defendants remarks,
10    and the other peoples remarks that I heard in this hearing
11    today.
12         I've also taken into account the need for this
13    sentence to serve the various purposes of a criminal
14    sanction.  Under 18 U.S. Code Section 3553, I am required to
15    impose a sentence sufficient, but not greater than
16    necessary, to comply with the purposes of sentencing for
17    which I will review now.  First and foremost among those
18    purposes is to provide just punishment.  Part of the meaning
19    of a just punishment is that it not be unduly different from
20    sentences received by defendants with similar records who
21    have been convicted of similar conduct.  A criminal sentence
22    also could protect the public by immobilizing an offender
23    and isolating him from society, thus, absolutely protecting
24    society during the period of incarceration.  Another
25    function of a sentence is specific deterrence.  Namely, to

1      make sure that Mr. Graham will not again commit a crime

2      after he completes his sentence here.  Another purpose is

3      general deterrence.  And that is to promote respect for the

4      law and to warn others who might be tempted to act as Mr.

5      Graham did, that the community, represented by the law

6      enforcement authorities and by the courts, treats these

7      offenses seriously and will punish others who behave as he

8      did.  And finally, I have thought about the goal of

9      rehabilitation for Mr. Graham as well.

10             Now, as to departures from the guidelines, I

11     recognize that I have the authority to depart downward

12     because of Mr. Graham's personal history and

13     characteristics.  I've chosen, however, to address these

14     characteristics in the context of a non-guidelines sentence.

15             I also have the authority to depart on the basis

16     that the offense level substantially overstates the

17     seriousness of the offense.  Again, I have, however, chosen

18     to address this in the context of a non-guidelines sentence.

19             As to the request concerning the cumulative

20     affects of substantially overlapping enhancements, the

21     Second Circuit in United States v. Lauersen held that

22     district courts may depart when substantially overlapping

23     enhancements result in a significant increase in the

24     sentencing range to an extent not adequately considered by

25     the Sentencing Commission.  There is no basis for a

1     departure on those grounds in this case.  The Commission

2     certainly contemplated the combination of levels for loss,

3     in this case 30, and the 6 level enhancement for more than

4     250 victims.  The combination of the base offense level with

5     those two factors alone results in an offense level of 43

6     and a guideline sentence of life imprisonment.  The addition

7     of two levels for sophisticated means and two levels for use

8     of a special skill have no effect on Mr. Graham's guideline

9     sentence range.  Of course, I still will consider this

10    argument in the context of considering and applying the

11    factors under 18 U.S. Code Section 3553(a).

12         Now, as to aberrant behavior, Section 5K2.20 of

13    the Sentencing Guidelines gives the court the discretion to

14    depart in an extraordinary case where the defendant's

15    criminal conduct constituted aberrant behavior.  The Court

16    may exercise this discretion to depart for aberrant behavior

17    only where the offense is a single criminal occurrence or

18    single criminal transaction that (A) was committed without

19    significant planning; (B) was of limited duration; and (C)

20    represents a marked deviation by the defendant from an

21    otherwise law-abiding life.

22         Mr. Graham argues that he spent only a few hours

23    on the LPT, and merely filled in a boilerplate contract and

24    reviewed a letter drafted by others.  In reality, however,

25    Mr. Graham worked on several stages of the LPT deal over a

1        period of at least six months.  His behavior was not

2        aberrant, and therefore this departure is inapplicable.

3               Of course, the Court will consider this

4        information in the context of a non-guidelines sentence,

5        though.

6               As to his claim that he was not motivated by

7        personal gain, the Court has chosen to address this argument

8        in the context of a non-guidelines sentence.

9               As to the argument concerning collateral

10       consequences, the Court finds that a departure is not

11       warranted because of the potential collateral consequences

12       of Mr. Graham's loss of his law license and the significant

13       financial and other regulatory penalties he may face, as

14       well as the other personal consequences.  Of course, the

15       Court will consider this information also in the context of

16       a non-guidelines sentence.

17             As to the argument the Sixth Amendment requires a

18       jury determination as to the amount of loss and the number

19       of victims, I do not read Booker or Rita to require under

20       the Sixth Amendment a jury determination as to the amount of

21       loss or the number of victims.

