# Walden Macht & Haran LLP



One Battery Park Plaza, 34th Floor
New York, NY 10004
212 335 2030

December 21, 2018

**Via CM-ECF**

Honorable Valerie E. Caproni
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

   Re: *United States v. Alain Kaloyeros, et al.,* No. S2 16 Cr. 776 (VEC) (S.D.N.Y.)

Dear Judge Caproni:

  We represent Joseph Gerardi in the above-referenced matter.  We write in reply to the Government's December 14, 2018 letter opposing Mr. Gerardi's motion for bail pending appeal.

  The Government's opposition contains several fatal flaws, which are discussed below.

**I.  Bail Pending Appeal May be Granted Based on Prejudicial Spillover**

  The Government does not dispute that prejudicial spillover can, and regularly does, require vacatur of convictions.  Nevertheless, it contends that prejudicial spillover somehow can never justify bail pending appeal.  *See* Gov't Letter at 3 (asserting that "a prejudicial spillover argument, on its own, is not sufficient to meet the standard for bail pending appeal").  That argument finds no support in the caselaw, statutory language, or common sense.

  The Government's argument rests entirely on *United States v. Randell*, 761 F.2d 122 (2d Cir. 1985).  That reliance is misplaced.  In *Randell*, the Second Circuit's denial of bail pending appeal was limited to "*this* spillover argument," not *all* spillover arguments.  761 F.2d at 126 (emphasis added; quotations omitted).  The Government does not cite a single case that has interpreted *Randell* as creating a categorical exception for prejudicial spillover arguments, or a case that has applied such a categorical exception itself.[1]  That is because no such exception exists.  *See, e.g., United States v. Reed*, No. 15-CR-100, 2017 WL 947274, at *4 (E.D. La. Mar. 9, 2017)

---

[1] Nor could we find any.  On those occasions where courts reject bail pending appeal arguments premised on prejudicial spillover, they do so because of the weakness of the potential spillover in that particular case, not because of a categorical rule.  *See, e.g.*, *United States v. Sturman*, No. 96-CR-318 (BSJ), 1999 WL 305094, at *2 (S.D.N.Y. May 14, 1999); *United States v. Munchak*, No. 3:10-CR-75, 2012 WL 1078842, at *9 (M.D. Pa. Mar. 30, 2012).

1

(granting bail pending appeal based on spillover prejudice); *United States v. Alfonso-Reyes*, 427 F. Supp. 2d 41, 46 (D.P.R. 2006) (same).[2]

The very nature of the analysis commanded by *Randell* would reject the categorical rule advanced by the Government. *Randell* requires that, where a defendant has identified a "substantial" question, he is entitled to bail by showing that if "that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed." *Id.* at 125. There is no reason for excluding questions of spillover prejudice from this analytical framework. Nor does the Government offer any. Where, as here, the Court of Appeals may reverse or vacate each count of conviction, bail pending appeal is mandated under 18 U.S.C. § 3143(b) regardless of the reason underlying the reversal/vacatur.

## II. Bail Pending Appeal is Required in this Case Because of Prejudicial Spillover

The Government argues that the question of spillover prejudice in this case is not substantial. That is incorrect. In order to conclude that a question is substantial, the Court need not find that it erred, or that reversal is the most likely outcome on appeal. *Randell*, 761 F.2d at 124-25. The Court need only find that the question has "more substance than would be necessary to a finding that it was not frivolous," in other words it is "close" or "fairly debatable." *Id.* at 125. The prejudicial spillover question in this case easily satisfies that standard.

"[W]hen evaluating taint or spillover effect, courts have applied a test somewhat favorable to the defendant." *United States v. Murphy*, 323 F.3d 102, 122 (3d Cir. 2003). The operative inquiry is whether the court is "*unable* to conclude that [Gerardi's] conviction on the [] § 1001 count[] did *not* result from a spillover from" the evidence and arguments on the reversed wire fraud and conspiracy counts. *United States v. Rooney*, 37 F.3d 847, 857 (2d Cir. 1994) (emphasis added).[3] Because one cannot rule out such prejudice, vacatur is required. At the very least, the ability to rule it out is fairly debatable, thus warranting bail pending appeal.

"In evaluating a claim of prejudicial spillover of evidence from an invalidated count, courts look to several factors in determining whether the totality of the circumstances requires reversal of some or all of the remaining counts." *Id.* at 855. Those factors, individually and collectively, compel a finding of prejudicial spillover in this case.[4] At a minimum, they make such a finding debatable.

---

[2] *See also United States v. Rooney*, 37 F.3d 847, 850 (2d Cir. 1994) (bail pending appeal granted where false statement counts vacated due to prejudicial spillover).