22             Although I recognize that I have the authority to

23       depart on other bases not identified by counsel, I choose

24       not to do so as the facts do not warrant it here.

25             However, after considering the application of the

1    United States Sentencing Guidelines as well as the factors

2    set forth in 18 U.S. Code Section 3553(a), I have decided to

3    give Mr. Graham a non-guidelines sentence.

4         An important factor here that is different from so

5    many other corporate fraud prosecutions is that Mr. Graham

6    did not personally gain in a direct way from his criminal

7    conduct, and his motivation was not one of obtaining direct

8    personal gain.  Mr. Graham's lack of direct personal gain

9    and his motivation for this criminal enterprise certainly

10   does not excuse his conduct and perhaps does not warrant a

11   departure from the offense level under the Sentencing

12   Guidelines.  But, surely, it is relevant under the federal

13   sentencing statute.

14        There was substantial loss caused to AIG

15   stockholders here, over 500 million dollars.  And Mr. Graham

16   was aware of how harmful his conduct could be to the

17   integrity of the market.  His intent, though, was different

18   from the typical fraud defendant, which is to make money

19   personally and directly from the illegal conduct.  Mr.

20   Graham's intent satisfied the criminal offenses here.  He

21   knew that the 500 million dollar loss portfolio deal was

22   important to AIG as well as to Gen Re and, if discovered,

23   would have a substantial negative effect on AIG as well as

24   Gen Re.  He also had a substantial role in creating the

25   phony documents supporting the LPT.  But, there is a

1    difference in the conduct here and Mr. Graham's motivation

2    should be relevant under the federal sentencing statute.

3         The Court is also mindful of the Second Circuit's

4    recent guidance in United States v. Cutler, which held that

5    District Courts should not conflate an evaluation of the

6    defendant's role in the defense with an evaluation of

7    whether the amount of loss substantially overstates the

8    seriousness of the offense when the actual gain by the

9    defendant was minimal in relation to the loss.  Surely, Mr.

10   Graham played an important role in the fraud here.  However,

11   unlike Cutler, Robert Graham's motive here was not direct,

12   immediate personal gain, and he did not directly gain from

13   the fraud in an immediate fashion.  As the Second Circuit

14   more recently acknowledged in the U.S. v. Cavera case, even

15   when an offense caused a large financial impact, there still

16   may be a wide variety of culpability amongst defendants that

17   counsels different sentences based on the factors identified

18   in 3553(a).

19        Mr. Graham's participation in this fraud was

20   important to its success, however.  He served as the only

21   lawyer creating and reviewing the legal documents which

22   would be examined by auditors of Gen Re and AIG.  He

23   approved the fake offer letter which made it look like Gen

24   Re proposed the transaction to AIG.  He suggested the method

25   of structuring the transaction to help conceal it, and he

1       drafted the actual sham contracts. Mr. Graham knew no

2       outside counsel would review his work, and agreed with his

3       co-conspirators to limit the number of people involved in

4       the LPT so as to keep its fraudulent nature hidden. He knew

5       full well that AIG, a public company, would misrepresent the

6       fraudulent nature of the LPT, and his legal work was

7       important to that concealment. He didn't want others to

8       connect the dots here, knew that regulators would attack the

9       deal if they found out about its true nature, knew there was

10      no real risk transfer, knew that AIG had issues with

11      regulators reviewing the LPT, and told his general counsel

12      at Gen Re that how AIG books the LPT is between them, their

13      accountants, and God. This was hardly the kind of conduct

14      or ethics a lawyer should follow.

15              Like with the other defendants in this case,

16      though, this is also a sad day and a tragedy for Mr. Graham.

17      By all accounts, he had a strong reputation as an honest,

18      ethical lawyer. So many of his colleagues, both at the bar

19      and in business, spoke and wrote of his integrity and

20      fairness, his counseling of junior lawyers and executives,

21      and at times he would stand up for what is right. He also

22      has already suffered a great deal, not only in his

23      reputation among his family and friends, but also because of

24      the end of what otherwise was a fine legal career and the

25      loss of a hard earned profession.