[3] *See also United States v. Berkery*, 889 F.2d 1281, 1286 (3d Cir. 1989) ("Because we cannot say that the jury could *not* have used the admission of guilt required by the pre-Mathews rule to convict Berkery of the substantive offenses, we will reverse the district court's denial of the motion and remand for a new trial on Counts 2-14 as well." (emphasis in original)).

[4] Importantly, a defendant may establish prejudicial spillover based solely on one factor. *See United States v. Bruno*, 383 F.3d 65, 91 (2d Cir. 2004) (vacating false statement conviction due to strength of one factor).

1. <u>The Wire Fraud and Conspiracy Counts Impacted the False Statement Count</u>

The first factor courts consider is whether the reversed counts would have tended to incite or arouse the jury into convicting the defendant on the remaining count. *Id.* This factor cuts strongly in Mr. Gerardi's favor. Without the reversed wire fraud and conspiracy counts, the trial would simply have been about whether Mr. Gerardi's statement regarding tailoring was false. The lawfulness of the alleged tailoring would not have been in question, and -- given the lack of wire fraud charges, the absence of procurement rules, and the practice of developers shaping RFPs on which they bid -- the jury would have had no basis for assuming any underlying illegality. This is critically important for two reasons. First, absent a claim that the alleged tailoring was illegal, the jury would have been far less likely to infer that Mr. Gerardi had intended to lie about it. Indeed, a rational jury would have had reasonable doubt as to Mr. Gerardi's intent to lie if there had been no crime to conceal. *See United States v. Poindexter*, 727 F. Supp. 1470, 1475 (D.D.C. 1989) ("Evidence regarding the absence of motive is usually admitted to negate specific intent." (citations omitted)).[5]

Second, the constant invocation of fraud and conspiracy throughout the trial necessarily tainted the jury's view of the false statement count and had the natural effect of inciting and arousing its ire. *Old Chief v. United States*, 519 U.S. 172 (1997), is instructive on this point. In *Old Chief*, the Supreme Court noted how, in order to "convince the jurors that a guilty verdict would be morally reasonable," the prosecution will seek "not just to prove a fact but to establish its human significance." 519 U.S. at 187-88. Here, the "human significance" of the alleged RFP tailoring would have been radically different without the wire fraud and conspiracy allegations: such tailoring would have been perceived as relatively mundane business discussions relating to a procurement process, rather than a sinister attempt to cover up a criminal scheme.

Moreover, the Government's presentation of the wire fraud and conspiracy counts heightened their inherent prejudice. As in *Rooney*, the Government's depiction of Mr. Gerardi with respect to the alleged scheme to defraud "had a decidedly pejorative connotation that was of the sort to arouse the jury." *Rooney*, 37 F.3d at 856. In *Rooney*, the Second Circuit found such a connotation (thus supporting the first prejudice factor) from a single statement by the prosecution: "Mr. Rooney was trying to take advantage of people who were less able to control their own destiny than he was, and he should be found guilty of the offenses charged." *Id.* The June Trial featured countless statements by the prosecution that were far more pejorative than this. For example:

- "These men did not want to play by the rules. They were not willing to play fair or honest. They did not want to give anyone else a fair shot at these projects, at the millions and millions of dollars being offered up by the State of New York, so they wired it. They used their inside guy, Alain Kaloyeros, to make sure that they all got what they wanted, and they committed fraud." Tr. 2531.

---

[5] A trial on the false statement count alone would have required a very different defense strategy, including one that emphasized the absence of motive. This further supports a finding of prejudicial spillover. *See Murphy*, 323 F.3d at 118 (a factor in determining presence of prejudicial spillover is whether "the elimination of the invalid count significantly changed the strategy of the trial" (quotations omitted)).

3

- "[T]hese men, the men sitting at these tables -- Kaloyeros, Ciminelli, Aiello, and Gerardi -- they could not hide what they did. They lied and deceived and committed fraud so that millions of dollars of state funds would find their way to their pockets. The State of New York trusted Alain Kaloyeros with all of that taxpayer money, and he abused that trust. Working with Todd Howe, Kaloyeros rewarded Howe's clients with that money. He made sure that the money went to their friends, or BFFs, as he called them. And he and those men, the men sitting behind me, committed a federal crime -- fraud -- to do it." Tr. 2434-35.

- "So the four defendants decided to trick and defraud the non-profit. And you'll learn that their scheme worked. And why did they do that? Why did they conspire together to cheat and corrupt the competition? Well the answer for Ciminelli, Aiello, and Gerardi is obvious: These state contracts were worth hundreds of millions of dollars to their companies." Tr. 38.