1         Mr. Graham also has a fine record of service to
2    his community, serving, by all accounts, as a distinguished
3    member of the Westport Planning and Zoning Commission and
4    its Board of Finance.  He has devoted considerable time to
5    the Delaware Avenue Commission Association, Meals on Wheels,
6    and as a teacher of reinsurance law to professional and
7    business associations.  Mr. Graham has also been a good,
8    loyal and helpful friend and neighbor to so many.  I have
9    received numerous letters detailing his help to others in
10   need without looking for any public recognition.
11        In addition, although I have concluded that Mr.
12   Graham does not merit a role adjustment here, his
13   participation in the LPT was not as deep as some others.  He
14   was important to its success, but in comparing him to some
15   of its other participants, he did not have as active and as
16   central a role.
17        Some of the other factors in the federal
18   sentencing statute also support a non-guidelines sentence,
19   including the goal of specific deterrence.  The sentence of
20   life imprisonment or any sentence near that is far too great
21   for that purpose.  There's no question that general
22   deterrence is also an important consideration for this
23   sentence, but the sentence called for by the Guidelines is
24   excessive for that purpose as well.  A message must be sent
25   to the business community, including those lawyers who

1    counsel that community, that this kind of conduct will not
2    be tolerated and will be punished severly, but the
3    Guidelines sentence called for here is too severe to address
4    that goal. I believe the sentence I will impose today
5    satisfies those elements of specific and general deterrence
6    as it constitutes a significant deprivation of freedom for
7    Mr. Graham and sends the appropriate message to those
8    similarly situated to him.

9         It must also be stated that Mr. Graham is not
10   responsible for the difficulties AIG has faced within the
11   last year or so. It would be unfair to hold him accountable
12   for all the recent bad news about AIG. This criminal
13   conduct was much before those events, but we expect and
14   require much more from our business leaders, and Mr. Graham
15   fell far short of discharging his responsibilities to the
16   investing public.

17        In arriving at a particular sentence here, the
18   Court has consulted many similar cases for guidance. In
19   many ways, though, this case is different. Such sentencings
20   in cases like Enron, Adelphia, Worldcom, Cendant, Adelson,
21   Parris, including the cases referred to in Parris, Bennett,
22   Surgent, Earls, Olis, Cushing, Grabske, Reyes, Salinger and
23   Argo provide some points of reference for arriving at a
24   sentence that satisfies the federal sentencing statute.
25   However, there are distinguishing characteristics, as I have

1    mentioned.  I have arrived at a particular sentence in

2    consideration of all that, but I've also given due

3    consideration to particular aspects of this case, Mr.

4    Graham's participation in it, and the individualized

5    application of factors under the federal sentencing

6    statute.

7         The Supreme Court in <u>Gall v. United States</u>

8    instructed District Courts that they must give sufficient

9    justification for a major departure from suggested

10   guidelines sentencing ranges.  I will impose a sentence

11   which is such a significant deviation from the range here,

12   but the Court has consulted all the decisions mentioned

13   previously and, in applying the factors of 18 U.S. Code

14   Section 3553(a), arrived at the sentence I will now impose.

15        Mr. Graham, would you please stand at this time.

16        Mr. Graham, I hereby sentence you to the

17   following:

18        As to incarceration, to the custody of the United

19   States Bureau of Prisons for a period of 12 months and one

20   day on each count of conviction, all sentences of

21   incarceration to be concurrent.

22        I'm also sentencing you to a term of supervised

23   release of two years on each count of conviction, also to be

24   concurrent.

25        As conditions of supervised release, I order the

1      following:

2          The mandatory conditions at Guideline Section

3      5D1.3(a)(1),(2),(5),(6) and (8);

4          The standard conditions of supervised release set

5      forth in the Policy Statement at Guideline Section 5D1.3(c),

6      except for condition (13); and

7          The special condition of supervised release which

8      prohibits you from possessing a firearm or other dangerous

9      weapon.

10          If you violate any of these conditions during your

11      period of supervised release, the court will be free to

12      sentence you to additional time in prison of as much as two

13      years.

14          As to a fine, I'm imposing a fine of $100,000.

15          The court hereby directs that the Probation Office

16      provide Mr. Graham with a written statement that sets forth

17      all of the conditions of his supervised release.  And that

18      statement should be sufficiently clear and specific so that

19      it may serve as a guide for his conduct.