- "Kaloyeros, Ciminelli, Aiello, and Gerardi lied, cheated, and tricked the non-profit into giving their companies massive state contracts. And in doing so, they committed a federal crime called wire fraud." Tr. 39.

- "After you have heard all of the evidence, it will be clear to you the reason for all the secrecy, for all the lies. It is because the defendants defrauded the SUNY nonprofit and duped it into picking the defendants' companies, and the defendants lied because they knew what they were doing was wrong, and they didn't want to get caught." Tr. 49.

- "This is a case about lying and cheating to get huge state construction contracts worth hundreds of millions of dollars, all paid for by the taxpayers of New York. . . . Ciminelli, Aiello, and Gerardi schemed with Kaloyeros to rig the bid." Tr. 37.

If the lone reference to the defendant in *Rooney* as "trying to take advantage of people who were less able to control their own destiny than he was" was enough to incite or arouse the jury to convict on two false statement counts, so too were the highly inflammatory accusations against Mr. Gerardi relating to the wire fraud scheme. In fact, because the Government accused Mr. Gerardi of fraudulently obtaining contracts funded by taxpayers -- a group that included the jurors -- the tendency to incite and arouse was far greater here than in *Rooney*.

   2. A Trial on the False Statement Count Alone would have Featured a Much Different Set of Evidence

Second, courts assessing prejudicial spillover "look to the similarities and differences between the evidence on the reversed count and the remaining counts." *Rooney*, 37 F.3d at 855. Prejudice is more easily found where this evidence is neither identical nor completely distinct. *Id.* at 855-56. This case falls squarely within that sweet spot. Indeed, the false statement count was about tailoring -- the very conduct at issue in the wire fraud and conspiracy counts -- yet the vast majority of the evidence pertaining to those counts (including the most damning evidence) would be inadmissible with respect to the false statement count. *See id.* at 856 (finding prejudicial spillover where most of the evidence supporting the reversed count was inadmissible with respect

4

to the false statement counts); *United States v. Wright*, 665 F.3d 560, 575 (3d Cir. 2012) (vacating counts of conviction due to prejudicial spillover where "much of the evidence at this trial would be inadmissible at a hypothetical trial on [the non-reversed count] alone").

To recap, such inadmissible evidence includes: (1) the avalanche of documents and testimony relating to the Buffalo RFP (the bulk of the trial evidence), including Dr. Kaloyeros's email to Mr. Ciminelli that they needed to "fine tune the developer requirements to fit" (GX 321) and his email to Mr. Howe that "these are not unique to Lou's company.. we need more definite specs, like minimum X years in Y, Z number of projects in high tech, etc, etc" (GX 312); (2) the several days of testimony from Mr. Schuler about how he, Mr. Ciminelli, Dr. Kaloyeros, and Mr. Howe schemed to defraud Fort Schuyler of hundreds of millions of dollars in taxpayer-funded contracts; (3) the days of testimony and troves of documents about concealing conduct through email deletion, use of gmail, and disappearing Wickr messages; (4) the hours of testimony and numerous documents regarding the 50-year experience requirement in the initial Buffalo RFP, and Dr. Kaloyeros's claim that this was a typo; (5) the lengthy testimony and arguments regarding the Buffalo RFP's vagueness, which was allegedly intended to hide the fact that a project worth hundreds of millions of dollars (Riverbend) was up for grabs; (6) nearly an entire day of testimony from aggrieved Buffalo developers saying they felt the Buffalo RFP was rigged and Fort Schuyler was deprived of competition; (7) the numerous email exchanges and witnesses discussing LPCiminelli's purported selection of McGuire as the developer for the Center City project; (8) extensive testimony, emails, and arguments regarding Dr. Kaloyeros's and Mr. Howe's respective relationships with Governor Cuomo; (9) Dr. Kaloyeros's alleged lies to the public that Fort Schuyler followed state procurement procedures "to the letter" (Tr. 2454) and that Fort Schuyler had no relationship with Mr. Howe (Tr. 2455), and his alleged misrepresentations to Fort Schuyler that the RFP process was fair, open, and competitive; and (10) the incessant references to wire fraud and conspiracy to commit wire fraud.