20          As to forfeiture, the Court ordered a final order

21      of forfeiture as to all the defendants on December 31, 2008.

22          Mr. Graham shall pay the mandatory special

23      assessment of $1600 which is due and payable immediately for

24      his counts of conviction.

25          And is there a request for a recommendation to the

1          Bureau of Prisons, Mr. Vinegrad?

2                  MR. VINEGRAD:  The Otisville Minimum Security

3          Facility.

4                  THE COURT:  Is there any objection to that, Mr.

5          Patricco?

6                  MR. PATRICCO:  No, your Honor.

7                  THE COURT:  I'll make that recommendation.

8                  MR. VINEGRAD:  Thank you.

9                  THE COURT:  The judgment of the court will be

10         prepared for my signature by the Clerk's Office in

11         consultation with U.S. Probation Office.

12                 Mr. Graham, I need to advise you of your appeal

13         rights.  I inform you that you or Government have the right

14         to appeal within ten days the convictions and sentence that

15         I've just imposed.  If you cannot afford to pay for the cost

16         of an appeal, you have the right to apply for leave to

17         appeal in forma pauperis.  That is, the court will allow you

18         to appeal and to use the services of an attorney at no cost

19         to you if you cannot afford to pay for one yourself.

20                 Do you understand that, Mr. Graham?

21                 THE DEFENDANT:  Yes, your Honor.

22                 THE COURT:  Is there a request for voluntary

23         surrender in this case, Mr. Vinegrad?

24                 MR. VINEGRAD:  Yes, there is.

25                 THE COURT:  How has he done during the course of

1    his presentence release, Mr. Topor?

2                MR. TOPER:  There has been no issues, your

3    Honor.

4                THE COURT:  How does the Government feel about

5    that?

6                MR. PATRICCO:  No objection, your Honor.

7                THE COURT:  I hereby find that release pending the

8    execution of the sentence is appropriate in this case

9    pursuant to 18 U.S. Code Section 3143(a).

10               Accordingly, the application for voluntary

11   surrender is granted.

12               Mr. Graham, I hereby order that on June 3, 2009,

13   you are to surrender yourself to the federal correctional

14   facility designated by the United States Bureau of Prisons

15   or as such other place as the United States Marshal Service

16   may direct.  If you fail to surrender for service of your

17   sentence, you face an additional ten year term of

18   imprisonment to be served consecutively to the sentence I've

19   just ordered or an additional fine or both sanctions.  Do

20   you understand that too?

21               THE DEFENDANT:  Yes, your Honor.

22               THE COURT:  Is there a request for release pending

23   appeal?

24               MR. VINEGRAD:  Yes, there is.  My understanding,

25   based on prior discussions, is the Government does not

1            object.

2                        THE COURT:  Is that correct?

3                        MR. PATRICCO:  That's correct, your Honor.  We do

4            not object.

5                        THE COURT:  I'll grant that request as well.

6                        I also order that a corrected of the PSR be

7            provided to the U.S. Bureau of Prisons and the U.S.

8            Sentencing Commission, that other copies of the PSR remain

9            confidential, and that if an appeal is taken, counsel be

10           permitted access to the PSR.  Under Local Rule 32(j), a copy

11           of the PSR also shall be made part of the court record, but

12           shall be placed under seal.  If a notice of appeal is not

13           filed, the Clerk's Office shall return the report to the

14           Probation Office.

15                       Is there anything else to take up concerning Mr.

16           Graham today, Mr. Patricco?

17                       MR. PATRICCO:  No, your Honor.

18                       THE COURT:  Or Mr. Vinegrad?

19                       MR. VINEGRAD:  No, your Honor.

20                       THE COURT:  We'll be in recess.

21                            (Recess.)

22

23

24

25

1                           C E R T I F I C A T E

2

3                   I, Martha C. Marshall, RMR, CRR, hereby certify

4          that the foregoing pages are a complete and accurate

5          transcription of my original stenotype notes taken in the

6          matter of UNITED STATES V. ROBERT GRAHAM, which was held

7          before the Honorable Christopher F. Droney, U.S.D.J, at 450

8          Main Street, Hartford, Connecticut, on April 30, 2009.

9

10

11

12                                    /s/_____
                                      Martha C. Marshall, RMR,CRR
13                                    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25