By overwhelming the jury with inflammatory evidence of his alleged co-conspirators' alleged fraudulent conduct, lies, and efforts to conceal the truth, the Government made it far more likely that the jury would view Mr. Gerardi as a liar who lied to federal officers. Most of this evidence would not have been admitted at a trial on the false statement count alone.[6]

Further bolstering a finding of prejudicial spillover is the fact that "the prosecution encouraged the jury to consider the evidence on [the wire fraud and conspiracy counts] as bearing on [Mr. Gerardi's] culpability on" the false statement count. *Rooney*, 37 F.3d at 856. Indeed, the Government lumped all of the alleged co-conspirators' alleged lies and misconduct together as proof that they were all guilty of the crimes charged.[7] Moreover, the fact that the jury's verdict

---

[6] Mr. Gerardi need not show that all of this evidence was irrelevant. Rather, it is enough that the Court "likely would exclude some of it." *Wright*, 665 F.3d at 576.

[7] *See, e.g.*, Tr. 2464 ("Now, pause, think about all of these lies, all of the concealment, the destruction of evidence. These defendants lied repeatedly and they lied to everyone. These are not normal ways of doing business. This is what you do when you're trying to cover up your tracks. Why would people lie, why do they hide things, why do they cover things up? Because they know they did something wrong. And in this case, the lies, the concealment, the destruction of evidence by these defendants are proof positive that they knew what they were doing was wrong, and that they are guilty."); Tr. 49 ("After you have heard all of the evidence, it will be clear to you

5

was not selective supports the conclusion that the jury did not compartmentalize the evidence. *See United States v. Hamilton*, 334 F.3d 170, 183 (2d Cir. 2003) ("The absence of such spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others.").

    3.   <u>The Government's Case on the False Statement Count was Far from Overwhelming</u>

The third factor is "the strength of the government's case on the count[] in question." *Rooney*, 37 F.3d at 856. Where, as here, the case "was not overwhelming," vacatur due to prejudicial spillover is appropriate. *Id.* at 857.

As explained in our December 4 letter, the actual statement attributed to Mr. Gerardi regarding the denial of tailoring was as follows: "[Mr. Gerardi] stated that he did not ask for the RFP to be tailored to COR, nor did he feel as though it was tailored to COR." Tr. 1700. As an initial matter, the Government does not dispute that this is the only charged false statement. Other comments allegedly made by Mr. Gerardi during his proffer session may offer context to this statement, but they cannot form the basis of a false statement conviction. And the only proof cited by the Government of this statement's falsity is: (1) Howe's email to Messrs. Gerardi and Aiello asking them "what do you think?" regarding the draft Syracuse RFP (GX 606); (2) Mr. Gerardi's emailed feedback that "[i]t would be more flexible" if developers could submit not only audited financial statements, but also "other financial information/statements that demonstrate the DEVELOPER'S financial qualification" (GX 607); and (3) Mr. Gerardi's email saying, "Great, thank you," in response to Mr. Howe's confirmation that the financial statement provision was broadened as Mr. Gerardi had suggested (GX 646). Gov'n't Letter at 3. This is far from overwhelming evidence that Mr. Gerardi's statement was false.[8]

First, this evidence does not demonstrate that Mr. Gerardi "asked" for the RFP to be tailored. It shows that Mr. Howe asked for Mr. Gerardi's thoughts on the RFP, and that Mr. Gerardi responded by pointing out (correctly) that the RFP "would be more flexible" if the financial statement provision were slightly broadened.[9]

Second, the evidence does not show that Mr. Gerardi sought to tailor the RFP to COR. Just the opposite. As Mr. Gerardi noted in his handwritten comments on the RFP (GX 606), audited financial statements were "typically prepared for not-for-profits or public corp[orations]," rather than for private developers. The Government conveniently ignores this notation, which would

---

the reason for all the secrecy, for all the lies. It is because the defendants defrauded the SUNY nonprofit and duped it into picking the defendants' companies, and the defendants lied because they knew what they were doing was wrong, and they didn't want to get caught.").

[8] Indeed, the insufficiency of this evidence itself poses a substantial issue of fact on appeal, as discussed in Mr. Gerardi's December 4 letter.

[9] Both the Court and the Government have appeared to acknowledge that the alleged tailoring of the Syracuse RFP was not done at Mr. Gerardi's request. *See* Gerardi Sentencing Tr. (ECF No. 956) at 27-28 (noting the Court's "gut" sense that "this scheme originated with and was nudged along by Howe"); Kaloyeros Sentencing Tr. (ECF No. 961) at 16 (Government stating that "it was really Kaloyeros's plan to rig these RFPs").

apply to *all* private developers, not just COR. Far from rigging the RFP, the expansion of the financial statement provision increased competition by encouraging developers who might otherwise be deterred by the audited-financial-statement requirement to bid on the RFP.[10]

Finally, with respect to the last part of the alleged false statement, the Government does not dispute that its witnesses uniformly corroborated Mr. Gerardi's "feeling" regarding the RFP's lack of tailoring. *See, e.g.*, Tr. 1272 (Kevin Schuyler testifying that "for the most part" he found the RFP "to be entirely generic" and "it didn't look like there was anything unique"); Tr. 1007-08 (Joseph Schell confirming that he "didn't see anything in the [RFPs] that indicated that these were tailored for anybody"), Tr. 490 (Walter Barber confirming that the RFP "appeared not to be tailored to anyone"). Indeed, the Syracuse RFP was so generic, very similar language was used in RFPs issued throughout the state in regions where COR did not compete. *Compare* GX 203 (Syracuse) *with* GXs 1077 (Buffalo), 1074 (Marcy Nanocenter); DXs 4 (Rochester), 5 (Rensselaer), 6 (Plattsburgh).

These critical details were likely lost on a jury inundated over the course of several weeks with inflammatory allegations regarding completely separate lies, fraud, and corruption. When viewed without the prejudice and distraction of the wire fraud and conspiracy counts, it is clear that the evidence regarding the alleged falsity of Mr. Gerardi's statement was far from overwhelming.

\*   \*   \*

In sum, there is a substantial question as to whether the spillover prejudice from the wire fraud and conspiracy counts tainted Mr. Gerardi's conviction on the false statement count. Accordingly, bail pending appeal is warranted.

## III. The Government Misconstrues the Substantial Question Regarding its Improper Summation Argument

The Government does not dispute that, in its summation, it invited the jury to consider several uncharged statements as the basis for the false statement count. *See* Tr. 2464 (stating that these uncharged statements "were all lies told to the government to get away with fraud" and that "these lies were another crime"). Rather, the Government contends that "[i]t was entirely appropriate for the Government to reference those [uncharged alleged] lies and argue that they were circumstantial proof of Gerardi's knowledge of his own wrongdoing." Gov't Letter at 2 n.2. This completely misses the point.

The Government's summation was improper not because it referenced uncharged statements, or argued that those statements were lies, but rather because it told the jury that those statements "were another crime." This impermissibly "broaden[ed] the basis of conviction beyond that charged in the indictment," *United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992) (quotations omitted), and amounted to a constructive amendment. *Stirone v. United States*, 361 U.S. 212, 218

---

[10] Furthermore, as Mr. Gerardi explained in his proffer session, "COR Development could have easily obtained [audited financial statements] should they have had to," Tr. 1695, so the expansion of the financial statement provision hardly enabled COR's victory in the RFP process.

7

(1960). This misconduct is especially egregious given that just days before summations, Mr. Gerardi had warned of the impropriety of this exact conduct. *See* July 6, 2018 Letter (ECF No. 778) at 1 (explaining the impropriety of "arguing in summation that Mr. Gerardi's alleged false statements to federal officers consisted of anything beyond the denial that he helped tailor the Syracuse RFP to benefit COR").

The Government's attempt to expand the basis of conviction during its summation had an obvious impact on the jury. Indeed, in one of its few notes, the jury asked about one of the uncharged alleged statements the Government had said was "another crime," writing: "Can you please read us the testimony from Agent Kathleen Garver when she testified that Joe Gerardi told her that he was helping edit the RFP as a friend, rather than as a representative of COR?" Tr. 2926-27. That note was clearly prompted by the Government's summation, and not Agent Garver's testimony: the phrase as "a friend" was what the Government said in its summation (Tr. 2461); the actual testimony from Agent Garver was, "as an attorney and as a friend" (Tr. 1692).

### IV. The Government Misconstrues the Substantial Question Regarding its Misrepresentation that Mr. Gerardi was not a Target

The Government also misconstrues the substantial question regarding the prosecutorial misconduct that yielded the alleged false statement in the first place. The Government's response on this issue is that "[f]ederal law makes it a crime for individuals to make false statements to federal officers, 18 U.S.C. § 1001(a), and that proscription applies to everyone interviewed by the Government, regardless of whether the Government believes them to be targets, subjects, or simply witnesses." Govn't Letter at 2. Again, the Government misses the point. Mr. Gerardi's claim of misconduct goes not to what the Government believed, but the duplicitous clash between what it believed and what it represented to Mr. Gerardi in order to induce him (and his then-lawyer) to give a proffer. Notably, the Government does not cite a single case excusing such misconduct.

\*   \*   \*

In conclusion, because there are substantial questions regarding Mr. Gerardi's conviction on the false statement count, we respectfully request that the Court grant bail pending appeal.

Thank you for your attention to this matter.

Very truly yours,

WALDEN MACHT AND HARAN

By:   */s/ Milton L. Williams*

Milton L. Williams
Avni P. Patel
Jacob Gardener

Enclosures

cc:   all parties, via ECF